**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| **HONEYFUND.COM, INC.,** **CHEVARA ORRIN**, and **WHITESPACE CONSULTING, LLC D/B/A COLLECTIVE CONCEPTS, LLC**, | Case No. 4:22-cv-227 |
| | JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| **RON DESANTIS**, *in his official capacity as Governor of Florida*; **ASHLEY MOODY**, *in her official capacity as Attorney General of Florida*, **DARRICK MCGHEE**, *in his official capacity as the Chair of the Florida Commission on Human Relations,* et al. | |
| Defendants. | |

**<u>INTRODUCTION</u>**

1.     This lawsuit challenges Florida's use of state authority to stifle speech with which those in power disagree—a clear violation of the First Amendment of the United States Constitution.  The defining feature of the American constitutional system of government is that the government cannot establish orthodoxy of thought, either by mandating certain beliefs or by prohibiting disfavored ideas.

1

The State of Florida has blatantly violated these fundamental values of democracy, requiring swift and decisive action by this Court.

2.      House Bill 7, titled the "Individual Freedom Act," was enacted at Governor DeSantis's behest with the stated purpose to "fight back against woke indoctrination" and to "take on . . . corporate wokeness."[1]  Governor DeSantis originally called it the "Stop the Wrongs to Our Kids and Employees" or "Stop W.O.K.E. Act" (hereinafter the "Stop WOKE Act").  The Stop WOKE Act violates the First Amendment on its face by purporting to ban and impose liability for "promot[ing]," "endors[ing]," or "advanc[ing]" certain "concepts" disfavored by those in power, including based on whether the concepts make a listener "feel guilt, anguish, or other forms of psychological distress" about the relative privilege they enjoy in our society.

3.      While the Stop WOKE Act purports to combat discrimination, existing federal and state antidiscrimination law already prohibits speech that strays into actual discrimination with an adverse employment consequence.  With this bill, Florida seeks to go further and ban pure speech that its political leaders dislike.  That it cannot do.

---

[1] Press Release, Florida Office of the Governor, *Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations* (Dec. 15, 2021), https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations/.

4.      In fact, the Stop WOKE Act reads more like the policy of an authoritarian regime than a law passed in our American democracy.  The Stop WOKE Act aims to forward the government's preferred narrative of history and society and to render illegal speech that challenges that narrative.  It also seeks to muzzle independent institutions, including businesses, that are or might become centers of dissent.  And, in doing so, it attempts to direct public outrage toward disfavored minorities.

5.      Over the past several years, the American public has been engaged in an energetic discussion regarding the ongoing, entrenched effects of the Nation's recent history of formal and informal discrimination on the basis of race, gender, and sexual orientation. That disparities along these lines continue to exist in our society, and remain relevant in the workplace, is clear.  For example: Black Americans as a group suffer higher rates of unemployment[2] and homelessness[3], as well as lower rates of college education[4], average wages[5], and representation in

---

[2] Kristen Broady and Carl Romer, *Despite June's Positive Jobs Numbers, Black Workers Continue to Face High Unemployment*, THE AVENUE (Jul. 2, 2021), https://www.brookings.edu/blog/the-avenue/2021/07/02/despite-junes-positive-jobs-numbers-black-workers-continue-to-face-high-unemployment/.

[3] *Homelessness and Racial Disparities*, NATIONAL ALLIANCE TO END HOMELESSNESS (Oct. 2020), https://endhomelessness.org/homelessness-in-america/what-causes-homelessness/inequality/.

[4] Jon Marcus, *Racial Gaps in College Degrees are Widening, Just When States Need Them to Narrow*, THE HECHINGER REPORT (Aug. 13, 2021), https://hechingerreport.org/racial-gaps-in-college-degrees-are-widening-just-when-states-need-them-to-narrow/.

[5] Jillian Berman, *Black New Yorkers with a College Degree Earn $21,900 Less a Year than Their White Counterparts*, NEW YORK POST (Aug. 5, 2020), https://nypost.com/2020/08/05/black-new-yorkers-with-a-college-degree-earn-21900-less-a-year-than-their-white-counterparts/.

corporate management and leadership positions[6]; women on average continue to earn only a fraction of what their male counterparts earn[7], and they remain significantly underrepresented in the upper echelons of business[8]; and groups at the intersection of those characteristics face even greater challenges.[9]

6.      These ongoing vestiges of our history of discrimination take an economic toll on American businesses as well.  One source estimates that organizations that prioritize diversity, equity, and inclusion ("DEI") training are up to 21% more profitable than those that do not.[10]  One hypothesis that Plaintiffs subscribe to is that workplace discrimination results in economic harm by preventing employees from fully realizing their potential and employers from enjoying the benefits of that increased productivity.  It also interferes with the optimal allocation of talent.[11]  Understanding and addressing the causes of these persistent disparities in our society is thus of urgent importance.  While people of

---

[6] Laura Morgan Roberts & Anthony J. Mayo, *Toward a Racially Just Workplace* (Nov. 14, 2019) (noting that, at the time of publication, "8% of managers and 3.8% of CEOs [were] Black" and "[i]n Fortune 500 companies, there [were] currently only three Black chief executives, down from a high of 12 in 2002"), https://hbr.org/2019/11/toward-a-racially-just-workplace.

[7] Amanda Barroso and Anna Brown, *Gender Pay Gap in U.S. Held Steady in 2020*, PEW RESEARCH CENTER (May 25, 2021), https://www.pewresearch.org/fact-tank/2021/05/25/gender-pay-gap-facts/.

[8] *Women in the Workplace 2020: Corporate America Is at a Critical Crossroads*, MCKINSEY & COMPANY (2020), https://wiw-report.s3.amazonaws.com/Women_in_the_Workplace_2020.pdf.

