## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

|  |  |
|---|---|
| **HONEYFUND.COM, INC.,** **PRIMO TAMPA, LLC,** **CHEVARA ORRIN**, and **WHITESPACE CONSULTING, LLC D/B/A COLLECTIVE CONCEPTS, LLC,** | Case No. 4:22-cv-227 (ACW) (MAF) |
| Plaintiffs, | Oral Argument Requested |
| v. | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW** |
| **RON DESANTIS**, *in his official capacity as Governor of Florida*; **ASHLEY MOODY**, *in her official capacity as Attorney General of Florida*, **DARRICK MCGHEE**, *in his official capacity as the Chair of the Florida Commission on Human Relations,* et al. | |
| Defendants. | |

# TABLE OF CONTENTS

**MOTION FOR PRELIMINARY INJUNCTION** ...................................................1

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** ..........................................................................3

**STATEMENT OF FACTS** ...............................................................................4

    I.    THE STOP WOKE ACT WAS EXPLICITLY ENACTED TO SILENCE DISFAVORED SPEECH. ....................................................4

    II.   DEI TRAININGS VITAL TO PLAINTIFFS' BUSINESSES ARE DRAMATICALLY CHILLED BY THE STOP WOKE ACT. ...................................................................................................7

**STANDING**....................................................................................................14

**ARGUMENT** ................................................................................................15

    III.   LEGAL STANDARD AND SUMMARY OF ARGUMENT............15

    IV.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ..........................................................................................18

        A.    Plaintiffs Are Likely to Succeed in Demonstrating that the Act Violates the Freedom of Speech Guaranteed by the First Amendment.................................................................18

            1.    The Stop WOKE Act squarely regulates "speech" within the meaning of the First Amendment.................18

            2.    The restrictions imposed by the Stop WOKE Act constitute viewpoint-based discrimination and therefore are presumptively unconstitutional ................21

            3.    In the alternative, the restrictions imposed by the Act are content-based and fail under the strict scrutiny test, as they are not narrowly tailored to serve compelling state interests ......................................23

B.     Plaintiffs Are Likely to Succeed in Demonstrating that
       the Stop WOKE Act Is Void for Vagueness in Violation
       of the Fourteenth Amendment. .................................................27

C.     Plaintiffs Are Likely to Succeed in Demonstrating that
       the Stop WOKE Act Is Unconstitutionally Overbroad in
       Violation of the First Amendment. ...........................................31

V.    UNLESS ENJOINED BY THIS COURT, THE STOP WOKE
      ACT WILL IRREPARABLY HARM PLAINTIFFS.........................32

VI.   PLAINTIFFS' THREATENED INJURY OUTWEIGHS
      WHATEVER DAMAGE THE PROPOSED INJUNCTION
      MAY CAUSE DEFENDANTS, AND THE INJUNCTION
      WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST.........35

**CONCLUSION**.......................................................................................**37**

The First Amendment plainly states that "Congress shall make no law . . . abridging the freedom of speech."  As Justice Jackson wrote, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  That the government cannot silence or discriminate against speech based on its content or viewpoint, regardless of who dislikes that speech or why, is the First Amendment's most fundamental premise.  Nor does the First Amendment tolerate vague laws that cast a shadow over protected speech—because the government's power to ban speech is exceedingly narrow, the First Amendment demands precision of regulation to ensure that protected speech is not chilled.

Florida's House Bill 7, titled the "Individual Freedom Act" and referred to as the "Stop WOKE Act" (or "Act"), violates those core principles by doing exactly what its name implies.  The Act violates the First Amendment on its face by banning and imposing liability for "promot[ing]," "endors[ing]," or "advanc[ing]" eight restricted "concepts."  Fla. Stat. § 760.10(8)(a) (2022).  Further, the Act is so vague and overbroad that it is impossible for employers to know how to comply, further chilling their speech.  The Act silences speech aimed at combating racism and sexism—speech that is vital to Plaintiffs' operation of their businesses.  The

Governor, and the Florida Legislature acting at his behest, has repeatedly sought to punish companies who have engaged in speech that displeases him, in flagrant violation of the First Amendment.[1]  Because Governor DeSantis is not a monarch, but rather a democratically elected official, the Stop WOKE Act cannot stand.

Each of the Defendants, sued in their capacity as a government official charged with enforcing the Stop WOKE Act, is a proper defendant in an action for injunctive relief under 42 U.S.C. § 1983 to enjoin further constitutional violations under color of this state statute. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989).

Plaintiffs, pursuant to Fed. R. Civ. P. 65, hereby move this Court for a preliminary injunction prohibiting Defendants from enforcing provisions of the Stop WOKE Act.  The statute violates the First Amendment on its face by purporting to ban and impose liability for "promot[ing]," "endors[ing]," or "advanc[ing]" certain "concepts" disfavored by those in power.  Without Court intervention, the Act will irreparably harm Plaintiffs—private employers and a diversity, equity, inclusion, and justice ("DEIJ") trainer.

---

[1] *See, e.g.*, Robbie Whelan & Arian Campo-Flores, *Disney Faces Backlash in Florida Amid 'Don't Say Gay' Controversy*, WALL ST. J. (Apr. 15, 2022), https://www.wsj.com/articles/disney-faces-backlash-in-florida-amid-dont-say-gay-controversy-11650027780; Jason Dill, *Gov. DeSantis Reportedly Vetoed Future Rays Spring Training Site for This Reason*, MIAMI HERALD (June 3, 2022), https://www.miamiherald.com/sports/article262117137.html; Sara Morrison, *Florida's Social Media Free Speech Law Has Been Clocked for Likely Violating Free Speech Laws*, VOX (May 24, 2022), https://www.vox.com/recode/2021/7/1/22558980/florida-social-media-law-injunction-desantis.

