## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

|  |  |
|---|---|
| **HONEYFUND.COM, INC.,**<br>**PRIMO TAMPA, LLC,**<br>**CHEVARA ORRIN**, and<br>**COLLECTIVE CONCEPTS, LLC,**<br><br>Plaintiffs,<br><br>v.<br><br>**RON DESANTIS**, *in his official*<br>*capacity as Governor of Florida;*<br>**ASHLEY MOODY**, *in her official*<br>*capacity as Attorney General of*<br>*Florida*, **DARRICK MCGHEE**, *in*<br>*his official capacity as the Chair of*<br>*the Florida Commission on Human*<br>*Relations,* et al.<br><br>Defendants. | Case No. 4:22-cv-227<br><br><br>**DECLARATION OF**<br>**CHEVARA ORRIN** |

I, Chevara Orrin, declare as follows:

1.      I am over the age of 18 and have personal knowledge of the facts in this declaration.

2.      I am Chief Creative Catalyst of Whitespace Consulting, LLC d/b/a Collective Concepts, LLC ("Collective Concepts"), a position I have held for about the last eight years. Collective Concepts is a corporation I started to consult with clients in an individual capacity on Diversity, Equity, Inclusion, and Justice (DEIJ) issues.

3.      My particular areas of focus are gender, race, civil rights, social justice, and LGBTQ+ issues. Most of my work involves facilitating DEIJ trainings and policy strategies for corporations, nonprofits, government entities, and institutions of higher education. Collective Concepts' clients include the American Bar Association, SunTrust Bank (now Truist), St. Jude Children's Research Hospital, and Florida Blue, among many others.

4.      I am also a principal strategist at the Winters Group, a global diversity and inclusion consulting firm, and have been in this position for the past three years.

5.      Over the last year, at least four of my clients, through both my individual consulting business and through my work at the Winters Group, have been based in Florida or had a significant presence in the state in terms of operations or employees. These include corporations who do IT work, nonprofits, hospitals, and government agencies.

6.      Apart from these, Collective Concepts has many clients who are large multistate or multinational corporations. A number of these clients have employees who live in Florida or who have moved to Florida since the pandemic and work remotely. Since the beginning of the pandemic in spring 2020, many sessions I used to do in person for clients have moved to videoconference sessions online with their employees joining from remote locations across the country, including from Florida.

7.      I have done DEIJ work professionally for over ten years. And even before that, many of my prior professional experiences incorporated DEIJ principles, which are core to my identity. For example, right out of college, I helped to transition women into the workplace from welfare, typically into roles that had been male-dominated. I later worked at a historically black college, founded the gay-straight alliance, and successfully advocated for a nondiscrimination policy inclusive of sexual orientation.

8.      I believe that DEIJ instruction is crucial for all companies to engage in, given the ubiquity of structural racism in so many sectors—from banking to transportation. Part of my work as a DEIJ strategist is to educate my clients and their employees about historical and structural racism. I also help to provide tools and resources for employees of color and other marginalized groups.

9.      DEIJ work is important for organizations to align on a common mission and set of values. I find DEIJ work to be incredibly powerful in connecting individuals

who might otherwise feel isolated and othered so that there is a sense of common purpose.

10.     Further, organizations that conduct regular, mandatory DEIJ trainings often experience an increase in productivity. It stands to reason that when employees feel empowered and comfortable with colleagues enough to show up to work as their full selves, they are much more productive.

11.     When these DEIJ trainings are mandatory, they have much more benefit for the organization. When my clients make DEIJ trainings voluntary for their employees, I note there is typically a significant drop in attendance—usually around 30-40% and sometimes even more. That gap in attendance often means that many people who most need to receive the DEIJ information do not receive it. Further, making DEIJ sessions optional for employees often means greater conflict in the organization afterward and much more difficulty in achieving the policy, behavior, and culture change the DEIJ work is supposed to engender.