[9] *Id.*

[10] InStride, *8 types of diversity, equity and inclusion training to implement within your organization* (Apr. 1, 2021), https://www.instride.com/insights/diversity-inclusion-training/; *see also* Sundiatu Dixon-Fyle et al., *Diversity Wins: How Inclusion Matters*, MCKINSEY & COMPANY (2020), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters (finding that, in terms of ethnic and cultural diversity, "top-quartile companies outperformed those in the fourth one by 36 percent in profitability" and that "a systematic business-led approach to I[nclusion] & D[iversity]" is key to increasing diversity).

[11] Kilian Huber, *How Discrimination Harms the Economy and Business*, CHICAGO BOOTH REVIEW (Jul. 15, 2020), https://www.chicagobooth.edu/review/how-discrimination-harms-economy-and-business.

good faith may disagree about why such inequalities continue to exist, or what steps are most likely to address them, or even whether some solutions might entail other costs that counterbalance the benefits, there is no doubt that the First Amendment protects the right of all citizens to openly engage in that debate and to espouse their own views about these inequalities and the best way to tackle them.

7.     The Supreme Court has clearly held that employers, including corporations, have rights under the First Amendment to share their own views on these matters.

8.     One view that has attracted considerable attention and support over the past decade, and which Plaintiffs believe, is that discrimination on the basis of race, gender and sexual orientation is "systemically" embedded in American society, both formally and informally, as a result of centuries of legal and socially reinforced discrimination.  According to this view, the structures and dynamics of power are so integrated throughout society that, whether consciously or unconsciously, those who are privileged by those rules, norms, and habits can fail to recognize how they have benefited from historical and present-day discrimination; only by acknowledging such unconscious bias and privilege on the basis of race, gender, or sexual orientation can we begin the process of counteracting those forces.

9.    Of course, many oppose this view and seek to counter it with alternative explanations and proposals.

10.    The First Amendment protects the rights of those on all sides of this significant public discourse to participate and to advocate for their preferred solutions.  The government may not silence one side of the discourse by labeling it unlawful, as the State of Florida has attempted to do in the Stop WOKE Act. Regardless of one's views on the underlying strength of these arguments, the First Amendment precludes the State of Florida from banning disfavored "concepts."

11.    Plaintiff Honeyfund.com, Inc. ("Honeyfund") is a private employer based in Clearwater, Florida that is committed to fostering an inclusive workplace free of discrimination.  Honeyfund's CEO regularly speaks to its employees about the need for diversity and inclusion efforts in the workplace and ways to combat institutional racism and sexism.  Honeyfund is also planning to institute a formalized DEI training program for its employees later this year that will cover topics including advancing women in business, understanding gender expansiveness and understanding institutional racism. For Honeyfund, prioritizing diversity in the workplace and in marketing materials is both a values-driven practice and a financially prudent business decision, allowing Honeyfund to serve its diverse customer base.

12.     Plaintiff Chevara Orrin is an award-winning expert on diversity, equity, inclusion, and justice ("DEIJ") and a dedicated social activist who works with private employers in Florida and around the country to advance gender, racial, and LGBTQ+[12] equality, including by conducting trainings to advance workplace parity.  In her capacity as a DEIJ consultant, she is engaged by many of Florida's leading corporations and nonprofits to provide seminars and leadership and employee learning sessions on topics such as historical and structural racism, unconscious bias, and power relationships, which explore diversity and inclusion in workplace environments.

13.     Plaintiff Whitespace Consulting, LLC d/b/a Collective Concepts, LLC ("Collective Concepts") is a consulting corporation that works with corporate and nonprofit clients to provide DEIJ trainings. Plaintiff Orrin provides DEIJ consulting services through Collective Concepts.

14.      Plaintiffs regard their efforts to address workplace DEI concerns through educational programs and dialogue as crucial to their mission of advancing equitable workplace culture, improving employee and customer satisfaction and retention, and enhancing productivity and innovation.

---

[12] This term encompasses people who are lesbian, gay, bisexual, transgender, queer/questioning, and those of other gender identities and sexual orientations.

7

15.     Governor DeSantis and the Florida Legislature seek to broadly silence this speech with which they disagree.  The Stop WOKE Act purports to prohibit all employers of 15 or more employees from advocating any of an enumerated set of concepts.  The law was enacted with an obvious and stated purpose of silencing those who the Governor castigates as "woke"—which is to say that they advance ideas contrary to his own.

16.     The Stop WOKE Act plainly violates the First Amendment by restricting speech based on content and suppressing expression merely because certain public officials disagree with Plaintiffs' viewpoints.  Beyond even the broad reach of its plain text, Florida's law is intended to and will chill an even wider range of protected speech because it is so vaguely worded.  Those whose First Amendment rights will be restricted include not only Florida employers and the DEI consultants they retain, but also employees, who will be denied access to educational programs and dialogue due to the State's censorship.

17.     This action seeks to protect the rights that Florida private employers and DEI consultants have under the First and Fourteenth Amendments to the United States Constitution to engage in open and free exchange of information with employees to identify and begin to address discrimination and harm within their or their clients' organizations.

## PARTIES

18.    Plaintiff Honeyfund is a technology company that provides wedding registries, as well as other wedding resources, advice, articles, and directories. Honeyfund is based in Clearwater, Florida.  The company is committed to DEI principles and fostering both an inclusive workplace as well as externally fostering a more just and racially equitable society.  The legislation at issue restricts its ability to provide DEI trainings, seminars, and workshops to its 16 employees and 7 contractors.