## <u>MEMORANDUM OF LAW IN SUPPORT OF</u>
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Plaintiffs are private employers Honeyfund.com, Inc. ("Honeyfund") and Primo Tampa, LLC ("Primo"), as well as DEIJ trainer Chevara Orrin ("Orrin") and her company Whitespace Consulting, LLC d/b/a Collective Concepts, LLC ("Collective Concepts"). The types of conversations the Stop WOKE Act prohibits and chills are essential to Plaintiffs' businesses, and to their commitment to challenging and changing entrenched systems of power and inequality.

The Act plainly infringes on Plaintiffs' constitutional rights under the First and Fourteenth Amendments. In its face, Plaintiffs must, in order to avoid liability, suppress their speech by censoring trainings and other employee instruction, undermine the effectiveness of those trainings by making them optional, or cease them altogether. Plaintiffs are already experiencing harm, including self-censorship and loss of business, due to this law, resulting in irreparable injury that will only worsen absent an injunction.

Because the infringement on Plaintiffs' constitutional rights is clear, their injuries irreparable, and the balance of equities heavily in their favor, this Court should enjoin Defendants from enforcing the Stop WOKE Act.

## STATEMENT OF FACTS

## I.   THE STOP WOKE ACT WAS EXPLICITLY ENACTED TO SILENCE DISFAVORED SPEECH.

House Bill 7 was enacted at Governor DeSantis's behest for the stated purpose of "fight[ing] back against woke indoctrination" and "tak[ing] on . . . corporate wokeness."[2]  Governor DeSantis originally called the legislative effort the "Stop the Wrongs to Our Kids and Employees" or "Stop W.O.K.E. Act."

Governor DeSantis has not concealed his intent to block disfavored speech— which he refers to as "woke" speech—through the Act.[3]  "Woke" was initially slang describing awareness of important social issues such as racial justice,[4] but in recent years has been co-opted by opponents in Florida and elsewhere to belittle the viewpoint that such awareness is desirable.  The Governor has further described workplace diversity, equity, and inclusion ("DEI") trainings as creating "a hostile work environment" by "telling [people] that they're privileged or that they're part of oppressive systems."[5]  He explicitly targeted corporate DEI trainings for the messages that he deemed wrong for employers to espouse, describing them as

---

[2] Press Release, Florida Office of the Governor, Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations (Dec. 15, 2021), https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations/.
[3] *Id.*
[4] "Woke," MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/woke.
[5] Governor Ron DeSantis, *Introducing the Stop W.O.K.E. Act*, at 17:55-18:18, FACEBOOK (Dec. 15, 2021), https://www.facebook.com/GovRonDeSantis/videos/introducing-the-stop-woke-act/877277022969704/.

purportedly "corporate-sanctioned racism" that employers are "trying to shove . . . down these employees' throats."[6]

The Stop WOKE Act modifies the Florida Civil Rights Act's definition of "unlawful employment practices" and "race discrimination" to include "subjecting an individual, as a condition of employment, membership, certification, licensing, credentialing, or passing an examination" to any "training, instruction, or any other required activity" that "espouses, promotes, advances, inculcates, or compels an individual to believe" any of the following eight forbidden "concepts" that touch upon "race, color, sex, or national origin":

1. Members of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin.

2. An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3. An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex, or national origin.

4. Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin.

5. An individual, by virtue of his or her race, color, sex, or national origin, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, sex, or national origin.

6. An individual, by virtue of his or her race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

---

[6] *Id.* at 18:18-18:30.

7. An individual, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the individual played no part, committed in the past by other members of the same race, color, sex, or national origin.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin.

Fla. Stat. § 760.10(8)(a) (2022).

The Stop WOKE Act is explicitly viewpoint-based, allowing discussion of the eight concepts only if a speaker refrains from "endors[ing]" them:  the law "may not be construed to prohibit discussion of the concepts listed therein as part of a course of training or instruction, provided such training or instruction is given in an objective manner *without endorsement of the concepts*."  Fla. Stat. § 760.10(8)(b) (2022) (emphasis added).  Employers may offer training that is neutral on or disagrees with these concepts, but any training that endorses them is banned.

The Stop WOKE Act, which goes into effect July 1, 2022, reads more like the policy of an authoritarian regime than a law passed in our American democracy.  It is a transparent attempt to advance the government's preferred narrative of history and society by prohibiting speech that challenges that narrative.  It is hard to imagine a law more antithetical to the First Amendment.

## II.    DEI TRAININGS VITAL TO PLAINTIFFS' BUSINESSES ARE DRAMATICALLY CHILLED BY THE STOP WOKE ACT.

The Stop WOKE Act chills speech that Plaintiffs regard as central to the success of their business and to their personal expression, and the Act is having an immediate, deleterious effect on Plaintiffs' ability to engage their employees regarding efforts to make their workplaces more just, inclusive, and productive.

Numerous empirical studies support Plaintiffs' belief that overcoming implicit bias requires acknowledgement that such biases exist.[7]  Plaintiffs believe that acknowledging color, race, and gender aids in understanding that people's lived experiences are different as a result of racial and/or gender identity.  Plaintiffs also believe that this understanding is essential for ensuring that all individuals are treated with dignity in the workplace, and that people who refuse to take notice of "race, color, sex, or national origin" are likely to ignore manifestations of persistent discrimination.  Fostering inclusive workplaces that promote and empower a diverse range of voices is a central value for Plaintiffs.

Plaintiff Honeyfund is a Florida-based technology company whose online platform provides wedding registries and other wedding resources.  Honeyfund has been planning to establish formal DEI programming, including an initial mandatory

---

[7] *See, e.g.*, Christy K. Boscardin, *Reducing Implicit Bias Through Curricular Interventions*, 30 J. Gen. Internal Med. 1726, 1726 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4636582/ ("Previous studies have shown that rather than suppressing automatic negative biases, a conscious acknowledgment of one's own biases and active efforts to refute those biases can have a positive impact.").

training for its sixteen employees, to be held at Honeyfund's annual retreat.  *See* Margulis Decl. ¶ 22.  This training, to be facilitated by an outside company specializing in diversity conversations and scheduled to take place this November, would be followed by additional learning sessions and workshops.  *See id*.  The training would cover both the need to advance women in business and how to overcome structural racism in the workplace.  *See id.* ¶ 23.  Honeyfund has been planning to implement anti-harassment training for its employees at the same retreat.  *See id*.  Co-founder and CEO Sara Margulis has regularly instructed employees about the need for diversity and inclusion in the workplace and has hoped to continue doing so, but now fears liability for her speech.  *See id.* ¶¶ 20-21.