12.     Since the murder of George Floyd, all types of institutions, including a number of my clients, have begun to think more seriously about how to engage in DEIJ work. While many employers reflexively issued statements of solidarity in the days after the murder, since then, a smaller number have engaged in DEIJ work more deeply, with regular trainings, DEIJ plans, and broader consideration of how to rectify past harms that their industries are implicated in.

13.     I have deep concerns about several provisions of Florida's Stop WOKE Act and how it will affect my work. A number of the "prohibited concepts" that employers may not subject their employees to trainings about will require me to change my work in ways that are counterproductive to DEIJ goals.

14.     Even on a basic level, I object to the Governor's decision to title his bill the "Stop WOKE Act," insofar as I have run a white allyship campaign to involve white people in dismantling structural racism within their communities called "White and Woke." I understand "woke" to mean having a higher level of social consciousness such that a person is not blind to systemic oppression. I was offended to hear the Governor seek to appropriate the word "woke" to mean some version of political correctness gone wild that has been weaponized against people of color.

15.     As to the prohibited concepts themselves, including that "members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex," in my trainings, (this is prohibited concept number 1

3

in the law) I do use language about "dominant groups" and "subordinated groups" to describe power relationships that often map onto race or sex, for example. I would need to change this language and have, in fact, been asked to change this language by some clients who are concerned that the Stop WOKE Act will trigger discrimination complaints from employees. Of course, censoring discussions of the power dynamics that exist in our society hurts the DEIJ outcomes I seek to achieve.

16.     Similarly, the prohibited concept that "a person by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously" (number 2 in the law) is in tension with the reality that all of us have unconscious biases by virtue of the culture in which we are steeped. Pretending that such bias does not exist would force me to change not just my terminology in DEIJ sessions, but my entire framework, to the detriment of my clients.

17.     The prohibited concept that "members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex" (number 4 in the law) is incompatible with the reality that people really have different lived experiences, often as a result of their demographic characteristics. The vast majority of Americans operate from a frame of minimization, overemphasizing the commonality between groups to the detriment of recognizing real differences in resources, opportunities, and outcomes available to different segments of the population.

18.     Attached as Exhibit A to this declaration are selected slides from my presentation *Beyond Empathy: A Call for White Humility in Response to Black Rage and Resistance*. I have given the substance of this presentation virtually to clients with a substantial presence in Florida as a principal strategist with the Winters Group. I have also presented much of this material to clients through my individual consulting business. In these slides, after playing a video about violence committed against Black people in the United States over the centuries, I ask Black participants to talk about what their black rage is and white participants to define what their white humility must be. I do not know how I could effectively give this presentation without running afoul of, at the least, prohibited concept numbers 1, 2, and 4.

19.     The prohibited concept that "a person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex," (number 3 in the law) is at odds with honestly reckoning with the

unspoken rules in institutions. If people do not understand their own privilege, they cannot understand the impact of their decisions on people who are marginalized. In my DEIJ sessions, I regularly use a "privilege wheel," based on characteristics like race, sex, or national origin, for participants to visualize those in their organizations with the most and the least power—the center being the most powerful, and concentric circles around that reflecting those more and more distant from the center of power.

20.     To help my clients and their employees understand the idea of white privilege, I regularly assign reading before my DEIJ sessions including texts like *White Privilege: The Invisible Knapsack* by Peggy McIntosh, *White Fragility* by Robin DiAngelo, and *White Too Long* by Robert P. Jones. I do not know how I could assign these readings in the future without advancing prohibited concept number 3. I am especially wary of assigning several of these texts now that I know the sponsors of the law mentioned them as being problematic during the debate of the bill.

21.     As to the three prohibited concepts that a person must bear responsibility for the acts of others (numbers 5, 6, and 7 in the law)—they should be discriminated against because of historical wrongs committed by other members sharing their demographic characteristics or to achieve DEI and that they "must feel guilt, anguish, or any other form of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin or sex"—this would be a major problem for my work. Clients work with me all the time on issues like corporate reparations and recompense from profiting off of institutions like chattel slavery.