19.    Plaintiff Orrin is a DEIJ consultant residing in Broward County, Florida.  She is the Chief Creative Catalyst of Whitespace Consulting, LLC d/b/a Collective Concepts, LLC, a consulting firm she founded to provide DEIJ training. She is also a principal strategist at the Winters Group, a global diversity and inclusion consulting firm.  Plaintiff Orrin specializes in devising and facilitating leadership and employee learning sessions on improving cultural agility and work climate, developing comprehensive organizational strategies, building marketplace DEIJ brand awareness, and developing Business Resource Groups.  Her clients through the Winters Group include many prominent companies, including Walgreens, Make-A-Wish America, Glenstone, and Facebook, among others.  The legislation at issue restricts her ability to conduct DEIJ trainings for employers.

20.     Plaintiff Whitespace Consulting, LLC d/b/a Collective Concepts is a Florida corporation co-founded by Plaintiff Orrin.  Collective Concepts is a consulting firm that provides DEIJ training to corporate clients. Plaintiff Orrin provides DEIJ consulting services through Collective Concepts.  Her clients through Collective Concepts include St. Jude Children's Research Hospital, SunTrust Banks, the American Bar Association, Comoto, and Florida Blue.  The legislation at issue restricts its ability to conduct DEIJ trainings for employers.

21.     Defendant Ron DeSantis ("DeSantis") is sued in his official capacity as the Governor of the State of Florida.  He is Florida's constitutional officer vested with "supreme executive power" who must "take care that the laws be faithfully executed." *See* Art. IV, § 1(a), Fla. Const. Under the Florida Civil Rights Act of 1992, the Florida Commission on Human Relations (the "Commission") may refer any employment discrimination complaint to the Governor's office. Governor DeSantis is among the Florida state officials personally responsible for the enforcement of the Stop WOKE Act.

22.     Defendant Ashley Moody is sued in her capacity as Attorney General for the State of Florida.  She serves as Florida's chief legal officer.  *See* Fla. Const. Art. IV, § 4(b), Fla. Const.  Florida's Attorney General is empowered to bring civil actions for damages, injunctive relief, and fines not to exceed $10,000 per violation when the attorney general has cause to believe an employer engaged in a pattern or

practice of discrimination or otherwise engaged in discrimination that violates the

law and raises issues of "great public interest."  *See* § 760.021(1), Fla. Stat. (2022).

Attorney General Moody is among the Florida state officials personally

responsible for enforcement of the Stop WOKE Act.

23.     Defendant Darrick D. McGhee is sued in his official capacity as

Senior Chair of the Commission, a state entity with responsibility for enforcement

of the Florida Civil Rights Act.  The Commission has the power to initiate and

investigate complaints alleging any discriminatory practice.  Six members of the

Commission constitute a quorum for the purposes of exercising the Commission's

powers, but a quorum may also establish a panel of three Commissioners to

exercise the Commission's powers.  The Commission's investigatory powers allow

it to issue subpoenas, administer oaths or affirmations to and compel the

attendance and testimony of witnesses or to issue subpoenas for and compel the

production of books, papers, records, documents, and other evidence pertaining to

any investigation or hearing.  These investigatory powers may be delegated to a

single commissioner or the executive director.  Furthermore, those alleging

violations of the Florida Civil Rights Act must submit their complaint to the

Commission, which has the power to decide whether there is reasonable cause to

believe an alleged violation of the Florida Civil Rights Act occurred.  The

Commission also has the power to refer a complaint to any other State agency that

has jurisdiction. *See* § 760.11(2), Fla. Stat. (2022). Chairman McGhee is among the Florida state officials personally responsible for enforcement of the Stop WOKE Act.

24.     Defendant Angela Primiano, of Hollywood, Florida, is sued in her official capacity as Vice Chair and Commissioner of the Commission. Commissioner Primiano is among the Florida state officials personally responsible for enforcement of the Stop WOKE Act.

25.     Defendant Mario Garza, of Tampa, Florida, is sued in his official capacity as Commissioner of the Commission.  Commissioner Garza is among the Florida state officials personally responsible for enforcement of the Stop WOKE Act.

26.     Defendant Libby Farmer, of Tallahassee, Florida, is sued in her official capacity as Commissioner of the Commission.  Commissioner Farmer is among the Florida state officials personally responsible for enforcement of the Stop WOKE Act.

27.     Defendant Jay Pichard, of Tallahassee, Florida, is sued in his official capacity as Commissioner of the Commission.  Commissioner Pichard is among the Florida state officials personally responsible for enforcement of the Stop WOKE Act.

28.     Defendant Larry D. Hart, of Fort Myers, Florida, is sued in his official capacity as Commissioner of the Commission.  Commissioner Hart is among the Florida state officials personally responsible for enforcement of the Stop WOKE Act.

29.     Defendant Monica Cepero, of Fort Lauderdale, Florida, is sued in his official capacity as Commissioner of the Commission.  Commissioner Cepero is among the Florida state officials personally responsible for enforcement of the Stop WOKE Act.

30.     Defendant Vivian Myrtetus, of Miami, Florida, is sued in her official capacity as Commissioner of the Commission.  Commissioner Myrtetus is among the Florida state officials personally responsible for enforcement of the Stop WOKE Act.

31.     Defendant Dawn Hanson, of Tallahassee, Florida, is sued in her official capacity as Commissioner of the Commission.  Commissioner Hanson is among the Florida state officials personally responsible for enforcement of the Stop WOKE Act.

32.     Defendant Kenyatta Moye, of Tallahassee, Florida, is sued in her official capacity as Commissioner of the Commission.  Commissioner Moye is among the Florida state officials personally responsible for enforcement of the Stop WOKE Act.

33.     Defendant Pamela Payne, of Jacksonville, Florida, is sued in her official capacity as Commissioner of the Commission.  Commissioner Payne is among the Florida state officials personally responsible for enforcement of the Stop WOKE Act.

## JURISDICTION AND VENUE

34.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States.

35.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question).