Honeyfund's DEI programs and initiatives are an important expression of its values and critical for employee satisfaction and workplace harmony.  *See id.* ¶¶ 5-7.  They help foster an inclusive workplace free of discrimination where employees of diverse backgrounds, experience, and perspectives can work collaboratively toward shared goals of professional advancement, innovation, and business success.  *See id.* ¶ 7.  Without such trainings, Honeyfund would risk losing substantial benefits to its businesses, including improving collaboration and productivity, attracting more diverse candidates, and increasing employee engagement.  *See id.* ¶ 7.  Moreover, engagement on issues impacting society allows Honeyfund to attract a broader customer base from all walks of life.  *See id.* ¶ 8.  Honeyfund recognizes

that DEI trainings are also paramount to reducing workplace incidents of discrimination and harassment and may offer protection from liability for discriminatory incidents by fostering open communication and dismantling preconceived notions. *See id.* ¶ 7. The Act's specific inclusion of "sex" as a category in many of the eight restricted "concepts" has led Honeyfund to wonder whether the anti-sexual-harassment trainings it plans to conduct will violate the law when it takes effect. *See id.* ¶ 11.

It is unclear how Honeyfund will be able to conduct its planned DEI training later this year consistent with the Stop WOKE Act. In order to move forward with its retreat, Honeyfund would need to change the content of the training significantly to try to comply with the speech restrictions in the Act. *See id.* ¶ 24. At the least, Honeyfund would need to engage attorneys to advise on how to frame its DEI message to avoid violating the Act. Beyond official training sessions, Honeyfund is concerned that the Act will impact its ability to have frank and necessary discussions with its employees when instances of workplace discrimination arise. *See id.*

Plaintiff Primo is a Black-owned franchisee of Ben & Jerry's operating in Florida and a subsidiary of Primo Partners LLC. *See* McBroom Decl. ¶¶ 2-4. It is the largest Ben & Jerry's franchise operator in the country. *See id.* ¶ 3. Primo focuses on "improving racial and socioeconomic equity and creating opportunities for historically marginalized people to help grow generational wealth in [their]

community." *Id.* ¶ 6. According to CEO Antonio McBroom, Primo is "a social justice organization, and ice cream is the platform to achieve it." *Id.* ¶ 7. Primo believes that "learning about diversity, equity, and inclusion . . . is important in the workplace" and "vital for supporting other minority-led businesses"—so much so that its parent company started "its own DEI consulting business to help mentor other minority business owners and executives." *Id.* ¶ 10.

Primo employees must attend monthly corporate training sessions provided by Ben & Jerry's, which "shares Primo's commitment to social and racial justice and acknowledges the existence of systemic racism and implicit biases." *Id.* ¶ 14. Some of these required corporate trainings seek to help franchisee employees embark on a "racial equity learning journey" that involves employees engaging with selected sources on racial equity. *Id.* ¶ 23. In addition, Primo's parent company, with Primo employees, collaborates with Working to Extend Anti-Racist Education ("We Are") to conduct mandatory mid-level manager anti-racism trainings that discuss implicit bias and systemic racism; conducts internal racial equity workshops that educate employees on navigating incidents of racism in the workplace; and sponsors cultural competency training for employees that focuses on developing empathy for others. *Id.* ¶ 11. Primo believes it is critical to educate its employees about implicit bias and the need for restorative justice so they can better understand

-10-

its organizational culture, function more effectively as a team, and provide true hospitality to customers. *Id.* ¶ 17.

In Primo's view, the Stop WOKE Act "will force us to change the content of our DEI-focused training sessions, including both those offered by corporate headquarters and those that Primo Partners and Primo Tampa conduct with We Are, in order to avoid 'advancing' or 'promoting' the prohibited concepts." *Id.* ¶ 19. McBroom notes, "[I]t is unclear to me how to discuss the prohibited concepts in an 'objective manner without endorsement of the concepts' without sacrificing our commitment to advancing racial and socioeconomic equity." *Id.* ¶ 27. The Act "will force [Primo] to dramatically alter our business model, sacrifice our values, and turn away from what has made us successful." *Id.* ¶ 29.

Plaintiffs Chevara Orrin and her Florida-based company, Collective Concepts, are regularly retained by private employers to provide consulting and training on DEIJ issues. *See* Orrin Decl. ¶ 3. Orrin's clients include the American Bar Association, SunTrust Banks (now Truist), St. Jude Children's Research Hospital, and Florida Blue, among others. *See id.* Orrin is deeply committed to addressing racial and structural inequality as well as historical privileges associated with gender, sexual orientation, and skin color, no matter how upsetting or uncomfortable facing such topics might be. *See id.* ¶¶ 7-8. The employers who retain Collective Concepts find that when employees have better awareness and

-11-

understanding of these issues, they work together more productively and each employee can thrive, fostering greater innovation and success. *See id.* ¶¶ 9-10. Clients further benefit from having a common mission and set of values, which aids employees' sense of connectedness to each other and the organization, and motivation to accomplish their workplace goals together. *See id.*

As a DEIJ trainer, Orrin must explicitly acknowledge systemic racism and sexism in the workplace to promote racial equity and gender parity, and to facilitate respectful, inclusive, and productive workplaces. *See id.* ¶ 22. Because of this, nearly every prohibited concept in the Stop WOKE Act would restrict her speech. *See id.* ¶¶ 13-26. For example, as to prohibited concept 2, the entire framework of Orrin's DEIJ sessions is about unconscious bias. *See id.* ¶ 16. Similarly, as to prohibited concepts 5, 6, and 7, Orrin regularly gives presentations addressing corporate complicity and restorative justice that are at odds with these concepts. *See id.* ¶¶ 21-22. Once the law takes effect, Orrin and Collective Concepts will not be able to make these presentations or advance these ideas central to DEIJ principles, without violating the prohibited concepts. *See id.* ¶¶ 13-26.