22.     For example, attached as Exhibit B to this declaration are selected slides from my presentation *Corporate Complicity: A Case Study in Restorative Justice*, in which I ask participants to "[a]nalyze our institutions' complicity in perpetuating structural and systemic oppression and how a Restorative Justice model could help them evolve." I have given the substance of this presentation to clients with a substantial presence in Florida. During this presentation, I promote the model of restorative justice, which is "a process to involve, to the extent possible, those who have a stake in a specific offense and to collectively identify and address harms, needs and obligations, in order to heal and put things as right as possible." I also ask participants to think about how "your own institutions have been involved in larger systemic oppression" and how the institution could "address the harms it has caused using the pillars of Restorative Justice." In talking through possible corrective action on the part of companies, I endorse the idea of reparations,

"policies and practices that specifically address the unique harm experienced by Black & Brown people, [and] re-entering citizens." I do not know how I would make this presentation to clients in the future without promoting prohibited concept numbers 5, 6, and 7.

23.    Likewise, in my presentation *Beyond Empathy: A Call for White Humility in Response to Black Rage and Resistance*, I inculcate the notion that participants should try to disrupt white supremacy culture in their organizations. I further espouse the idea that this means that the comfort of white people must be decentered as the main priority in order to achieve racial equity and justice. I do not know how I would make this presentation to clients in the future without promoting prohibited concept number 7.

24.    Further, during my DEIJ sessions, when people reflect on historical wrongs, they will routinely tell me that they are experiencing shame and guilt about racial injustices or, in another example, exclusion of women from traditionally male fields like science and technology. That experience is an important one for people to develop empathy for the other. Psychological unease or guilt may be a necessary part of growth.

25.    Finally, the prohibited concept that "such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex," (number 8 in the law) completely contradicts basic tenets of DEIJ work. I work with clients to help them to recognize when they have set us systems of reward based on white normative culture to the exclusion of other ways of working that are just as valuable for the organization but may prioritize different skills. Adopting the rhetoric of this bill would force me to say things that are simply not true. Nor will it help a client that has a toxic corporate culture to ignore the truths that make it toxic.

26.    For example, in my slides in Exhibit A, I talk about "white supremacy culture," which revolves around the idea that "white people and the ideas, thoughts, beliefs, and actions of white people are superior to People of Color" and how this influences what U.S. institutions define as "normal," "professional," or "effective." Features of white supremacy culture include defensiveness of individuals in power and fear of open conflict, an emphasis on quantity over quality (e.g., focusing on measurable goals more than intangible assets like quality of relationships, or privileging the written word over other forms of

communication), as well as a culture of individualism that perpetuates the myth of meritocracy. I do not know how I would make this presentation to clients in the future without advancing prohibited concept number 8.

27.    Florida's Stop WOKE Act has already harmed my work–something made clear in my conversations with clients about the scope of my work for them. A number of my clients are very afraid of the implications of this bill, just as they are seeking to rectify issues relating to DEIJ in their cultures. They are now scared to do so because of the fear that they will be sued by their employees or by the state.

28.    This is true both for my clients who are based in or have a significant presence in Florida and those elsewhere or which have a national presence. Just about every potential client I speak with these days references the Stop WOKE Act, Governor DeSantis, and/or the concepts the bill seeks to prohibit—like white privilege, white guilt, implicit bias, and systemic racism—as reasons for concern about pursuing DEIJ work at their organizations.

29.    A number of my clients and potential clients have been pointing to Disney and even the Tampa Bay Rays as examples in which the Governor has used the mechanisms of the state to punish a private entity for speech he disagrees with. Even companies who are very interested in doing DEIJ work are scared to continue for fear of becoming the next Disney. They view Disney as a cautionary tale—a large and politically powerful corporation that was retaliated against for expressing a position contrary to the Governor's. A number of potential clients have told me that they want to wait and see if Disney is able to emerge successfully after being targeted by the Governor before they will agree to proceed with DEIJ work and bring me in to work with their employees.