36.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

37.     Venue appropriately lies in this District pursuant to 28 U.S.C. § 1391(b) because at least one defendant resides in this District and all defendants are residents of the State in which the District is located; additionally, a substantial part of the events giving rise to Plaintiffs' claims have occurred and are occurring in this District.

38.    The Stop WOKE Act constitutes an immediate infringement of Plaintiffs' free speech rights.  Therefore, an actual and justiciable controversy exists between Plaintiffs and Defendants.

39.    Plaintiffs have standing to bring this action.

## FACTUAL ALLEGATIONS

**A.    Governor DeSantis Announces the "Stop W.O.K.E." Legislative Initiative to Publicly Attack Disfavored Speech.**

40.    This case arises from the Florida Legislature and Executive Branch's efforts to suppress speech in Florida's workplaces by passing a law that amends the Florida Civil Rights Act of 1992 to forbid employers in Florida from endorsing concepts about race and sex.  This law enacts unconstitutional viewpoint-based restrictions on the speech of Florida's business owners and employers operating within the State in violation of their First Amendment rights.  It employs nebulous terms with vague definitions to chill protected speech with which Florida's Governor and certain elected officials disagree, while protecting speech more aligned with their own viewpoints on certain issues.

41.    On December 15, 2021, Governor DeSantis held a press conference to announce a new legislative proposal called the "Stop the Wrongs to Our Kids and Employees ("W.O.K.E.") Act."

42.     The press release characterized the initiative as a way "to fight back against woke indoctrination" and "take on . . . corporate wokeness."[13]  The release gave as examples of problematic corporate wokeness a company "advanc[ing] white employees to confront their 'privilege,'" among other things, and another company "teach[ing] that white toddlers 'develop racial biases by ages 3-5.'"[14]

43.     The term "woke"—initially slang describing an awareness of important social issues like racial justice—has been co-opted by political leaders in Florida and elsewhere to belittle the viewpoint that such awareness is desirable.

44.     Governor DeSantis further characterized critical race theory ("CRT"), as a form of "state-sanctioned racism" from which Florida workers need to be protected.[15]  The release gave as examples of CRT school exercises "celebrat[ing] 'Black communism,'" and requiring students to "deconstruct their racial identities, then rank themselves according to their 'power and privilege.'"[16]

45.     In reality, however, CRT is a concept developed in legal scholarship that racism is not just a product of individual bias or prejudice but instead is embedded in legal systems and policies.

---

[13] Press Release, Florida Office of the Governor, *Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations* (Dec. 15, 2021), https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations/.
[14] *Id.*
[15] *Id.*
[16] *Id.*

46.     During the press conference, Governor DeSantis described workplace trainings about diversity, equity, and inclusion as creating "a hostile work environment" by "attacking people based on their race or telling them that they're privileged or that they're part of oppressive systems."[17]  He further characterized DEI trainings as "basically corporate sanctioned racism" that "they're trying to shove . . . down these employees' throats."[18]  As Governor DeSantis described DEI trainings, "nobody wants this crap."[19]

47.     As reflected in its announcement and its title, content and viewpoint discrimination were the intended purposes of the Stop WOKE Act from the start.

**B.     The Florida Legislature Introduces an Act to Penalize Private Employers Who Promote Disfavored Concepts and Governor DeSantis Signs it into Law.**

48.     On January 11, 2022, the Republican Speaker *pro tempore* of the Florida House of Representatives, Bryan Avila, introduced the Stop WOKE Act in the House as House Bill 7.  That same day, then Republican Senator and now Commissioner of the Florida Department of Education (appointed by Governor DeSantis), Manny Diaz, introduced the Stop WOKE Act in the Senate as Senate Bill 148.

---

[17] Governor Ron DeSantis, *Introducing the Stop W.O.K.E. Act*, at 17:55-18:18, Facebook (Dec. 15, 2021), https://www.facebook.com/GovRonDeSantis/videos/introducing-the-stop-woke-act/877277022969704/.
[18] *Id.* at 18:18-18:30.
[19] *Id.* at 26:55-27:06.

49.     The Stop WOKE Act effectuates the goals of Governor DeSantis's

Stop WOKE initiative by amending Florida's Civil Rights Act to prohibit certain

speech, which Governor DeSantis categorizes as "woke indoctrination," from

Florida's schools and workplaces.

50.     Specifically, the legislation addressed Governor DeSantis' crusade

against "corporate wokeness" by supplementing Florida's Civil Rights Act to make

it unlawful for Florida employers to require employees to undergo training or

experience instruction that includes any of eight forbidden "concepts" regarding

race, sex, religion, or national origin.

51.     On February 22, 2022, during the Stop WOKE Act's second reading

on the House floor, Representative Avila underscored the content-based nature of

the bill by highlighting particular texts listed on the website of the Broward County

Schools' equity and diversity department that he found problematic, including

Peggy McIntosh's *White Privilege: Unpacking the Invisible Knapsack* and Robin

DiAngelo's *White Fragility: Why It's So Hard for White People to Talk About

Racism*.[20]  Both of these texts are commonly used in DEI workshops and curricula.

When later asked whether the *White Privilege* text would be permissible reading

for students under the bill, Representative Avila did not respond directly but said

---

[20] Fla. H.R., recording of proceedings, at 1:04:49-1:05:40 (Feb. 22, 2022),
https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=7959.