Moreover, Orrin and Collective Concepts have already been affected. As Orrin explains, "Florida's Stop WOKE Act has already harmed my work. . . . A number of my clients are very afraid of the implications of this bill, just as they are seeking to rectify issues relating to DEIJ in their cultures. They are now scared to

do so because of the fear that they will be sued by their employees or by the state. . . . Because of this bill, some of my clients and potential clients have been unwilling to hire me to do the types of training they would otherwise do." *See id.* ¶¶ 27, 32. Since the Act was introduced, clients have cited it as a basis for asking Orrin to change the language of her presentations, for refusing to move forward with DEIJ training in which they are interested, and for canceling planned work with Collective Concepts. *See id.* ¶¶ 30, 32-33. Orrin's clients have worried explicitly about "not becoming the next Disney" and facing retaliation "for expressing a position contrary to the Governor's." *Id.* ¶ 29.

The Stop WOKE Act has led, and unless enjoined will continue to lead, to dramatic chilling effects on free speech—without any compelling (or even legitimate) government interest for doing so. The statute uses sweeping general language, by defining discrimination to include "espous[ing], promot[ing], advanc[ing], inculcat[ing], or compel[ling]" certain "concepts," and describing those concepts in similarly broad language. This creates an immediate fear of litigation arising from employer-initiated discussions, training, or instruction that is subjectively deemed to "endorse" any of the eight forbidden concepts. *See* Fla. Stat. § 760.021 (2022). Indeed, Orrin and Collective Concepts have already heard from employer clients unwilling to hire or rehire them because their DEIJ trainings could

-13-

lead to employee discrimination complaints and legal action.  *See* Orrin Decl. ¶¶ 15, 32.

The Stop WOKE Act's vagueness heavily burdens Plaintiffs because they cannot be certain of what discussions or trainings might be considered noncompliant. Plaintiffs legitimately fear that by simply discussing, let alone acknowledging, systemic and institutional sexism and racism and historical workplace gender and racial oppression to educate employees about the existence of implicit workplace bias, they could cause an employee to file suit or lodge a complaint with the Commission.  Plaintiffs also worry that navigating this new law will require significant expenditures of time and money, including legal fees for seeking compliance advice, so that they can continue to offer key trainings without "advancing" the regulated concepts.  *See* Margulis Decl. ¶¶ 17, 24; McBroom Decl. ¶ 28.

## **STANDING**

Constitutional standing requires the plaintiff to have (1) "suffered an injury in fact" that is (2) "fairly traceable to the challenged action of the defendant" and that (3) can "likely . . . be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up).

All Plaintiffs meet these requirements.  For employers Honeyfund and Primo, if "an employer specifically hires [a trainer] to speak . . . [w]hen the state restricts

that speech, employers can challenge that restriction." *Falls v. DeSantis*, No. 4:22-cv-166 (MW) (MJF), 2022 WL 2303949, at *9 (N.D. Fla. June 27, 2022) ("Indeed, a private employer—Honeyfund.com. Inc.—has filed just such an action in this Court."). Absent an injunction, employers will continue to suffer the severe chilling effects of the Stop WOKE Act that have already affected their corporate trainings. As for DEIJ trainer Orrin and Collective Concepts, Orrin's testimony reflects "that she has lost clients, that clients have told her they will no longer hire her, [and] that clients have even expressed trepidation about hiring her." *Falls*, 2022 WL 2303949, at *10.

The Stop WOKE Act is directly and severely impacting Plaintiffs and their businesses in Florida. This harm is directly traceable to Defendants—including the Governor, the Attorney General, and the members of the Florida Commission on Human Relations—who, along with private individuals, are empowered to enforce its speech-restricting provisions. *See* Fla. Stat. §§ 760.021-760.06 (2022). Only an injunction from this Court can stop this constitutional harm.

## **ARGUMENT**

## III.   **LEGAL STANDARD AND SUMMARY OF ARGUMENT**

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The Court should grant injunctive relief in

this case because Plaintiffs easily meet the four canonical factors under the law: "(1) [Plaintiffs have] a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [Plaintiffs] outweighs whatever damage the proposed injunction may cause [Defendants]; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

"Likelihood of success on the merits 'is generally the most important' factor." *NetChoice, LLC v. AG, Fla.*, 34 F.4th 1196, 1209 (11th Cir. 2022) (quoting *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020)). The Stop WOKE Act squarely targets speech itself on the basis of content and viewpoint, which the First Amendment forbids. The Act states that the eight prohibited concepts can be discussed, as long as they are discussed "*without endorsement*." Fla. Stat. § 760.10(8)(b) (2022) (emphasis added). Trainings that remain neutral or even *disagree* with the concepts are allowed, but trainings that endorse them are forbidden, making the prohibition expressly viewpoint-based. At the very least, the Act is content-based on its face and fails to survive strict scrutiny because it is not narrowly tailored to serve compelling state interests. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

The Stop WOKE Act is also unconstitutionally vague, in violation of the Fourteenth Amendment, which only exacerbates its unconstitutional overbreadth

under the First Amendment.  It is impossible to know whether many DEI topics would run afoul of the statute, thus contributing to the chill of constitutionally protected speech.  As this Court has explained, "decades of binding Supreme Court and Eleventh Circuit precedent has held that pre-enforcement review is available for plaintiffs in facial vagueness and overbreadth challenges in the First Amendment context." *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1264-65 (N.D. Fla. 2021).