30.    Especially in Florida, a number of potential clients have adopted a wait and see position of mostly not moving forward with contracts until this bill is enjoined or they can otherwise be confident that they will not incur liability from doing DEIJ training.

31.    Moreover, while several of my clients have expressed to me that they believe the Stop WOKE Act is an unconstitutional restriction of their speech, they have also expressed an unwillingness to file a legal challenge to the bill because of possible repercussions from the Governor and other state officials.

32.    Because of this bill, some of my clients and potential clients have been unwilling to hire me to do the types of training they would otherwise do.  For example, a national client with whom I had several meetings about the possibility

of providing DEIJ training for a couple hundred employees ultimately decided not to hire me. I learned afterward from my contacts at the organization that they felt DEIJ work was "too radical in this political climate" and that they were concerned about staying "in alignment with the Governor."

33.     Even for the more limited opportunities to train their employees they are hiring me for, many of my clients are seeking to whittle away and whitewash any use of DEIJ language including such phrases as "institutional slavery," "unconscious bias," "white supremacy culture," and "white privilege." Such requests have increased markedly since December 2021, when the Governor introduced the Stop WOKE Act.

34.     In fact, a Florida client with whom I worked as a principal strategist through the Winters Group recently was anxious to complete as much DEIJ training as possible before July 1, 2022, because they are simply uncertain about how explicitly they can do such training after this law goes into effect, even though they believe that such training is critical for the success of their employees and for their company. While they previously had expressed some further interest in exploring how to address their industry's involvement in perpetuating racial disparities in the criminal justice system, they have since said that they likely could not pursue this work with me after the law goes into effect because of the Stop WOKE Act.

35.     Furthermore, the language of the law is so unclear that even if I were trying to change the language of my presentations to comply with it, I am not sure how I would do so. While the law prohibits advancing or promoting the prohibited concepts, it is still supposed to allow me to discuss the concepts objectively without endorsement. I do not know what it means to objectively discuss white supremacy culture or white privilege without simultaneously endorsing that individuals should develop an awareness of and try to disrupt and dismantle these inequitable systems and structures.

I certify under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge. Executed in Broward County, Florida, this 29th day of June 2022.

Chevara Orrin

# Exhibit A



# BEYOND EMPATHY:
## A Call For White Humility in Response to Black Rage and Resistance

**Facilitated by:**
Brittany J. Harris,
VP, Innovation & Learning
Chevara Orrin,
Principal Strategist

# My Black Rage is...

# Black Rage Defined

Black Rage is a response and call to action, a posture of resistance towards oppressive people, practices, structures, and systems that have perpetually impacted Black people's well-being and quality of life for centuries.

## Righteous & Unapologetic.

©The Winters Group, Inc.

# My White Humility must be…

# White Humility Defined

A way of being which includes a reflective practice that helps white people develop capacity to interrupt white supremacy, own and act on their white privilege, and be more intentional in their interactions with other white people about race, racism, and white privilege.

## Radical white privilege as a strategy.

©The Winters Group, Inc.

# White Supremacy

Idea that white people and the ideas, thoughts, beliefs, and actions of white people <u>are superior</u> to People of Color and their ideas, thoughts, beliefs, and actions.

<u>Assigns value, morality, goodness, and humanity to whiteness</u> while casting people and communities of color as worthless (worth less), immoral, bad, and inhuman and "undeserving."

Dismantling Racism Works (dRworks)

# White Supremacy Culture

- The dominant, unquestioned <u>standards of behavior</u> and ways of functioning embodied by most institutions in the United States.

- Seen as <u>mainstream, dominant cultural practices</u>; they have evolved from the United States' history of white supremacy.