18

that "if that material in any way, shape, or form, does not align with the principles in this bill, then that material would certainly not be permissible."[21]

52.     On March 9, 2022, during the Stop WOKE Act's second reading on the Senate floor, Senator Diaz also highlighted the content-based nature of the bill with his skepticism of the term "white privilege" in employee trainings. Supporters of the bill rejected an amendment to omit the provisions of the bill affecting private employers, prompted in part by a letter from business leaders asking them to adopt such an amendment, by suggesting that the bill would not interfere with workplace DEI trainings.[22]  However, when asked later if the bill would limit a DEI facilitator from using the words "white privilege" in a company training, Senator Diaz responded "it would depend on how it's used. . . . [T]he whole thrust of the bill is to say that you cannot impose on an individual based on their background, the color of their skin or anything else, judgment on their character . . . ."[23]  Asked again whether the term "white privilege" would be off-limits under the bill as part of a discussion or a training, Senator Diaz responded "I would say that there are some very specific topics listed including not imposing privilege or oppression on any particular individual based on race."[24]

---

[21] *Id.* at 1:38:15-1:39:06.
[22] Fla. S., recording of proceedings, at 2:25:25-2:54:11 (Mar. 9, 2022), https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8067.
[23] *Id.* at 3:44:32-3:45:17.
[24] *Id.* at 4:15:32-4:16:04.

53.     On April 22, 2022, Governor DeSantis signed the Stop WOKE Act into law, hailing it as a step towards protecting against "the far-left woke agenda tak[ing] over [Florida's] schools and workplaces."[25]

**C.    The Stop WOKE Act Restricts Employer Speech and Employee Access to Information.**

54.     The Stop WOKE Act amends the Florida Civil Rights Act of 1992, which was enacted to protect Floridians' civil rights, including by prohibiting unlawfully discriminatory employment practices.

55.     The Stop WOKE Act modifies the Florida Civil Rights Act's definition of "unlawful employment practices" and "race discrimination" to include "subjecting an individual, as a condition of employment, membership, certification, licensing, credentialing, or passing an examination" to any "training, instruction, or any other required activity" that "espouses, promotes, advances, inculcates, or compels an individual to believe" any of the following concepts:

a.      Members of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin.

b.      An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

c.      An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex, or national origin.

---

[25] Press Release, Florida Office of the Governor, *Governor Ron DeSantis Signs Legislation to Protect Floridians from Discrimination and Woke Indoctrination* (Apr. 22, 2022), https://www.flgov.com/2022/04/22/governor-ron-desantis-signs-legislation-to-protect-floridians-from-discrimination-and-woke-indoctrination/.

d.    Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin.

e.    An individual, by virtue of his or her race, color, sex, or national origin, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, sex, or national origin.

f.    An individual, by virtue of his or her race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

g.    An individual, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the individual played no part, committed in the past by other members of the same race, color, sex, or national origin.

h.    Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin.

§ 760.10(8)(a), Fla. Stat. (2022).

56.    The Stop WOKE Act further provides that its eight restrictions "may not be construed to prohibit discussion of the concepts listed therein as part of a course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." § 760.10(8)(b), Fla. Stat. (2022).

57.    By its express terms, the Stop WOKE Act *allows* employers to offer training that *disagrees* with these concepts or takes a neutral position on them, while *banning* as unlawful employment practices any training that *endorses* the

same concepts. Distinguishing the permissibility or impermissibility of discussions based on a stance towards the topics to be discussed is a naked example of a viewpoint-based restriction on private speech.

58.    The Stop WOKE Act permits aggrieved parties to bring an administrative action or civil lawsuit against an employer who engages in unlawful employment practices.  *See* § 760.11, Fla. Stat. (2022).  Under the statute, parties who may bring an action include individuals, the Florida Attorney General, and the Commission.

59.    The Stop WOKE Act further provides that the Florida Attorney General may commence a civil action for damages, injunctive relief, civil penalties of up to $10,000 per violation and such other relief as may be appropriate under the laws of Florida to enforce the Act's provisions.  The Attorney General may do this if she has reasonable cause to believe that any person or group has engaged in a pattern or practice of discrimination as defined by the laws of this state or has been discriminated against as defined by the laws of this state and such discrimination raises an issue of great public interest.  *See* § 760.021, Fla. Stat. (2022).

60.    The Stop WOKE Act provides that the Commission has the power to initiate and investigate complaints alleging any discriminatory practice.  Six members of the Commission constitute a quorum for the purposes of exercising the

Commission's powers, but a quorum may also establish a panel of three Commissioners to exercise the Commission's powers.

61.     The Commission's investigatory powers allow it to issue subpoenas, administer oaths or affirmations to and compel the attendance and testimony of witnesses or to issue subpoenas for and compel the production of books, papers, records, documents, and other evidence pertaining to any investigation or hearing. These investigatory powers may be delegated to a single commissioner or the executive director.

62.     Furthermore, those alleging violations of the Florida Civil Rights Act must submit their complaint to the Commission, which has the power to decide whether there is reasonable cause to believe an alleged violation occurred.  The Commission also has the power to refer a complaint to any other State agency that has jurisdiction.

**D.     Plaintiffs Believe DEI Training is Beneficial, Enhances Productivity, Promotes Corporate Success, and is Culturally Valuable for Workplace Equality and Employee Morale.**

63.     Plaintiff Honeyfund has been planning to establish formal DEI programming, including an initial training to be held at Honeyfund's annual retreat facilitated by an outside company specializing in diversity conversations. This training, scheduled to take place in November of this year, would be followed by additional learning sessions and workshops after the retreat.  The training would

cover both the need to advance women in business and how to overcome structural racism in the workplace.  Honeyfund has also been planning to implement anti-harassment training for its employees at the upcoming annual retreat scheduled for November of this year.

64.    Further, the CEO of Honeyfund has spoken regularly with employees about the need for diversity and inclusion in the workplace.  These conversations primarily take place in team meetings or over Slack, an electronic messaging platform. Honeyfund's DEI programs and initiatives are both an important expression of its values and critical for employee satisfaction. They help to foster an inclusive workplace free of discrimination where employees of diverse backgrounds, experience, and perspectives can work collaboratively toward shared goals of professional advancement, innovation, and business success.