In these circumstances, the facial unconstitutionality of the Stop WOKE Act warrants injunctive relief, as it also means the other factors are satisfied.  Regarding the second factor, when "ordinances are an unconstitutional 'direct penalization' of protected speech, continued enforcement, 'for even minimal periods of time,' constitutes a per se irreparable injury." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) (quoting *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983)).  As to the third and fourth factors—harm to Defendants and the public interest—"neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance." *Id.*  Even on its own terms, the purported public harm identified in the legislation—a sense of "guilt, anguish, or other forms of psychological distress" on the part of the listener, Fla. Stat. § 760.10(8)(a)(7)— has been rejected by the Supreme Court as an insufficient basis for restricting speech. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989); *Snyder v. Phelps*, 562 U.S. 443, 458 (2011).  The greater harm to the public is requiring businesses like Plaintiffs to

censor themselves from expressing their views on important societal matters, and from engaging employees in robust discussion of ideas essential for improving their workplaces.

## IV.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.   Plaintiffs Are Likely to Succeed in Demonstrating that the Act Violates the Freedom of Speech Guaranteed by the First Amendment.

The Stop WOKE Act squarely regulates "speech" within the meaning of the First Amendment; moreover, the restrictions it imposes constitute viewpoint-based discrimination and are therefore virtually per se unconstitutional. *See Otto*, 981 F.3d at 864.   Even if only content-based rather than viewpoint-based, the Act cannot withstand strict scrutiny, as it is not narrowly tailored to serve compelling state interests. *See Reed*, 576 U.S. at 163.

### 1.   The Stop WOKE Act squarely regulates "speech" within the meaning of the First Amendment.

There is little question that the Act, though superficially targeting employment practices, squarely regulates "speech" within the meaning of the First Amendment. The Act expressly limits the ability of certain speakers—including private employers and DEI trainers—to speak about eight restricted topics: its central inquiry is whether a mandatory training "espouses, promotes, advances, inculcates, or compels an individual to believe" the eight restricted topics.   As the Eleventh Circuit has explained, "Saying that restrictions on writing and speaking are merely incidental to

speech is like saying the limitations on walking and running are merely incidental to ambulation." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017) (en banc).

Honeyfund and Primo are private companies with First Amendment rights. *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 781-84 (1978); *Citizens United v. FEC*, 558 U.S. 310, 342-43 (2010) ("The Court has recognized that First Amendment protection extends to corporations . . . . Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." (quoting *Bellotti*, 435 U.S. at 783)). As a result, each company's "right to speak is implicated when information [it] possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (quoting *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 32 (1984)). In regard to DEI and other workplace trainings, there is "little question that vocational training is speech protected by the First Amendment." *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542 (N.D. Cal. 2020) (quoting *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020)). Such speech "imparts a 'specific skill' or communicates advice derived from 'specialized knowledge.'" *Kirchmeyer*, 961 F.3d at 1069 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010)).

DEI trainers like Orrin, who deliver vocational trainings, *see id.*, are private individuals with First Amendment rights as well.  As the Eleventh Circuit has noted, "[i]f speaking to clients is not speech, the world is truly upside down."  *Otto*, 981 F.3d at 866.  Finally, employees, like all members of the public, also have a First Amendment right to receive information.  *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas.").

Nor can Defendants evade the import of the First Amendment by contending that the speech in question is actually unlawful employment-related conduct.  The Eleventh Circuit "has already rejected the practice of relabeling controversial speech as conduct . . . [because] 'the enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation.'"  *Otto*, 981 F.3d at 861 (quoting *Wollschlaeger*, 848 F.3d at 1308).  The fact that the Act only applies to required trainings does not change the analysis.  As discussed below, an employer may mandate attendance if the training is neutral with respect to or antagonistic to the disfavored concepts.  It is the content and viewpoint expressed in the training that determines whether the employer may mandate attendance.  Thus, the law plainly targets speech.

Even if the Stop WOKE Act could be said to "generally function as a regulation of conduct" (which it cannot), it would still be subject to strict scrutiny

because the "conduct triggering coverage under the statute consists of communicating a message." *Humanitarian Law Project*, 561 U.S. at 28. An employer does not trigger the Act's coverage merely by holding mandatory training sessions—only when those sessions espouse a particular message.

>   **2.** **The restrictions imposed by the Stop WOKE Act constitute viewpoint-based discrimination and therefore are presumptively unconstitutional.**

The First Amendment flatly prohibits the government from "engag[ing] in 'bias, censorship or preference regarding [another] speaker's point of view." *Otto*, 981 F.3d at 864 (quoting *Messer v. City of Douglasville*, 975 F.2d 1505, 1509 (11th Cir. 1992)). "The State may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell*, 564 U.S. at 578-79. Consequently, "[l]aws that restrict speech based on the viewpoint it expresses are presumptively unconstitutional." *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2607 (2020). Indeed, the Supreme Court has indicated that finding a statute "viewpoint discriminatory" is "all but dispositive" in a First Amendment challenge, *Sorrell*, 564 U.S. at 571, leading the Eleventh Circuit to suggest that such laws may be "unconstitutional per se," *Otto*, 981 F.3d at 864.

The Act fails this test, because it is viewpoint-discriminatory on its face. The statute's prohibition against "espous[ing], promot[ing], advanc[ing], inculcat[ing], or compel[ling]" any of eight disapproved "concepts" targets not only the concepts

themselves, but also the viewpoints favoring them.  If this were not clear enough from the phrasing of the prohibition alone, the subsequent provision makes this even clearer.  The statute clarifies that the law does *not* "prohibit discussion of the concepts" as long as the "instruction is given in an objective manner *without endorsement of the concepts*."  Fla. Stat. § 760.10(8)(b) (2022) (emphasis added). The relevant "question is whether a speaker's viewpoint determines his license to speak," *Otto*, 981 F.3d at 864, and here that is plainly so.  By its express terms, the Act allows an employer to offer (and require) training that takes a neutral position on these concepts or *disagrees* with these concepts, but bans any mandatory training that *endorses* them.

The circumstances of the Act's enactment further confirm that the purpose behind the law was to chill speech disliked by the government.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("The government's purpose is the controlling consideration" in "determining content neutrality.").  At the press conference announcing the Stop WOKE Act, Governor DeSantis criticized DEI trainings for "*telling* [employees] that they're privileged or that they're part of oppressive systems."[8]

---

[8] Governor Ron DeSantis, *Introducing the Stop W.O.K.E. Act*, at 17:55-18:18, FACEBOOK (Dec. 15, 2021), https://www.facebook.com/GovRonDeSantis/videos/introducing-the-stop-woke-act/877727022969704/ (emphasis added).