- <u>Normalized, it can be hard to see,</u> which only adds to its powerful hold. In many ways, it is indistinguishable from what we might call U.S. culture or norms – *a focus on individuals over groups, for example, or an emphasis on the written word as a form of professional communication.*

- Operates in even more subtle ways, by actually defining what "normal" is – and likewise, what "professional," "effective," or even "good" is.

Dismantling Racism Works (dRworks)



"Let's just hurry up and do something."

Pop-up "town-halls" without equal attention to long term strategy for DEI.

"Our leaders aren't ready to hear this."

People in the organization have surfaced an issue, but "this is just how the culture is."

"Risk-averse" culture

The act of tone-policing in response to feedback related to inclusion, equity

# Sense of Urgency

Acting swiftly without attention or time to make processes inclusive, thoughtful decision-making. Prioritizing quick visible outcomes over long term implications.

# Defensiveness

Protecting the feelings of those in power. Stifling criticism of those with power.

# Fear of Open Conflict

People in power actively avoid or ignore conflict. Blame people for raising 'issues' vs. interrogating the issues.

©The Winters Group, Inc.

Source: Dismantling Racism: A Workbook for Social Change Groups, by Kenneth Jones and Tema Okun, ChangeWork, 2001



Making decisions that impact groups that were not engaged in the strategy/program development process.

"Our leaders want to do this…[and have not solicited input from those most impacted]."

Few or no resources allocated to sustainable DEI Work.

The Proverbial "Business Case"

"If it doesn't impact the "bottom-line" our leaders won't care."

## Paternalism & Power Hoarding

Lack of transparency in how decisions are being made. Assumption that those in power know what is best.

## Quantity Over Quality

Resources mostly directed towards producing measurable goals—if it can't be measured, it has not value.

©The Winters Group, Inc.

Source: Dismantling Racism: A Workbook for Social Change Groups, by Kenneth Jones and Tema Okun, ChangeWork, 2001



May manifest as a "just fix it" mentality without attention to nuance or complexity.

Patterns of inequity may be seen as isolated rather than systemic.



Can perpetuate "meritocracy myth."

The belief in meritocracy undermines structural inequality.



# Either/Or Thinking

Things are either "good/bad" or "right/wrong"—results in trying to simplify complex problem & issues.



# Individualism

Competition valued more than cooperation—people in organization may defer to solving problems alone or in 'silos'

©The Winters Group, Inc.

Source: Dismantling Racism: A Workbook for Social Change Groups, by Kenneth Jones and Tema Okun, ChangeWork, 2001

# Breakout Discussion: How have these characteristics shown up in your role, organization, how you lead?

## What is the impact?



©The Winters Group, Inc.

As we engage in this work and respond during this time, we should be constantly asking ourselves...

**Are we colluding with or are we disrupting white supremacy?**

# Disrupting White Supremacy means decentering white comfort in our DEI strategies and responses…



White Comfort

Racial E
and Jus

Copyright, The Winters Group, Inc.

22

**A**llow yourself time to grieve and process.

Processing can be done alone or with others--cry, laugh, or yell. Do not feel compelled to educate or explain your grief to others.

**F**ind your community and lean into your village.

Seek out those individuals who feel similarly. Do not attempt to process with individuals who may not understand your sentiment.

**F**ocus on your sphere of influence.

"Making a difference" can be overwhelming. If you feel compelled to act, focus on the incremental shifts and seemingly 'small wins.'

**I**dentify self and communal care practices that work for you.

Self-Care should be ongoing and proactive. Commit to creating your own 'self-care' toolbox to lean on in times of stress.

**R**eject oppressive norms & systems that compromise sense of self.

White Supremacy is real and isn't going anywhere soon. Think critically about and build your capacity to 'name' systems at play instead of internalizing them (e.g., Liberated Love Notes)

**M**editate and practice mindfulness.

Practice ongoing mindfulness and embrace 'pausing.' Leverage apps that are F.U.B.U. (e.g., Liberate).