65.    To overcome implicit and systemic biases, Plaintiffs believe that employers and employees must acknowledge such biases exist, rather than ignoring them through a lens of "racial colorblindness."  Accordingly, Plaintiffs believe, seeing color and race helps people understand that people's lived experiences and histories are different as a result of racial identity.  Plaintiffs believe that this understanding is essential for ensuring that all individuals are treated as equal in the workplace, and that     refusal to take public note of race

allows people to ignore manifestations of persistent discrimination in the workplace.

66.     Without such DEI trainings, Plaintiff Honeyfund would risk losing substantial benefits to its businesses, including improving collaboration and productivity, attracting more diverse candidates, increasing employee engagement, and connecting with diverse clientele.  Honeyfund is best positioned to know what practices are best for its business.

67.     Honeyfund recognizes that DEI trainings are also paramount to reducing workplace incidents of discrimination and harassment and may offer protection from liability for discriminatory incidents by fostering open communication, mindful changes in attitude, and dismantling preconceived notions.  The Stop WOKE Act's specific inclusion of "sex" as a category in many of the eight restricted "concepts" has led employers like Honeyfund to wonder whether anti-sexual harassment trainings, which it already plans to conduct, will violate the law when it goes into effect.

68.     Nor is it clear how Honeyfund will be able to conduct its planned DEI training for later this year consistent with the Stop WOKE Act. In order to move forward with its annual employee retreat and DEI and anti-harassment trainings that will take place during the retreat, Honeyfund will likely need to change the

content of the training significantly to try to comply with the speech restrictions in the Stop WOKE Act.

69.    Beyond official training sessions, Honeyfund is concerned that Florida's Stope WOKE Act will impact its ability to have frank and necessary discussions with its employees when instances of workplace discrimination arise and need to be immediately remedied.

70.    Plaintiffs Orrin and Collective Concepts are regularly retained by private employers to provide consulting and training on DEIJ issues.  The employers that Plaintiff Orrin, through Collective Concepts, works with find that when employees have better awareness and understanding of these issues, they work together more productively and each employee can thrive, fostering greater innovation and success.

71.    Plaintiffs Orrin and Collective Concept's clients further benefit from the strength of organizations having a common mission and set of values, which aids employees' sense of connectedness to each other and the organization, and resulting motivation to accomplish their workplace goals together.

**E.    Plaintiffs Believe That Acknowledging and Addressing Systemic Racism and Sexism is an Important Part of DEI Consultation and Training to Their or Their Clients' Employees.**

72.    Plaintiffs Orrin and Collective Concepts must explicitly acknowledge systemic racism and sexism in the workplace as part of efforts to promote racial

equity and gender parity, and to facilitate respectful, inclusive, and productive work environments.  Because of this, just about every prohibited concept in the Stop WOKE Act would restrict Plaintiffs' speech.

73.     People of color, women, and LGBTQ+ individuals face professional barriers stemming from unconscious and historical bias.  Plaintiffs Orrin and Collective Concepts' DEIJ efforts identify and address implicit biases and inequities in the workplace based on race, color, sex, and national origin as a first step to mitigating these existing inequities.

74.     Plaintiffs Orrin and Collective Concepts' trainings confront attitudes and beliefs that occur outside of one's conscious awareness and control and are often incompatible with one's well-intentioned conscious values.  Implicit biases are embedded stereotypes about groups of people that are automatic, unintentional, deeply rooted, and able to influence an individual's judgment and behavior, even when that individual is not intentionally acting based on conscious prejudice. Discussing and addressing this type of bias is essential for affirmatively addressing and mitigating systemic workplace discrimination.

75.     Plaintiffs Orrin and Collective Concepts' trainings use both the terminology and framework of unconscious bias to help individuals understand how we each accrue biases based on our surroundings.  In order to avoid advancing the second prohibited concept, that "a person by virtue of his or her race, color,

national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously," Plaintiffs would have to change language and replace their entire framework for the origins of racism in their presentations.

76.     During their trainings, Plaintiffs Orrin and Collective Concepts also help clients and their employees to identify their privilege relative to others in the organization and how this often overlaps with hierarchies of race, gender, class, and sexual orientation.  Plaintiffs will be unable to continue this portion of their trainings without inculcating the prohibited concept that "a person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex."

77.     Similarly, the prohibition on advancing concepts that a person must bear responsibility for the acts of others—that an individual should be discriminated against to achieve DEI or that a person "must feel guilt, anguish, or . . . psychological distress because of actions . . . committed in the past by other members of the same race, color, national origin, or sex"—would also impede Plaintiffs Orrin and Collective Concepts' speech.  They regularly conduct sessions with clients about corporate reparations and recompense for profiting from historical injustices.  For instance, Plaintiffs have assisted large banks and their employees by critically examining historical policies contributing to the disproportionate denial of loans to black borrowers.  During these types of

28

sessions, participants routinely tell Plaintiffs that they feel shame and guilt for past injustices.  In order not to advance the concepts that reparations or psychological distress should be the result of historical inequities, Plaintiffs would again have to change the content of their trainings.

78.    A regular part of Plaintiffs Orrin and Collective Concepts' DEIJ work is helping clients to recognize when they have constructed reward systems that privilege particular ways of working associated with white normative culture over others that may be just as valuable for the organization but prioritize different skills.  They will be unable to perform this valuable function with clients without promoting the prohibited concept that "such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist."

79.    Fostering inclusive workplaces that promote and empower a diverse range of voices is an essential tenet of the types of businesses with which Plaintiffs Orrin and Collective Concepts work, as embodied by Plaintiff Honeyfund.  Though they do not work together, all Plaintiffs are deeply committed to addressing racial and structural inequality and historical privileges associated with gender, sexual orientation, and skin-color, no matter how upsetting or uncomfortable facing such topics may be.