Viewpoint-based regulations like the Stop WOKE Act are "an egregious form of content discrimination," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), that "the First Amendment *forbids*," *Otto*, 981 F.3d at 864 (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)), and must be enjoined under the First Amendment.

> **3.   In the alternative, the restrictions imposed by the Act are content-based and fail under the strict scrutiny test, as they are not narrowly tailored to serve compelling state interests.**

At a minimum, the Stop WOKE Act plainly constitutes content-based speech discrimination because the Act distinguishes permissible from impermissible speech at mandatory trainings "based on 'the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin*, LLC, 142 S. Ct. 1464, 1474 (2022) (quoting *Reed*, 576 U.S. at 171); *see also Otto*, 981 F.3d at 862.  A law is content-based where it "single[s] out specific subject matter for differential treatment." *City of Austin*, 142 S. Ct. at 1471 (quoting *Reed*, 576 U.S. at 169).  In contrast, a law is not content-based if it is "agnostic as to content," such as a law that regulates the location of advertisements without regard to their content. *Id.*  A law may be content-based on its face, or if it was adopted by the government "because of disagreement with the message [the speech] conveys." *Reed*, 576 U.S. at 164 (quoting *Ward*, 491 U.S. at 791).

The Stop WOKE Act is plainly *not* content-agnostic.  Instead, it singles out eight forbidden concepts for differential treatment and prohibits endorsement of those concepts while allowing neutrality or even disagreement.  As a content-based restriction, the Stop WOKE Act is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests."  *Reed*, 576 U.S. at 163.  "Laws or regulations *almost never* survive this demanding test."  *Otto*, 981 F.3d at 862 (emphasis added).

No legitimate state interest—let alone a compelling one—underlies the Stop WOKE Act.  Rather, Governor DeSantis has declared its purpose: to prevent "woke corporate trainings" in Florida.  Any state interest Defendants could plausibly identify would only come in the form of suppressing certain speech or ideas—which would be constitutionally impermissible—or in the form of avoiding "guilt, anguish, or other forms of psychological distress" on the part of certain individuals, to use the Act's own words.  Fla. Stat. § 760.10(8)(a)(7) (2022).  The Supreme Court has made clear that "a bedrock principle underlying the First Amendment . . . is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."  *Johnson*, 491 U.S. at 414. *See also Snyder*, 562 U.S. at 458 ("[S]peech cannot be restricted simply because it is upsetting or arouses contempt.").  One may not agree with the eight forbidden concepts and may even be upset by them, but that does not mean that the government can forbid a

speaker from endorsing those concepts.  Supreme Court precedent thus makes clear that even if the trainings caused "guilt, anguish, or other forms of psychological distress" on the part of certain listeners, that would not be a compelling state interest to silence the speech.  The Act does not, in any event, require that the speech even *have* such effect on an audience member, but merely that the employer advocate that some privileged individuals "must feel" that way.  It is the speech itself that the Act targets.

Nor are the eight concepts identified by the Stop WOKE Act narrowly tailored, and they catch far more in their expansive orbit than is necessary to serve any compelling state interest.  *See Reed*, 576 U.S. at 163.  As just one example, sexual harassment trainings are hallmarks of corporate America and vital to the proper functioning of American workplaces, including compliance with federal anti-discrimination law.  However, the Act has already had a chilling effect on those trainings, injecting uncertainty as to whether such trainings can continue under the Act, as the CEO of Plaintiff Honeyfund has explained.  *See* Margulis Decl. ¶ 11. One of the restricted concepts that may raise concern in this regard is the concept that "[m]embers of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin." Through this restricted concept, Florida seeks to preference the idea of colorblindness and sex-blindness.  This restriction would mean that many sexual

harassment trainings, which in part discourage employees from engaging in certain behaviors that negatively affect others because of their sex, would run afoul of the Stop WOKE Act, because the trainings treat the sex of the recipient of the behavior as important to understanding the behavior's impact. The wholesale repetition of "race, color, sex, or national origin" across all eight categories itself reflects that the State did not even attempt to tailor its speech restrictions narrowly.

Importantly, both federal and Florida law *already* prohibit discriminatory employment practices that result in adverse employment action based on an individual's race, sex, national origin, and other protected characteristics. *See, e.g.*, 42 U.S.C. § 2000e-2(a); Fla. Stat.§ 760.10(a). That includes speech that effectuates or is incidental to actionable discrimination, such as "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up). These protections, which do not target specific viewpoints, have been in place for years and undermine any argument that the Stop WOKE Act is narrowly tailored to achieve some further, legitimate interest. *See Wollschlaeger*, 848 F.3d at 1311, 1314-15 (holding that an existing law satisfying Florida's purported interest undermined any argument that a speech regulation survived even heightened scrutiny).

The Stop WOKE Act is not a good faith effort to narrowly tailor a remedy to a specific, compelling government need, but a blunderbuss governmental attempt to quell speech with which it disagrees. The Act therefore fails to pass muster under strict scrutiny and violates the First Amendment.

**B.      Plaintiffs Are Likely to Succeed in Demonstrating that the Stop WOKE Act Is Void for Vagueness in Violation of the Fourteenth Amendment.**

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." It is a "basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law "can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wollschlaeger*, 848 F.3d at 1319 (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). The Stop WOKE Act fails on both grounds.

In general, "the vice of unconstitutional vagueness is further aggravated where, as here, the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (quoting *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 287 (1961)). The "vagueness" of "content-based regulation of speech" notably "raises

special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997)).  Vague laws force would-be speakers to "steer far wider of the unlawful zone," *Wollschlaeger*, 848 F.3d at 1320 (quoting *Baggett*, 368 U.S. at 372), thus silencing even more speech than is intended.  *See also Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011) (noting vague law causes injury because "the litigant is chilled from engaging in constitutionally protected activity").