For <u>Black folks and other POC</u> experiencing and managing the impact of racism…

©The Winters Group, Inc.

44

**For <u>white folks</u> & other non-Black POC aspiring to be 'allies' …**

 **D**ecenter yourself and listen.
- Avoid centering your feelings, or jumping on the defense (e.g. "Not all white people…" "Why are you being so emotional or divisive?")
- Model empathy and compassion, not sympathy, and resist the urge to compare the experiences of those who are struggling to your own.

 **A**ct in the face of inequity and exclusion.
- When you hear or experience an unfair statement or learn that a policy is negatively impacting a group, do something, say something
- Proactively identify ways to leverage your power on your teams, at home, and in your communities.

**R**eflect on your own identities, values, assumptions, and power.
- Acknowledge whiteness, interrogate the ways in which your social and positional power may contribute to lack of awareness or insensitivity.
- Challenge your assumptions about people and groups from whom you are different.

 **E**ducate yourself.
- Be intentional about engaging in your own learning journey.
- Do not perpetuate emotional labor.

©The Winters Group, Inc.

# A Decolonial Approach to DEI: A Call to Action

1.  Challenge and disrupt your organization's interpretation of and assumptions around "value."

2.  Re-examine your organization's articulated commitment to D&I.

3.  Prioritize partnering with Black and Brown owned firms, especially for diversity, equity, justice, and anti-racism work.

4.  Actively engage Black employees and stakeholders in your policy, strategy development, and decision-making processes through equity centered design.

5.  Create ongoing systems of accountability to track progress towards goals and channels to solicit and share feedback.

©The Winters Group, Inc.

# A Decolonial Approach to DEI:
# A Call to Action

6. Embed social justice language into your organization's DEI lexicon.

7. Eliminate language and norms that center dominant culture norms and perpetuate exclusion.

8. Incorporate education and learning around racism, whiteness, white supremacy, and allyship into current organizational-wide learning strategy.

9. Destigmatize rest and work/life boundaries & balance by role modeling and centering both in team norms and processes.

10. Shift organizational assets to efforts and organizations that are led by the people from the communities they serve.

©The Winters Group, Inc.

# Exhibit B



# CORPORATE COMPLICITY:
## A CASE STUDY IN RESTORATIVE JUSTICE

# TODAY, WE WILL…



- Examine historical context and definitions of Restorative Justice

- Explore our personal narratives to deepen our understanding of the importance of Restorative Justice

- Analyze our institutions complicity in perpetuating structural and systemic oppression, and how a Restorative Justice model could help them evolve

# **RESTORATIVE JUSTICE** DEFINED

Restorative justice is a process to involve, to the extent possible, those who have a stake in a specific offence and to collectively identify and address harms, needs and obligations, in order to heal and
put things as right as possible."

--Howard Zehr ,*The Little Book of Restorative Justice*

# SMALL GROUP DISCUSSION (EXTERNAL SPHERE)

In which ways have your own institutions
been involved in larger
systemic oppression?

How could your institution address the harms it has
caused using the pillars of Restorative Justice?

## AMPLIFICATION

Leverage access to networks, wealth and information to amplify Black and Brown people.

## ACCOUNTABILITY

Evolve accountability channels to include and center those you are serving, not the current power structure.

## TRANSPARENCY

Expanding access to information, decision-making and fostering transparency, specifically towards groups who have been historically excluded.

## COALITION BUILDING

Build coalition with other Black or Brown people or individuals who are committed to justice. Disrupting status quo requires collective power and shared risk.

## MARKET SHARE

Identify opportunities to create more access to market share, not competition for Black and Brown owned businesses.

## FUNDING

Direct unrestricted funds to Black- and Brown-led grassroots organizations and small businesses

## REPARATIONS

Develop "pathway to reparations" policies and practices that specifically address the unique harm experienced by Black & Brown people, re-entering citizens.

# What else?

24