80.     Plaintiff Honeyfund finds two of the Stop WOKE Act's prohibited concepts to be particularly problematic: "An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously," and "An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex, or national origin."  Honeyfund believes it is important to train its employees on unconscious bias because it exists, and therefore discussing it, including in the context of formal training, is necessary for Honeyfund's employees to recognize and remedy unconscious bias in the workplace.  Further, Honeyfund feels it is important to acknowledge and discuss white and male privilege with employees in order to advance women and people of color in the workplace.

## F.     The Stop WOKE Act Infringes on Plaintiffs' Constitutional Rights and Has Had an Immediate Chilling Effect on Protected Speech.

81.     The Stop WOKE Act imposes unlawful restrictions on the First Amendment rights of Plaintiffs by intruding on free expression and restricting protected speech using impermissibly vague statutory language.

82.     The Stop WOKE Act regulates how Plaintiffs train their employees and clients and speak about issues of critical public import, without establishing any overriding legitimate or compelling government interest to do so.

30

83.     The Stop WOKE Act sets forth unconstitutionally vague and overbroad restrictions.  The statute uses sweeping general language, by defining discrimination to include "espous[ing], promot[ing], advanc[ing], inculcate[ing], or compel[ling]" belief.

84.     The Stop WOKE Act also employs broad language to describe the "concepts" that Florida's employers are prohibited from advancing in any of the previously referenced vague manners, including that individuals "should be discriminated against or receive adverse treatment to achiever diversity, equity, or inclusion," or that an individual "bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress" because of past actions by others of the same race.

85.     The vaguely worded prohibitions are written in language that ambiguously bars "promot[ing]" concepts central to current DEI trainings and workshops, including concepts such as cultural competency, white privilege, implicit bias, systemic or institutionalized racism and sexism, and cisnormativity.

86.     The Stop WOKE Act modifies the definitions contained in the Florida Civil Rights Act, which permits employees to bring a private right of action and has a chilling effect on Plaintiffs who fear litigation, including from lawful employer-initiated discussions, training, or instruction, subjectively deemed to "endorse" any of the eight forbidden concepts.  *See* § 760.021, Fla. Stat. (2022).

31

Indeed, potential clients of Plaintiffs Orrin and Collective Concepts have already indicated an unwillingness to hire them because their DEIJ trainings materials contain phrases such as "white privilege," "unconscious bias," and "institutional slavery," which organizations fear could lead to employee discrimination complaints and legal action.

87.    The Stop WOKE Act's modifications further chill employer speech by empowering the Commission to "receive, initiate, investigate, seek to conciliate, hold hearings on, and act upon complaints" alleging that an employer offers required training, instruction, or other required activity "endorsing" any of the eight forbidden concepts using the same method under which the Commission might use to investigate an employer for race-based hiring practices.  *See* § 760.06, Fla. Stat. (2022).  Plaintiff Honeyfund fears such legal and investigatory ramifications should any of its critical instruction on DEI topics make an employee uncomfortable.

88.    The vague nature of the Stop WOKE Act burdens Plaintiffs because they cannot be certain of what discussions or training might be considered noncompliant.  Plaintiffs worry that by simply discussing, let alone acknowledging, systemic and institutional racism and historical workplace gender and racial oppression to educate employees about the existence of implicit workplace bias, they could cause an employee to file suit under the Florida Civil

Rights Act or launch a complaint with the Commission.  Plaintiffs also worry that

navigating this new law will require significant expenditure of time and money,

including legal fees associated with seeking compliance advice, so that they can

continue to offer critical trainings without "advancing" the regulated concepts.

89.     The Stop WOKE Act has had, and until enjoined will continue to

have, a significant chilling effect on Plaintiffs' ability to plan and execute their

workplace DEI initiatives and corporate missions.

## CLAIMS FOR RELIEF

### COUNT 1
### FIRST AMENDMENT FREE SPEECH CLAUSE –
### FREEDOM OF EXPRESSION

90.     Plaintiffs repeat and incorporate by reference each and every

allegation contained in the preceding paragraphs as if fully set forth herein.

91.     All Plaintiffs state this cause of action against all Defendants, seek

preliminary and permanent injunctions, and challenge the Stop WOKE Act and

any government or agency action seeking to implement or enforce it.

92.     The First Amendment provides that the government "shall make no

law … abridging the freedom of speech."

93.     The Stop WOKE Act violates the Free Speech Clause of the First

Amendment because it impermissibly discriminates against speech     based on

33

content and viewpoint by targeting certain subject matter and suppressing ideas with which certain lawmakers disagree.

94.    Discrimination against speech based on content and/or viewpoint violates the First Amendment.  Efforts to suppress speech based on the government's opposition to particular speech or the speaker's view are unconstitutional.

95.    All Plaintiffs engage in speech about issues of systemic racism, sexism, anti-LGBTQ+ bias, and implicit bias—whether through formal DEI trainings or instruction at workplace meetings.  Plaintiffs believe that this speech is an important part of their business, and particularly their efforts to effectively address social and workplace inequalities, and thus wish to continue conducting and/or participating in them.  Plaintiffs' decision to conduct such training or instruction constitutes protected, private speech under the First Amendment.

96.    The purpose and effect of the Stop WOKE Act is to suppress constitutionally protected First Amendment activity by targeting specific content and viewpoints through a range of mechanisms.  For example, the Stop WOKE Act on its face prohibits private employers from "inculcating" certain views in their employees through trainings that teach certain disfavored concepts.  It further directs the Attorney General to commence civil action for damages, injunctive relief, civil penalties, and other relief "as may be appropriate" if she has cause to

believe any employer engages in such training and enables the Commission to initiate, investigate, and otherwise act upon complaints of such trainings.  The Commission can also allow an aggrieved person to bring a civil action upon a determination of reasonable cause, and it can refer complaints to other agencies and government units.  This includes Governor DeSantis's Executive Office, which the Commission specifically refers to on its website.