The Stop WOKE Act is incredibly vague in what speech it bars.  Whether read individually or together, the Act's eight restricted concepts would likely (though their vagueness creates uncertainty) encompass core elements of common workplace instruction and training programs, many of which involve empirically validated concepts.  Implicit bias, for example, is the concept that one may be "unconsciously" "racist" "by virtue of his or her race," which is prohibited under concept 2.[9] Trainings or resources might only be targeted at women in order to provide support in corporate environments traditionally dominated by men, but those would be "discriminating" based on "sex" "to achieve diversity, equity, or inclusion," which is prohibited under concept 6.  Any training on inclusion likely raises difficult facts about exclusion—that is, how some groups have been historically and continue to be discriminated against—which could cause members of the groups that oppressed

---

[9] *See supra* note 7.

them to feel "guilt" about the actions of their fellow citizens, or "anguish" and "distress" that oppression persists in American society, which is prohibited under concept 7. The phrase "to treat others without respect to" characteristics would prohibit DEI trainings that encourage participants to be "culturally competent" by understanding that the race, color, sex, or national origin of a co-worker may affect how they experience different events or actions, a common topic of DEI training, which is prohibited under concept 4.

Vague terms abound among the eight prohibited concepts. To name just a few: what it means to be "morally superior" in prohibited concept 1; what counts as "unconsciously" "inherently" biased in prohibited concept 2; what constitutes being "necessarily" "privileged" in prohibited concept 3; what "without respect to" the listed criteria means in prohibited concept 4; what "responsibility" in prohibited concept 5 encompasses; what "other forms of psychological distress" are covered or what "must feel" means in prohibited concept 7; and what is intended by "created . . . to oppress" in prohibited concept 8.

Companies like Honeyfund and Primo cannot determine what corporate speech the Act prohibits and what it permits. *See* Margulis Decl. ¶¶ 17, 19, 24; McBroom Decl. ¶ 27. DEI trainers such as Plaintiffs Orrin and Collective Concepts can likewise make no sense of what the Act deems off-limits. *See* Orrin Decl. ¶ 35.

Moreover, the statute's dichotomy between allowing "discussion" of these concepts but prohibiting "endorsement" of them "fails to provide 'fair notice to those to whom it is directed'" and is "so imprecise that discriminatory enforcement is a real possibility." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991) (quoting *Grayned*, 408 U.S. at 112). It is impossible to know where the line between "discussion" and "endorsement" might be drawn, and the Act thus requires anyone attempting to provide such trainings to self-censor whenever they perceive they may be crossing that line. In enjoining a nearly identical executive order issued by President Trump targeting similar types of training, a federal court observed that "[t]he line between teaching or implying (prohibited) and informing (not prohibited) 'is so murky, enforcement of the ordinance poses a danger of arbitrary and discriminatory application.'" *Santa Cruz*, 508 F. Supp. 3d at 544 (quoting *Hunt v. City of L.A.*, 638 F.3d 703, 712 (9th Cir. 2011)). Plaintiffs all echo this same concern about line-drawing. *See* Margulis Decl. ¶¶ 17, 19; McBroom Decl. ¶ 27; Orrin Decl. ¶ 35.

The inherent vagueness in the Stop WOKE Act means that the government will essentially be able to silence those that it disagrees with, and discriminatory enforcement is an all-too-real possibility given the vagueness of the Act's language. For those reasons, the Act is unconstitutionally vague.

**C.**   **Plaintiffs Are Likely to Succeed in Demonstrating that the Stop WOKE Act Is Unconstitutionally Overbroad in Violation of the First Amendment.**

The Stop WOKE Act's unconstitutional overbreadth provides another basis on which it must be enjoined.  "[S]howing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep,' suffices to invalidate all enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'"  *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 615 (1973)).  This remedy arises "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech," given the reality that "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas."  *Id.* at 119 (internal citations omitted).

The Act has zero "plainly legitimate sweep" against which to judge the substantial amount of protected free speech it punishes.  There simply is no legitimate state interest in avoiding the type of "guilt, anguish, or other forms of psychological distress" that the Florida government purports will result from

-31-

existing trainings.  *See supra* Section II.A.3.  The amount of protected free speech chilled by the Act would, in any event, be more than substantial.

For example, as described earlier, one of the restricted concepts that raises overbreadth concerns is the concept that "[m]embers of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin."  Again, this would entail that sexual harassment trainings, which in part discourage employees from engaging in certain negative behaviors that are identified based on the sex of the recipient of the behavior would run afoul of this language contained in the Stop WOKE Act.  The wholesale repetition of "race, color, sex, or national origin" across all eight categories similarly demonstrates stunning overbreadth and encompasses an enormous range of existing corporate trainings.  The many sources of vagueness, as laid out in detail in Section II.B *supra*, also demonstrate the improper breadth of the Act in its "logically related and similar" doctrinal analysis.  *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983).  As such, the Act is unconstitutionally overbroad in violation of the First Amendment.

## V.    UNLESS ENJOINED BY THIS COURT, THE STOP WOKE ACT WILL IRREPARABLY HARM PLAINTIFFS.

Because Plaintiffs "meet the first requirement for a preliminary injunction . . . [t]hey also meet the remaining requirements as a necessary legal consequence" of demonstrating likelihood of success on the merits of their constitutional claims.

*Otto*, 981 F.3d at 870.   When "ordinances are an unconstitutional 'direct penalization' of protected speech, continued enforcement, 'for even minimal periods of time,' constitutes a per se irreparable injury."  *Id.* (quoting *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983)).  The Stop WOKE Act is plainly unconstitutional for the reasons detailed in Section II *supra*, and thus continued enforcement of the Act constitutes a per se irreparable injury.  "[A]n on-going violation may be presumed to cause irreparable injury [when it] involve[s] . . . certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether."  *Siegel*, 234 F.3d at 1178.