97.     The Executive Office of the Governor may, through its Citizen's Assistance Office: investigate, on complaint or on its own motion, any administrative action of any state agency, including the Commission, regardless of the finality of the administrative action; request assistance and information from the state agency; examine the records and reports of any state agency; and coordinate individual state agency complaint-handling activities. *See* § 14.26, Fla. Stat. (2022).  The Executive Office of the Governor may also, through the Office of Chief Inspector General, conduct similar activities. Gov. DeSantis has made explicit statements concerning his intention to engage in viewpoint discrimination with the Act.

98.     The Stop WOKE Act chills protected First Amendment activity by threatening legal action and associated costs against any employers who require training that "espouses, promotes, advances, inculcates, or compels" employees to

believe certain views.  Government penalization of protected First Amendment activity is unlawful.

99.    Plaintiffs are planning to change the language they use with respect to DEI because of the Stop WOKE Act.  Plaintiff Honeyfund will have to change the language and focus of sessions in its planned DEI training about advancing women in business and overcoming structural racism in the workplace, and its CEO is already thinking through how to modify her routine discussions of diversity and inclusion with staff.  Plaintiffs Orrin and Collective Concepts have already lost out on business contracts and had to change the language of their DEIJ presentations wholesale, to the detriment of their clients who are seeking to improve their work environments.

100.   Despite being framed as an antidiscrimination statute, the Stop WOKE Act is not narrowly tailored to achieve a compelling government interest.

## COUNT 2
### FOURTEENTH AMENDMENT DUE PROCESS CLAUSE – VAGUENESS AND OVERBREADTH

101.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

102.   The Due Process Clause of the Fourteenth Amendment provides that no State may "deprive any person of life, liberty, or property, without due process of law."

103.   Under the Fourteenth Amendment to the United States Constitution, a governmental enactment, like the Stop WOKE Act, is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as to allow arbitrary and discriminatory enforcement.  In other words, a statute is unconstitutionally void for vagueness when its prohibitions are not clearly defined.

104.   Vague restrictions chill free expression as individuals and entities, including Plaintiffs, self-censor for fear of legal and/or financial consequences when they are unsure on what side of the line of permitted or prohibited their speech will fall.

105.   Overbroad laws, like the Stop WOKE Act, infringe on free speech by regulating a substantial amount of constitutionally protected expression.

106.   The Stop WOKE Act is overbroad and employs vague and subjective terms.  It is unclear what training language would rise to the level of intending to cause employees to "feel guilt, anguish, or other forms of psychological distress," leaving enforcement ripe for arbitrary application.

107.   The Stop WOKE Act makes it difficult for Plaintiffs to distinguish between permissible and impermissible speech because of the difficulty in assigning meaning to the Stop WOKE Act's prohibited concepts, such as that a person's "moral character or status as either privileged or oppressed is necessarily

determined by his or her race, color, national origin, or sex."  The Stop WOKE Act employs numerous other undefined terms and phrases whose meanings are key to understanding the scope of its prohibitions and aligning employer behavior with the law, including, for example, what it means to "inculcate" a concept in an employee and what instruction qualifies as "objective" and does not "endorse" the regulated concepts.

108.   In spite of the Stop WOKE Act's vagueness and overbreadth, it exposes employers to a range of penalties, including civil investigation and monetary fines.

109.   Because of the vagueness and overbreadth of the bill, Plaintiffs are unsure about what language they can use in connection with their DEI efforts. Plaintiff Honeyfund has concerns that its CEO cannot continue to speak to her employees on DEI issues in the manner she believes is most productive for her business for fear of lawsuits, and that she cannot even discern what speech the bill permits and what it precludes.  Likewise, Plaintiff Orrin and Collective Concepts' clients are so afraid of the broad sweep of the bill that they have asked her to omit phrases such as "white privilege," "unconscious bias," and "institutional slavery" from her DEIJ training materials because of fear of legal liability.

110.   The Stop WOKE Act violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and is void for vagueness

because it infringes on Plaintiffs' constitutionally protected right to free speech and provides inadequate notice of the conduct it purports to prohibit.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants for each of the causes of action raised herein. Plaintiffs respectfully request that this Court enter judgment in their favor and that the Court:

A.     Declare that § 760.10(8), Fla. Stat. (2022) as amended by the Stop WOKE Act is unlawful and unconstitutional;

B.     Preliminarily and permanently enjoin Defendants from enforcing the Stop WOKE Act;

C.     Award Plaintiffs the costs incurred in pursuing this action, including reasonable attorneys' fees, reasonable and necessary costs of the suit, and prejudgment and post-judgment interest at the highest lawful rates; and

D.     Grant such other and further relief as this Court deems just and appropriate.

Dated: June 22, 2022                          Respectfully submitted,

By: */s/ Shalini Goel Agarwal*

Shalini Goel Agarwal
Fla. Bar No. 90843
THE PROTECT DEMOCRACY PROJECT
Pennsylvania Ave. NW, Suite 163
Washington, DC  20006

(202) 579-4582
shalini.agarwal@protectdemocracy.org

Sara Chimene-Weiss*
THE PROTECT DEMOCRACY PROJECT
15 Main St., Suite 312
Watertown, MA 02472
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

John Langford*
Rachel Goodman*
THE PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
john.langford@protectdemocracy.org
rachel.goodman@protectdemocracy.org

Douglas Hallward-Driemeier*
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Tel: (202) 508-4776
Douglas.Hallward-
Driemeier@ropesgray.com

Amy Jane Longo*
ROPES & GRAY LLP
10250 Constellation Blvd
Los Angeles, CA 90067
Tel: (310) 975-3269
Amy.Longo@ropesgray.com

*Pro hac vice application forthcoming*

**Counsel for Plaintiffs**