This Court recently detailed the ways in which another recently enacted Florida statute that unconstitutionally restricted speech has caused irreparable harm. In *Dream Defenders*, this Court enjoined a statute providing a new definition for the word "riot," noting that the chilling effect on speech was evidenced by: (1) the unwillingness of some plaintiffs to "turn out at protest events in the weeks following" the bill's enactment, (2) other plaintiffs choosing to "modify their activities to mitigate any threat of arrest at events," and (3) yet other plaintiffs "ceas[ing] protest activities altogether."   559 F. Supp. 3d at 1252.   Moreover, "[a]part from the chilling of speech, Plaintiffs, as organizations, have also shifted their activities away from their core mission and diverted resources to different events and operations in response to the statute's amendment." *Id.*

The Stop WOKE Act threatens a similarly broad array of chilling effects for Plaintiffs.  Honeyfund and Primo are both trying to determine how to alter the content of their planned DEI trainings later this year and how they can proceed if the law is not enjoined.  *See* Margulis Decl. ¶ 24; McBroom Decl. ¶ 19.  Both find themselves unable to discern what the Act permits them to say to employees.  *See* Margulis Decl. ¶¶ 17, 19, 24; McBroom Decl. ¶ 27.  Both anticipate harm to their business interests if they are unable to foster inclusiveness and diversity amongst their workforce in the manner that suits their businesses.  *See* Margulis Decl. ¶ 7; McBroom Decl. ¶¶ 16-17, 26.  And both foresee damage to their ability to attract diverse clientele and employees if their speech is restricted as the Act intends.  *See* Margulis Decl. ¶ 8; McBroom Decl. ¶¶ 18, 25.

Likewise, as a DEI trainer whose livelihood depends on the ability to speak about such concepts to employers, Orrin faces acute risk to her ability to carry out her core mission.  *See* Orrin Decl. ¶ 13.  Existing clients have narrowed the scope of their DEI trainings or decided to make them optional; others have postponed them indefinitely to avoid becoming the next "Disney," waiting to see how enforcement efforts or court challenges pan out; and some have canceled their contracts entirely. *See* Orrin Decl. ¶¶ 29-30, 32-33.

This evidence clearly "establish[es] an imminent likelihood that pure speech will be chilled," *Siegel*, 234 F.3d at 1178. Plaintiffs will be irreparably harmed unless this Court grants an injunction.

## VI. PLAINTIFFS' THREATENED INJURY OUTWEIGHS WHATEVER DAMAGE THE PROPOSED INJUNCTION MAY CAUSE DEFENDANTS, AND THE INJUNCTION WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST.

Because "[t]he nonmovant is the government . . . the third and fourth requirements—'damage to the opposing party' and 'public interest'—can be consolidated." *Otto*, 981 F.3d at 870 (citing *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)). "It is clear that neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance." *Id.* Since the Stop WOKE Act is plainly unconstitutional for the reasons detailed in Section II *supra*, there is minimal governmental or public interest that would be negatively affected by an injunction.

Damage to the government or to the public can only be understood to be a wholly theoretical possibility of "guilt, anxiety, or other forms of psychological distress," a rationale (discussed *supra* in Section II.A.3) that has already been rejected by the Supreme Court has a basis for restricting speech. *See Johnson*, 491 U.S. at 414 ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

To Plaintiffs however, the injury is the severe chilling of speech that is critical not only to their businesses and livelihoods, but to other businesses and the broader public as well, for the reasons laid out *supra* in Section III.  This threatened injury far outweighs the minimal damage to the governmental or public interest, were the Act to be enjoined.

Vague and overbroad laws that directly target speech hold great potential for abuse.  Such laws grant state officials wide discretion to penalize private actors with whom they disagree in an arbitrary and vindictive manner.  The potential fear of reprisal alone may be sufficient to have a severe chilling effect—and this fear would be well-founded.  In this and other contexts, Florida state officials, including Governor DeSantis, have brazenly disregarded the First Amendment by using official government acts to punish those who speak in ways that those officials disfavor.[10]  Even if such tactics are ultimately enjoined following litigation, the harm to Plaintiffs cannot not be fully undone, and other would-be critics will be chilled from speaking their opinions.  A preliminary injunction is necessary in order to curtail the potential for abuse in Florida's enforcement of the Stop WOKE Act and to uphold core First Amendment principles.

---

[10] *See supra* note 1.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion for preliminary injunction.

### **Local Rule 7.1(F) Certification**

The undersigned hereby certify that Plaintiffs' Motion for Preliminary Injunction contains 500 words, and that Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction contains 8,000 words.

### **Local Rule 7.1(B) Certification**

Counsel for Defendants have not entered an appearance in this matter, and the undersigned hereby certify that as soon as possible, they will conduct an attorney conference as required by Local Rule 7.1(B) and supplement this motion if it remains pending at that time.

Dated: June 30, 2022            Respectfully submitted,

By: */s/ Shalini Goel Agarwal*

Shalini Goel Agarwal
Fla. Bar No. 90843
THE PROTECT DEMOCRACY PROJECT
Pennsylvania Ave., NW, Suite 163
Washington, DC  20006
(202) 579-4582
shalini.agarwal@protectdemocracy.org

Sara Chimene-Weiss (*pro hac vice*)
THE PROTECT DEMOCRACY PROJECT
7000 N. 16th St., Suite 120, #430
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

John Langford (*pro hac vice*)
Rachel Goodman (*pro hac vice*)
THE PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038
Tel: (202) 579-4582
john.langford@protectdemocracy.org
rachel.goodman@protectdemocracy.org

Douglas Hallward-Driemeier (*pro hac vice*)
ROPES & GRAY LLP
2099 Pennsylvania Ave., NW
Washington, DC 20006-6807
Tel: (202) 508-4776
Douglas.Hallward-
Driemeier@ropesgray.com

Amy Jane Longo (*pro hac vice*)
ROPES & GRAY LLP
10250 Constellation Blvd.
Los Angeles, CA 90067
Tel: (310) 975-3269
Amy.Longo@ropesgray.com

***Counsel for Plaintiffs***