# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

<table>
<tr><td>

HONEYFUND.COM, INC., et al.,

         *Plaintiffs*,

v.

RON DESANTIS, in his official
capacity as Governor of Florida, et al.,

         *Defendants*.

</td><td>

Case No. 4:22-cv-227-MW/MAF

</td></tr>
</table>

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Timothy L. Newhall
*Special Counsel*
Complex Litigation
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399-1050
Telephone: (850) 414-3300
timothy.newhall@myfloridalegal.com

Charles J. Cooper (Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601

*Counsel for Defendants Ron DeSantis,
in his official capacity, et al.*

July 21, 2022

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................1

FACTUAL BACKGROUND ..............................................................3

STANDARD OF REVIEW ................................................................6

ARGUMENT ....................................................................................6

I.   The Act's Employment Provisions Are Constitutional. ..................6

  A.   The Employment Provisions Govern Conduct, Not Speech.................6

  B.   In Any Event, the Employment Provisions Also Survive
       Heightened Scrutiny. ......................................................13

    1.   Under the Captive Audience Doctrine, At Most
         Intermediate Scrutiny Applies. ...................................14

    2.   The Employment Provisions Survive Any Level of
         Heightened Constitutional Scrutiny.............................18

    3.   Plaintiffs' Contrary Arguments All Fail. ....................20

II.  The Act's Employment Provisions Are Neither Unconstitutionally
     Vague nor Overbroad. .....................................................25

  A. The Challenged Provisions Are Not Unconstitutionally Vague. .............25

  B.  The Challenged Provisions Are Not Overbroad ......................31

III. Any Unconstitutional Provisions Are Severable...........................32

IV.  Plaintiffs Are Not Entitled to a Preliminary Injunction. ...............33

  A.   Plaintiffs Have Not Shown Irreparable Injury. ....................33

B.    The Balance of the Equities Militates Against Preliminary Injunctive Relief. ....................................................................34

CONCLUSION .......................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page**

*Attwood v. Clemons*, 526 F. Supp. 3d 1152 (N.D. Fla. 2021) .................................22

*Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986)............................15

*Brown v. Board of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955) ............................1

*Doe v. Valencia College*, 903 F.3d 1220 (11th Cir. 2018) ......................................31

*Dream Defenders v. DeSantis*,
    559 F. Supp. 3d 1238 (N.D. Fla. 2021) ...............................................................26

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ...................................14, 15

*Frisby v. Schultz*, 487 U.S. 474 (1988).........................................................14, 17, 18

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)...............................................20, 23

*Heyman v. Cooper*, 31 F.4th 1315 (11th Cir. 2022) ..............................................25

*High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225 (11th Cir. 1982)..........................26

*Hill v. Colorado*, 530 U.S. 703 (2000) .......................................................14, 16, 17

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ...............................12, 13

*Initiative and Referendum Inst. v. Walker*,
    450 F.3d 1082 (10th Cir. 2006) ..........................................................................32

*Jones v. Gov. of Fla.*, 975 F.3d 1016 (11th Cir. 2020) .....................................25, 26

*Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974)..................................15, 17

*Locke v. Shore*, 634 F.3d 1185 (11th Cir. 2011)....................................................8

*Loving v. Virginia*, 388 U.S. 1 (1967) ..............................................................1, 18

*Lowe v. S.E.C.*, 472 U.S. 181 (1985) ...................................................................10

*Maryland v. King*, 567 U.S. 1301 (2012) ............................................................34

*Members of City Council of City of Los Angeles v. Taxpayers For Vincent*,
    466 U.S. 789 (1984).............................................................................................32

*Miller v. Johnson*, 515 U.S. 900 (1995)................................................................1

*National Inst. of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) ................................................................................7

*NetChoice, LLC v. Moody*, 34 F.4th 1196 (11th Cir. 2022) ....................................21

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) ................................................16

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ............................................8

*Otto v. City of Boca Ratan*, 981 F.3d 854 (11th Cir. 2020)..............................10, 22

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992).....................................21, 22

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ........................................................18

*Robinson v. Jacksonville Shipyards, Inc.*,
  760 F.Supp. 1486 (M.D. Fla. 1991)..............................................................17, 19

*Rowan v. United States Post Off. Dep't*, 397 U.S. 728 (1970)..........................14, 17

*Rumsfeld v. FAIR, Inc.*, 547 U.S. 47 (2006) ...........................................8, 10, 11, 12

*Rust v. Sullivan*, 500 U.S. 173 (1991)......................................................................12

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
  508 F. Supp. 3d 521 (N.D. Cal. 2020)................................................................30

*Shaw v. Reno*, 509 U.S. 630 (1993) .........................................................................18

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ......................................................8

*Tracy v. Fla. Atl. Univ. Bd. of Trustees*, 980 F.3d 799 (11th Cir. 2020)...........25, 29

*United States v. Dean*, 635 F.3d 1200 (2011)..........................................................32

*United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014) .........................................28

*United States v. Paradise*, 480 U.S. 149 (1987).....................................................19

*United States v. Williams*, 553 U.S. 285 (2008) .........................................25, 31, 32

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982)......................................................................................25, 26

*Virginia v. Hicks*, 539 U.S. 113 (2003) ............................................................31, 32

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015)............................................................................................12

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) ...........................................................22

*Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017) ......9, 10, 33

*Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016)..........................6

## Constitution and Statutes

FLA. CONST. art. I, sec.2 ................................................................................1, 3

42 U.S.C. §§ 2000e *et seq.* ........................................................................19, 20

FLA. STAT.

    § 760.01 *et seq.* ...............................................................................3, 4
    § 760.10...........................................................................................1, 4
    § 760.10(1).............................................................................................4
    § 760.10(1)-(8) (as amended by the Act)..........................................4, 5
    § 760.10(1)(8)(b) ..................................................................................5
    § 760.10(2)...........................................................................................23
    § 760.10(8)(a) ...............................................................................2, 7, 8
    § 760.10(8)(a)(1)...................................................................................2
    § 760.10(8)(a)(4).................................................................................23
    § 760.10(8)(a)(5)...................................................................................2
    § 1000.05(4)(a) .....................................................................................2

2022 Fla. Laws 72 ..........................................................................................4

2022 Fla. Laws 72, § 8 ...................................................................................4

6 FL ADC 6A-1.094124(3)(c) ................................................................30, 31

## Other Authorities

Eugene Volokh, *Freedom of Speech & Workplace Harassment,*
    39 U.C.L.A. L. REV. 1791 (1992)..................................................17

Justin D. Levinson, *Forgotten Racial Equality: Implicit Bias, Decisionmaking,*
    *and Misremembering,* 57 DUKE L.J. 345 (2007) ................................24

Order, *Falls v. DeSantis,* No.22-cv-166 (N.D. Fla. July 8, 2022)....................24

Suzanne Sangree, *Title VII Prohibitions Against Hostile Environment Sexual*
    *Harassment and the First Amendment: No Collision in Sight,*
    47 RUTGERS L. REV. 461 (1995) ......................................................17

*Advance,* MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007),
    https://bit.ly/3PjS3mX ......................................................................31

*Create,* MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
    (last visited July 19, 2022), https://bit.ly/3v0IBwu ......................28, 29

*Distress,* MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
    (last visited July 19, 2022), https://bit.ly/3crnUDk ...........................28

*Endorse*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY 470
(4th ed. 2002) ........................................................................................29

*Inherent*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
(last visited July 19, 2022), https://bit.ly/3v4kc9h ...............................27

*Moral*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
(last visited July 19, 2022), https://bit.ly/3v4kc9h ...............................26

*Necessarily*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
(last visited July 19, 2022), https://bit.ly/3oiWjHn ...............................27

*Objective*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
(last visited July 19, 2022), https://bit.ly/3zcLbB1 ...............................29

*Oppress*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
(last visited July 19, 2022), https://bit.ly/3yNwxjg ...............................29

*Privilege*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
(last visited July 19, 2022), https://bit.ly/3aTTNnN................................27

*Psychological*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
(last visited July 19, 2022), https://bit.ly/3PngXlr.................................28

*Responsibility*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
(last visited July 19, 2022), https://bit.ly/3AYU2bJ..............................28

*Superior*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
(last visited July 19, 2022), https://bit.ly/3AZWxuz .............................26

*Unconscious*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
(last visited July 19, 2022), https://bit.ly/3crt2aN ...............................27

*With Respect To*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)
(last visited July 19, 2022), https://bit.ly/3Po5fXG.............................27

## INTRODUCTION

"At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (cleaned up). "All provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle." *Brown v. Board of Educ. of Topeka, Kan.*, 349 U.S. 294, 298 (1955).

Impelled by the fundamental moral principle at the root of the Equal Protection Clause—that discriminating against people solely because of their race, sex, or other immutable characteristics is "odious to a free people whose institutions are founded upon the doctrine of equality, " *Loving v. Virginia*, 388 U.S. 1, 11 (1967) (cleaned up)—the Florida Legislature has enacted the statute at issue in this case, the Individual Freedom Act, to condemn eight "concepts" it deems antithetical to the fundamental constitutional mandate that "[a]ll natural persons … are equal before the law." FLA. CONST. art. I, § 2. Among the eight are concepts such as "[m]embers of one race … are morally superior to members of another race …"; "[a]n individual, by virtue of his or her race … is inherently racist, … whether consciously or unconsciously"; and "[m]embers of one race … cannot and should not attempt to treat others without respect to race …." FLA. STAT. § 760.10 (as amended by the Act). Believing these ideas to be repugnant the goal of non-discrimination, the

People of Florida, through their elected representatives, have directed that they cannot be "espouse[d], promote[d], advance[d], or inculcate[d]" in the instruction imposed upon students in their public schools and universities, nor in the training mandated by Florida employers for employees. *See* FLA. STAT. §§ 1000.05(4)(a); 760.10(8)(a). Such mandatory instruction, training, or any other required activity that endorses any of the eight concepts "constitutes discrimination" against the student or employee as defined by the Legislature in the Florida Civil Rights Act. *Id.*

Plaintiffs' First Amendment challenge to the employment-related provisions of the Act fails because the Act does not limit any speech that is protected by the First Amendment. Anything that a Florida employer could say (or could hire consultants to say) before the Act takes effect can still be said after, just as freely and in exactly the same manner. What the Act does—all it does—is prevent employers from *conscripting their employees*, against their will, into the audience *as a condition of their employment*. The First Amendment may well protect the right of employers (and their paid consultants) to *espouse* the ideas that a person "by virtue of his or her race … *should* be discriminated against … or receive adverse treatment because of actions committed in the past by other members of the same race" and that "[m]embers of one race … *are* morally superior to members of another race." FLA. STAT. § 760.10(8)(a)(1), (5). (emphases added). And it may protect the rights

2

of employees to seek out, listen to, and share those views. What it does *not* protect is the ability of employers to use their economic leverage over their workers to *force them*, on pain of losing their jobs or other sanction, to listen to such views. That is conduct, not speech, and the First Amendment has nothing to say about it. And even if it did, the Act would easily pass any level of heightened constitutional scrutiny, given the State's unquestionably compelling interest in eliminating open racial discrimination and/or hostility in the workplace. For acceptance of Plaintiffs' First Amendment claim would enable employers to force their employees to attend trainings endorsing white supremacy no less than white privilege.

## FACTUAL BACKGROUND

The People of Florida enshrined in their Constitution certain fundamental principles that lie at the bedrock of our Nation and the State of Florida. Article I, Section 2, of the Florida Constitution enumerates these "Basic Rights":

> All natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property. No person shall be deprived of any right because of race, religion, national origin, or physical disability.

In furtherance of these principles, Florida's elected officials have prohibited discrimination in the workplace through the Florida Civil Rights Act of 1992. *See* FLA. STAT. § 760.01 *et seq.* This legislation, among other things, prohibits

"employment practice[s]" that discriminate on the basis of race, sex, national origin, and religion. *Id.* § 760.10.

Earlier this year, the Florida Legislature passed the Individual Freedom Act (the "Act"). *See* 2022 Fla. Laws 72. Governor DeSantis approved the Act on April 22, and it took effect on July 1. *See* 2022 Fla. Laws 72, § 8. As relevant in this case, Section 1 of the Act amended the Florida Civil Rights Act to enumerate several employment practices that constitute "discrimination based on race, color, sex, or national origin" under FLA. STAT. § 760.10(1). Specifically, the Act makes it unlawful for any employer to "[s]ubject[] any individual, as a condition of employment, membership, certification, licensing, credentialing, or passing an examination, to training, instruction, or any other required activity that espouses, promotes, advances, inculcates, or compels such individual to believe any of the following concepts":

1.  Members of one race, color, sex, or national origin, are morally superior to members of another race, color, sex, or national origin.

2.  An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3.  An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex, or national origin.

4.  Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin.

4

5.      An individual, by virtue of his or her race, color, sex, or national origin bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, sex, or national origin.

6.      An individual, by virtue of his or her race, color, sex, or national origin should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7.      An individual, by virtue of his or her race, color, sex, or national origin, bears responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the individual played no part, committed in the past by other members of the same race, color, sex, or national origin.

8.      Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin.

FLA. STAT. § 760.10(1)-(8) (as amended by the Act).

Section 1 further makes clear, however, that it does not prohibit discussion of these concepts as part of required training. Specifically, it directs that this provision "may not be construed to prohibit discussion of the concepts listed therein as part of a course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." *Id.* § 760.10(1)(8)(b).

Plaintiffs are two businesses based in Clearwater, Florida, a DEI consultant, and her consulting firm. Together, they argue that the Act's employment provisions violate the First Amendment and the Due Process Clause. A little over a week after filing their complaint, Doc. 1, Plaintiffs filed an amended complaint and a motion

for a preliminary injunction. Defendants now respond to the motion for preliminary injunction.

## STANDARD OF REVIEW

Under Rule 65 of the Federal Rules of Civil Procedure, a district court may grant a preliminary injunction if the movant shows "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (internal quotation marks omitted). The movant "bears the burden of persuasion to clearly establish all four of these prerequisites." *Id.* (internal quotation marks omitted).

## ARGUMENT

### I.   The Act's Employment Provisions Are Constitutional.

The challenged provisions of the Individual Freedom Act are constitutional, and Plaintiffs' claims challenging these employment provisions are unlikely to succeed.

### A. The Employment Provisions Govern Conduct, Not Speech.

Plaintiffs' First Amendment challenge to the employment provisions fails right out of the starting gates because these provisions do not regulate speech at all,

and they thus are not subject to First Amendment analysis. Rather, the employment provisions regulate pure conduct: an employer's non-expressive, commercial action of imposing "a condition of employment" that requires its employees to attend certain instruction or training activities. Defendants do not dispute that consultants like Orrin, and private companies like Honeyfund and Primo, have "First Amendment rights." PI Br. 19. And yes, the "writing and speaking," *id.* at 18-19, that *goes on during* workplace instruction or training sessions constitutes speech. But *that* speech remains as free and unrestrained as it was before the passage of the Act; all the Act says is that employers cannot engage in the action of *forcing their employees to listen to it.*

While drawing the line between speech and conduct may at times be difficult, the Supreme Court's precedents "have long drawn it, and the line is long familiar to the bar." *National Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018) (internal quotation marks and citations omitted). Here, it is evident that the Act's provisions regulating Florida employees lie safely on the "conduct" side of this speech-conduct divide. Yes, workplace "training" and "instruction" events necessarily involve speech. But the Act does not restrict that speech in the slightest. Employers remain free under the Act to arrange, sponsor, and pay for training events advocating such propositions as, for example, the moral superiority of one race over another and that an employee, by virtue of his or her race, "should be discriminated

against or receive adverse treatment to achieve diversity, equity, or inclusion," FLA. STAT. § 760.10(8)(a).[1] Consultants like Orrin remain free to espouse these ideas and to collect fees for doing so, and employees who wish to attend such training events remain free to do so. The *only thing* that the Act prohibits is this: an employer may not make attendance at training events or sessions like these a mandatory "condition of employment." *Id.*

The Act's employment provisions thus do not impose even an incidental burden on speech. But even if the Act's limits did somehow *incidentally* burden speech, heightened constitutional scrutiny would still not apply. For "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011); *see also Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 62 (2006) (internal quotation marks omitted); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978); *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011). A legislature, for example, can prohibit racial discrimination in hiring without violating the First Amendment, even though such a prohibition would require an employer to take down a sign reading "White Applicants Only." *FAIR*, 547 U.S. at 62. And here, the Individual Freedom Act does not even impose *that* much of a burden on speech.

---

[1] Subject, of course, to any other relevant principles of federal or state anti-discrimination law not challenged here.

Rather, the Act's employment provisions are akin not to a prohibition on a "White Applicants Only" signs, but rather to a prohibition on an employer's practice of *forcing all employees to look at it*.

Plaintiffs invoke the Eleventh Circuit's en banc decision in *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017) (en banc), but that case in fact confirms beyond any doubt that the Act does not implicate the First Amendment. *Wollschlaeger* held that a provision of Florida's Firearm Owners' Privacy Act ("FOPA") prohibiting doctors from discriminating against patients for owning firearms did not implicate the First Amendment because it could be construed "to apply to non-expressive conduct such as failing to return messages, charging more for the same services, declining reasonable appointment times, not providing test results on a timely basis, or delaying treatment because a patient … owns firearms." 848 F.3d at 1317. Based on that construction, the court concluded that "there is no First Amendment problem." *Id.* Here, a saving construction is unnecessary: the Individual Freedom Act's employment provisions, by their plain terms, apply only to the non-expressive conduct of *requiring* employees to attend training sessions where the kind of speech identified by the Act occurs.

Instead of discussing the portion of *Wollschlaeger* dealing with non-expressive conduct, Plaintiffs instead cite (at 20) the portion of the opinion relating to the regulation of "the speech of those who are engaged in a profession." *Id.* at

1308. Relying on Justice White's concurring opinion in *Lowe v. S.E.C.*, 472 U.S. 181, 232 (1985) (White, J., concurring), the State had argued that while doctors may technically be engaging in "verbal or written communications" when they are speaking to their patients "on the topic of firearm ownership," because those communications are "incidental to the conduct of the profession," they are subject to rational basis review only. 848 F.3d at 1307, 1308. It was in rejecting that "professional speech" argument that the Eleventh Circuit criticized the "dubious constitutional enterprise" of "characterizing speech as conduct." *Id.* at 1311; *see also Otto v. City of Boca Ratan*, 981 F.3d 854, 861 (11th Cir. 2020) (rejecting similar professional-speech argument). That statement self-evidently has no application here. Defendants are not characterizing speech as conduct; we are characterizing *conduct* as conduct. Plaintiffs nowhere dispute that an employer's action of requiring employees to attend training sessions is conduct, not speech, and that is the beginning and end of their reliance on *Wollschlaeger*.

The Supreme Court's decision in *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47 (2006), also conclusively shows that the First Amendment offers no resistance to Florida's regulation of employer conduct. *FAIR* concerned the constitutionality of the Solomon Amendment, which required law schools to provide military recruiters equal access to students as any other recruiter. The Court concluded that the Solomon Amendment regulated conduct, not speech: "It affects what law schools

10

must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60. Any speech that was affected by the Amendment—such as "send[ing] e-mails or post[ing] notices on behalf of the military"—was "plainly incidental to the Solomon Amendment's regulation of conduct." *Id.* at 62. And "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.*

So too here. Just as the Solomon Amendment "affect[ed] what law schools must *do*," *id.* at 60, the Act's employment provisions solely affect *the conduct* of employers: mandating attendance at trainings espousing the principles at issue, on pain of losing your job. And just as "[l]aw schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy," *id.*, employers, employees, and consultants like Orrin, remain free under Florida's Act to express whatever views they may have, including those pertaining to matters of race, color, sex, religion, or national origin. The only thing employers may not do is require, on pain of sanction, their employees to listen to those views if they do not wish to.

Plaintiffs argue that the Act's regulation of conduct should still be treated as a restriction on speech because "[i]t is the content and viewpoint expressed in the training that determines whether the employer may mandate attendance." PI Br. 20.

The idea appears to be that even where a law regulates only conduct, where the *trigger* of that regulation is in some sense the occurrence of speech with a particular "content and viewpoint," the regulation nonetheless "targets speech" and is subject to First Amendment scrutiny. *Id.* Plaintiffs cite no authority for that proposition, and it makes no sense. Where a law regulates conduct, not speech, the First Amendment simply *has no application at all*—and the First Amendment doctrines of content- and viewpoint-based discrimination, *a fortiori*, also have no application. *Cf. Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) (government may discriminate based on viewpoint when it is speaking itself); *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) (government subsidies of speech may discriminate based on viewpoint). That is why, while "a sign reading 'White Applicants Only' " obviously expresses a particular *viewpoint*, if a prohibition on such a sign qualifies as "incidental to the … regulation of conduct," the First Amendment—and its doctrine of content- and viewpoint-discrimination—pose no obstacle. *FAIR*, 547 U.S. at 62.

Finally, Plaintiffs grasp for support in the Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). It provides them none. *Humanitarian Law Project* dealt with the federal ban on knowingly providing material support to terrorist organizations, as applied to human rights organizations and advocates who "wished to provide support for the humanitarian and political

activities of [two designated terrorist organizations] in the form of monetary contributions, other tangible aid, legal training, and political advocacy." *Id.* at 10. The Government argued that the plaintiffs' challenge should "receive intermediate scrutiny" because the federal ban was a "generally applicable regulation of conduct"—supporting terrorist organizations—that "most often does not take the form of speech at all." *Id.* at 26, 28. The Court rejected that argument, reasoning that while the ban "may be described as directed at conduct," where the conduct proscribed in a particular case "consists of communicating a message," the resulting burden on speech necessitated strict scrutiny. *Id.* at 28. *Humanitarian Law Project* has no application here. This case does not involve a generally applicable conduct regulation that happens to restrict the content of Plaintiffs' *speech*; again, Plaintiffs may say whatever they please. The Act imposes a generally applicable conduct regulation that only *restricts Plaintiffs' conduct.*

**B. In Any Event, the Employment Provisions Also Survive Heightened Scrutiny.**

Even if the Act's employment provisions were subject to First Amendment scrutiny, they would survive it, and Plaintiffs' challenge would still be unlikely to succeed.

1.    **Under the Captive Audience Doctrine, At Most Intermediate Scrutiny Applies.**

As discussed above, the employment provisions impose no content-based restriction on speech. Instead, the Act's employment provisions advance a very different—and "substantial and justifiable"—interest: preventing Florida employers from conscripting a " 'captive' audience" for that speech, made up of employees "who are presumptively unwilling to receive it." *Frisby v. Schultz*, 487 U.S. 474, 488 (1988). "[T]he protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it." *Hill v. Colorado*, 530 U.S. 703, 716 (2000).

The Supreme Court has repeatedly recognized that "[t]he First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech." *Frisby*, 487 U.S. at 487. Because "the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate," *Rowan v. United States Post Off. Dep't*, 397 U.S. 728, 736 (1970), the State has the power to protect "[t]he unwilling listener's interest in avoiding unwanted communication," *Hill*, 530 U.S. at 716. This authority is of course most acute in the home. *Rowan*, 397 U.S. at 737. But Supreme Court precedent also establishes that the Government may protect unwilling listeners outside the home, in those situations where "the degree of captivity makes it

impractical for the unwilling viewer or auditor to avoid exposure." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975).

In *Lehman v. City of Shaker Heights*, for example, the Court upheld a city's rule barring the display of "paid political advertising" in its mass-transit vehicles. 418 U.S. 298, 299 (1974) (plurality). Though no single opinion commanded a majority, both the plurality opinion and Justice Douglas's concurrence emphasized the captive nature of commuters and their right to avoid unwanted speech. The City's rule, the plurality concluded, was designed to minimize "the risk of imposing upon a captive audience." *Id.* at 304. And Justice Douglas reasoned that, while a speaker "has a right to express his views to those who wish to listen, he has no right to force his message upon an audience incapable of declining to receive it." *Id.* at 307 (Douglas, J., concurring). Subsequent cases have thus read *Lehman* as standing for the proposition that the government "may protect its citizens against unwilling exposure to materials that may be offensive" in those situations where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Erznoznik*, 422 U.S. at 208-09.

Later Supreme Court decisions are in accord. In *Bethel School District No. 403 v. Fraser*, for example, the Court upheld the School District's decision to discipline a student for a speech he gave during assembly "nominating a fellow student for student elective office" in which he "referred to his candidate in terms of

an elaborate, graphic, and explicit sexual metaphor," based in part on the State's authority "to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech." 478 U.S. 675, 677-78, 684 (1986). Similarly, in *Hill*, the Court upheld state restrictions on "speech-related conduct within 100 feet of [an abortion clinic]" in part based on "the interests of unwilling listeners in situations where the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." 530 U.S. at 707, 718 (quotation marks omitted).

The Act's employment provisions apply—and only apply—in precisely such a captive audience situation. To the extent these provisions burden speech at all, they do so only to the extent that they liberate an employee from being coerced into attending an instructional event that he cannot, practically, avoid—at least not without risk to his livelihood. Other First Amendment precedents recognize that the degree of protection for "an employer's free speech right to communicate his views to his employees … must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969).

Indeed, because of concerns like these, the U.S. District Court for the Middle District of Florida held, in an influential case, that "the regulation of discriminatory speech in the workplace" in general is justified under the First Amendment because, in part, "female workers … are a captive audience in relation to the speech that comprises the hostile work environment," given the "coercion" inherent in "employer-employee relations." *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1535-36 (M.D. Fla. 1991). Scholars have debated whether the captive audience doctrine should apply this broadly, to all workplace speech.[2] But it surely cannot be debated that it applies here, to the attendance at training events that an employer makes mandatory, on pain of losing your job or other sanction.

The Supreme Court case law does not make it entirely clear what form of (diminished) First Amendment scrutiny applies to laws protecting the members of a captive audience from unwanted speech. The language in some cases suggests that the First Amendment simply has no application at all to such speech, *see Rowan*, 397 U.S. at 738; *Lehman*, 418 U.S. at 303-04. Other precedents suggest that a form of intermediate scrutiny applies in this context, where "the interests of unwilling listeners" are balanced against "the rights of speakers." *Hill*, 530 U.S. 718; *see also*

---

[2] *Compare* Suzanne Sangree, *Title VII Prohibitions Against Hostile Environment Sexual Harassment and the First Amendment: No Collision in Sight*, 47 RUTGERS L. REV. 461, 515-20 (1995), *with* Eugene Volokh, *Freedom of Speech & Workplace Harassment*, 39 U.C.L.A. L. REV. 1791, 1831-43 (1992).

*Frisby*, 487 U.S. at 488. The Court need not resolve this question here, however, for the Act's employment provisions clearly survive any standard—indeed, even strict scrutiny.

### 2.   The Employment Provisions Survive Any Level of Heightened Constitutional Scrutiny.

As just explained, the Individual Freedom Act's employment provisions serve the "substantial and justifiable" interest of preventing Florida employers from foisting speech that the State finds repugnant on a "captive audience" of employees "who are presumptively unwilling to receive it." *Frisby*, 487 U.S. at 488. And the Act also serves Florida's interest in stamping out invidious discrimination. The compelling nature of that interest is surely beyond dispute: indeed, it is so fundamental that it is embodied in our highest law. The Equal Protection Clause "prevent[s] the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). Such discrimination is "odious to a free people whose institutions are founded upon the doctrine of equality." *Loving*, 388 U.S. at 11.

These interests plainly extend into the workplace. The Supreme Court has recognized the "compelling state interests" in "[a]ssuring women equal access" to "business contacts and employment promotions," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984), and Florida's interest in eradicating discrimination in the workplace based on race, color, national origin, or religion is, if anything, even more weighty,

18

*see United States v. Paradise*, 480 U.S. 149, 170 (1987) (recognizing "compelling interest in remedying the [racial] discrimination that permeated entry-level hiring practices and the promotional process" by state agency); *Robinson*, 760 F. Supp. at 1536 (collecting cases).

The Act focuses with surgical precision on mandatory instruction that reflects invidious bias against certain employees on the basis of their race, sex, national origin, or religion; discriminatory principles that the targeted employees are forced to listen to or else suffer the consequences. It is in this narrow context that Florida's interests—in (1) protecting against invidiously biased, hostile speech aimed at employees on the basis of their race, sex, religion, or national origin and (2) preventing employers from coercing their employees to listen to speech that they, like the Florida Legislature, find abhorrent—unite and are at their apex. And the employment provisions are the least restrictive means of curbing this practice. They leave employers free to engage in, promote, and pay for any speech they wish, including the invidiously biased speech targeted by the Act, and they leave willing employees free to hear and to join in it. All they prevent is the use of the employer's coercive economic leverage over its employees to make them an offer they can't refuse: Listen to the company's speech or clear out your desk.

Indeed, the Act is far narrower than general statutes barring race- or sex-based hostile environments in the workplace, such as Title VII. *See* 42 U.S.C. §§ 2000e *et*

*seq.* Plaintiffs offer no explanation of how the employment provisions at issue here can be declared unconstitutional without dooming a vast range of routine employment discrimination claims under Title VII. While the Act is limited to the narrow context where an employer literally forces its employers to listen to unwelcome, discriminatory speech as an express condition of their employment, hostile environment claims are based on the judicial conclusion that, for example, a manager or co-worker's unwelcome, discriminatory speech can become so severe and pervasive as to *impliedly* alter the terms and conditions of employment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). Any holding striking down the Act's employment provisions would thus directly threaten the validity of Title VII's protections against hostile working environments. Yet the Supreme Court has endorsed hostile environment claims. *See, e.g.*, *id.* at 21-23. And *no* court, to Defendants' knowledge, has suggested that this entire field of employment discrimination law is unconstitutional. Yet that is a conclusion that Plaintiffs' arguments invite.

### 3.    Plaintiffs' Contrary Arguments All Fail.

Plaintiffs' arguments that the Act fails strict scrutiny have no merit.

i.    Plaintiffs' principal argument is that the Act is a viewpoint-based effort to "quell speech with which [Florida] disagrees" that is "unconstitutional per se." PI Br. 21, 27. They primarily base that conclusion on "[t]he circumstances of the Act's

enactment," including remarks by Gov. DeSantis at a press conference calling for the passage of the Act. *Id.* at 22. But the Eleventh Circuit has repeatedly made clear that lawmakers' public statements do not make an otherwise lawful statute unlawful. "We have held—'many times'—that 'when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *NetChoice, LLC v. Moody*, 34 F.4th 1196, 1224 (11th Cir. 2022) (quoting *In re Hubbard*, 803 F.3d 1298, 1312 (11th Cir. 2015)).

In any event, even assuming that the First Amendment is implicated and that the Act discriminates against speech based on viewpoint, the result would merely be the application of strict scrutiny—which, as explained above, the Act survives.

The Supreme Court's decision in *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992), clearly holds that viewpoint-based speech restrictions are subject to strict scrutiny, not any "per se" rule. After concluding that the challenged ordinance banning certain bias-motivated hate speech "goes even beyond mere content discrimination, to actual viewpoint discrimination," the Court struck down the ordinance not as "per se" unconstitutional, but rather because it was not "*necessary* to serve the asserted compelling interest," *id.* at 391, 395 (cleaned up). Of course, *R.A.V.*'s holding that strict scrutiny applies in the first place is inapplicable here, since the Act regulates conduct, not speech. *See* 505 U.S. at 387 (noting the

ordinance applied to "proscribable *speech*" (emphasis added)); *Wisconsin v. Mitchell*, 508 U.S. 476, 487-88 (1993) (holding that *R.A.V.* does not subject sentencing enhancements based on discriminatory motives to strict scrutiny because such statutes are "aimed at conduct unprotected by the First Amendment"). But even if the Act *did* regulate speech, *R.A.V.* establishes that at most strict scrutiny would apply, not some "per se" rule.

Based on cherry-picked, cobbled-together dicta and the Eleventh Circuit's decision in *Otto*, Plaintiffs insist that the Court of Appeals has "suggest[ed]" that viewpoint-discriminatory laws "may be 'unconstitutional per se.' " PI Br. 21 (quoting *Otto*, 981 F.3d at 864). But *Otto* itself noted that "the Supreme Court has not explicitly adopted a per se rule," 981 F.3d at 864—and, as this court has previously noted, it therefore "constru[ed] Supreme Court precedent to mean that viewpoint based restrictions are not per se unconstitutional but are subject to strict scrutiny," *Attwood v. Clemons*, 526 F. Supp. 3d 1152, 1172 (N.D. Fla. 2021). True, the Court also noted that when the Government defends a viewpoint-based speech restriction, such scrutiny "will be difficult to surpass," *id.*, but for the reasons explained above, the Act's employment provisions clear that hurdle.

ii.     Plaintiffs' efforts to show that the Act is not narrowly tailored fail in equal measure. Indeed, most of their criticisms of the Act's "expansive orbit," PI Br. 25, are based on obvious misinterpretations of the Act's language.

22

Begin with Plaintiffs' claim that the Act would forbid "many sexual harassment trainings." *Id.* at 25-26. Plaintiffs argue that the Act's bar on mandatory workplace trainings inculcating the idea that individuals "should not attempt to treat others without respect to … sex," FLA. STAT. § 760.10(8)(a)(4), is inconsistent with sexual harassment trainings, "which in part discourage employees from engaging in certain behaviors that negatively affect others because of their sex" and thus "treat the sex of the recipient of the behavior as important to understanding the behavior's impact." PI Br. 25. Not so. Nothing in the Act prevents employers from "treat[ing] the sex" of its employees "as important;" all it prohibits is compulsory trainings that discourage employees from treating people of different sexes equally. Fostering such equal treatment of the sexes in the workplace is the *very goal* of sexual harassment law. *See Harris*, 510 U.S. at 21 (Title VII designed "to strike at the entire spectrum of disparate treatment of men and women' in employment").

Plaintiffs next claim that the Act would proscribe "unconscious" or "implicit bias" training. *See, e.g.*, Margulis Decl. ¶ 14. They have not come close to showing that that is so. The Act prohibits mandatory trainings inculcating the idea that some individuals are "*inherently* racist, sexist, or oppressive, whether consciously or unconsciously" simply "by virtue of [their] race, color, sex, or national origin." FLA. STAT. § 760.10(2) (emphasis added). But at least the most prominent version of "implicit bias theory" is fully consistent with the Act. It recognizes that a person's

23

implicit biases are *not* determined "solely by virtue of his or her race," but rather by "a variety of factors," including "past experiences, emotional reconditioning, cultural biases," "societal stereotypes," and "other potential causal links." Justin D. Levinson, *Forgotten Racial Equality: Implicit Bias, Decisionmaking, and Misremembering*, 57 DUKE L.J. 345, 362-63 & n.80 (2007). To be sure, if plaintiffs understand "implicit bias" to mean that every individual, simply by virtue of his or her race, is inherently racist, then the Act does indeed prohibit Florida employers from forcing that viewpoint on employees who, like the Florida Legislature, find it odious and prefer not to hear it.

Finally, nor does anything in the Act prohibit mandatory workplace trainings where the instruction on some topic—such as the historical "exclusion of women from traditionally male fields like science and technology"—results in some employees feeling "[p]sychological unease or guilt." Orrin Decl. ¶ 24. As this Court has elsewhere explained, the Act "does not bar instruction that incidentally makes students feel bad; it bars *instructing* students that they '*must* feel guilt, anguish, or other forms of psychological distress for actions, in which he or she played no part, committed in the past by other members of the same race or sex.' " Order at 9-10, *Falls v. DeSantis*, No.22-cv-166 (N.D. Fla. July 8, 2022).

## II.    The Act's Employment Provisions Are Neither Unconstitutionally Vague nor Overbroad.

Plaintiffs' claims that the Act is unconstitutionally vague and overbroad are also unlikely to succeed.

### A. The Challenged Provisions Are Not Unconstitutionally Vague.

"Under the Due Process Clause, a law is void for vagueness if it fails to give ordinary people fair notice of the conduct it punishes or is so standardless that it invites arbitrary enforcement." *Jones v. Gov. of Fla.*, 975 F.3d 1016, 1046 (11th Cir. 2020). Neither condition is present here.

First, the Act provides fair notice because the "plain text of the [Act] sets forth clearly perceived boundaries." *Heyman v. Cooper*, 31 F.4th 1315, 1323 (11th Cir. 2022). Each of the challenged provisions uses plain, everyday language that has an "ordinary or natural meaning" that is either commonly known or can be easily discerned. *Tracy v. Fla. Atl. Univ. Bd. of Trustees*, 980 F.3d 799, 807 (11th Cir. 2020) (consulting dictionary definitions to hold that a term was not unconstitutionally vague). The "mere fact that close cases can be envisioned" in applying statutory requirements does not render a statute vague. *United States. v. Williams*, 553 U.S. 285, 305 (2008). Moreover, the Act applies solely to required employment training and is thus an "economic regulation" that "is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be

25

expected to consult relevant legislation in advance of action." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982).

Second, the Act's language is not "so standardless" that it invites arbitrary enforcement. *Jones*, 975 F.3d at 1046 (internal quotation marks omitted). Because Plaintiffs challenge the Act on a preenforcement basis, their burden to show the risk of discriminatory enforcement is much higher. *See Village of Hoffman*, 455 U.S. at 503 (in pre-enforcement context, "the speculative danger of arbitrary enforcement does not render the ordinance void for vagueness"); *see also High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1231 (11th Cir. 1982).[3]

Plaintiffs' contrary arguments fail. They list numerous words or phrases that they claim, with no supporting argumentation, are vague. *See* PI Br. 29. But the plain meaning of each of the terms in Plaintiffs' litany is commonly known.

"[W]hat it means to be 'morally superior.'" To be "superior" is to be "of higher rank, quality, or importance." *Superior*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007) (last visited July 19, 2022), https://bit.ly/3AZWxuz. And to be "*morally* superior" is to be of higher quality in "conforming to a standard of right behavior." *Moral*, *id.*, https://bit.ly/3v4kc9h. Therefore, as relevant here, the Act

---

[3] We are not arguing "that pre-enforcement review is essentially never appropriate when it comes to vagueness … claims … that implicate First Amendment rights." *Dream Defenders v. DeSantis*, 559 F. Supp. 3d 1238, 1264 (N.D. Fla. 2021). Our point is instead that Plaintiffs may not prevail on a pre-enforcement vagueness claim if the text provides fair notice.

prohibits endorsing the idea that members of one race are better than members of a different race at conforming to right standards of behavior.

"[W]hat counts as 'unconsciously' 'inherently' biased." For something to be "inherent" is to be "involved in the constitution or essential character of something." *Inherent*, *id.*, https://bit.ly/3v4kc9h. The adverb "unconsciously" means "not knowing or perceiving" or "not aware." *Unconscious*, *id.*, https://bit.ly/3crt2aN. Thus, as relevant here, this provision prohibits endorsing the concept that an individual—*simply because of his or her race*—is automatically racist from birth, even if the individual is unaware of it.

"[W]hat constitutes being 'necessarily' 'privileged.'" The adverb "necessarily" means "unavoidably." *Necessarily*, *id.*, https://bit.ly/3oiWjHn. To be "privileged" is to have "a right or immunity granted as a peculiar benefit, advantage, or favor." *Privilege*, *id.*, https://bit.ly/3aTTNnN. Thus, as relevant here, this provision prohibits endorsing the idea that an individual's race *unavoidably—i.e.*, without exception—determines whether the individual occupies the status of holding "a peculiar benefit, advantage, or favor" over individuals of a different race.

"[W]hat 'without respect to' the listed criteria means." The phrase "without respect to" means *without* "a relation or reference to a particular thing or situation." *See With Respect To*, *id.*, https://bit.ly/3Po5fXG. Thus, as relevant here, this provision prohibits endorsing the idea that members of one particular race, sex, etc.

*cannot or should not* attempt to treat others as individuals and without "relation or reference to" the other individuals' listed characteristics.

"[W]hat 'responsibility'" "encompasses." Responsibility for something is "moral, legal, or mental accountability" for it. *Responsibility*, *id.*, https://bit.ly/3AYU2bJ. Thus, as relevant here, this provision prohibits endorsing the idea that members of one race bear "moral, legal, or mental accountability" for actions committed in the past simply because those actions were committed "by other members of the same race."

"What 'other forms of psychological distress' are covered or what 'must feel' means." "Distress" is "pain or suffering affecting the body, a bodily part, or the mind." *Distress*, *id.*, https://bit.ly/3crnUDk. And "psychological" distress is "pain or suffering" of "the mind." *See Psychological*, *id.*, https://bit.ly/3PngXlr. Thus, as relevant here, this provision prohibits endorsing the idea that, because a person is of a particular race, he or she is obligated to feel guilt, anguish, or other mental suffering. Courts have had no problem determining that the phrase "substantial emotional distress" is not some sort of "esoteric or complicated term[] devoid of common understanding." *United States v. Osinger*, 753 F.3d 939, 945 (9th Cir. 2014).

"What is intended by 'created … to oppress.'" To "create" something is "to bring it into existence." *Create*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007)

(last visited July 19, 2022), https://bit.ly/3v0IBwu. To "oppress" is "to crush or burden by abuse of power or authority." *Oppress*, *id.*, https://bit.ly/3yNwxjg. As relevant here, this provision thus prohibits endorsing the concept that the enumerated *theoretical principles*—such as "fairness"—were "br[ought] into existence" by members of a particular race for the purpose of "crush[ing] or burden[ing]" members of a different race "by abuse of power or authority."

Accordingly, each of the terms Plaintiffs identify as unconstitutionally vague has an "ordinary or natural meaning" that is commonly known, used, and understood in ordinary conversation and can, in any event, be easily discerned. *Tracy*, 980 F.3d at 807.

Plaintiffs also attack "the statute's dichotomy between allowing 'discussion' of [the listed] concepts but prohibiting 'endorsement' of them." PI Br. 30. But again, the Act's terms are ordinary and commonly understood—especially when contrasted with one another. To discuss a concept "in an objective manner" is, obviously, to discuss it by "expressing or dealing with facts or conditions as perceived without distortion by personal feelings, prejudice, or interpretation." *Objective*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007) (last visited July 19, 2022), https://bit.ly/3zcLbB1. In contrast, to "endorse" a concept is "to give approval to" or "support" it. *Endorse*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY 470 (4th ed. 2002). Therefore, the plain meaning of the text permits the discussion of the

concepts—as concepts that factually exist in the world—without *giving approval* to the concepts.

Plaintiffs' reliance on the district court's vagueness holding in *Santa Cruz* is misplaced. *See* PI Br. 30 (citing *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 544 (N.D. Cal. 2020)). There, the relevant text prohibited training "to the extent it *teaches or implies* that an individual, by virtue of his or her race, sex, and/or national origin, is racist, sexist, oppressive, or biased," but permitted the training if it was "designed to *inform* workers." *Santa Cruz*, 508 F. Supp. 3d at 544 (internal quotation marks omitted). Whatever the merits of the *Santa Cruz* decision, the perceived vagueness largely resulted from the difficulty of determining when a training "implied" that a concept is true—an issue not presented here. Thus, the text at issue in *Santa Cruz* was not "nearly identical" to the text at issue here. PI Br. 30.

By contrast, the acts of either discussing something objectively or endorsing it are commonly understood. For example, in the analogous context of classroom instruction in public education, the Florida Board of Education has provided a useful, albeit obvious, description of the distinction between discussion and endorsement: "Efficient and faithful teaching further means that … teachers serve as facilitators for student discussion and do not share their personal views or attempt to

indoctrinate or persuade students to a particular point of view …." 6 FL ADC 6A-1.094124(3)(c).

Plaintiffs' supporting declarations add little of substance. Margulis claims that he will need to "spend a lot of time and money to try to figure out how to choose my words very carefully to avoid 'advancing' the prohibited concepts so that I don't violate the law." Margulis Decl. ¶ 17. As an initial matter, having to choose *her own* words carefully is not about the vagueness of *the Act*. *See Williams*, 553 U.S. at 306 ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."). And in any event, as already discussed, the concept of "advancing" an idea, like that of "endorsing" it, is far from vague. *See Advance*, MERRIAM-WEBSTER'S DICTIONARY (11th ed. 2007), https://bit.ly/3PjS3mX.

**B. The Challenged Provisions Are Not Overbroad**

Plaintiffs also do not come close to demonstrating "from the text of the law and from actual fact," *Doe v. Valencia College*, 903 F.3d 1220, 1232 (11th Cir. 2018), that the Act "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks,* 539 U.S. 113, 118-19 (internal quotation marks omitted).

31

Apart from merely reciting the legal conclusion that the Act "has zero" constitutional applications, Plaintiffs offer a single paragraph with a single hypothetical that, they say, would violate a single provision of the Act. PI Br. 31-32. Even if Plaintiffs' lone hypothetical would violate the Act, *but see supra*, p. 23, "the 'mere fact that one can conceive of *some* impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *United States v. Dean*, 635 F.3d 1200, 1206 (2011) (quoting *United States v. Williams*, 553 U.S. 285, 303 (2008) (emphasis added)). Plaintiffs' incorporation of their vagueness arguments does not help: Nothing in that section of their brief "demonstrat[es], from the text of the law, *and from actual fact*, that substantial overbreadth exists." *Hicks*, 539 U.S. at 122 (cleaned up) (emphasis added).

Essentially, "Plaintiffs' 'overbreadth' argument is nothing more than a restatement of the First Amendment argument they make on their own behalf." *Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1105 (10th Cir. 2006). Their overbreadth claim is thus unlikely to succeed. *See Members of City Council of City of Los Angeles v. Taxpayers For Vincent*, 466 U.S. 789, 802 (1984).

## III. Any Unconstitutional Provisions Are Severable.

To the extent the Court finds Plaintiffs' claims likely to succeed with respect to any of the Act's provisions, it should sever them from the remainder of the Act. Severability is "a matter of state law," and in Florida, unconstitutional provisions are

severable even in the absence of a severability clause if "(1) they can be separated from the remaining valid provisions; (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void; (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other; and (4) an act complete in itself remains after the invalid provisions are stricken." *Wollschlaeger*, 848 F.3d at 1318 (cleaned up). Here, each of the provisions of the Act clearly stands on its own and independently furthers Florida's interests in enacting it. If any portion of the Act is held unconstitutional, it should be severed from the remaining, valid provisions.

## IV.   Plaintiffs Are Not Entitled to a Preliminary Injunction.

Plaintiffs request for preliminary injunctive relief also founders on the remaining equitable factors.

### A. Plaintiffs Have Not Shown Irreparable Injury.

Plaintiffs' principal argument that the Act will cause them irreparable harm is based on the rule that "[v]iolations of First Amendment freedoms" constitute "a per se irreparable injury." PI Br. 33. But because they have not shown any likelihood that the Act *actually violates* any First Amendment freedoms, this presumption simply does not apply. Plaintiffs also briefly assert that the Act harms their "business

interests," *id.* at 34, but they make no effort to detail that harm or explain why it is irreparable.

## B. The Balance of the Equities Militates Against Preliminary Injunctive Relief.

The balance of the equities and the public interest weigh against enjoining the Act. As shown above, the State has a compelling—indeed, constitutionally enshrined—interest in ending racial discrimination, and an injunction will provide judicial sanction to conduct that Florida has determined, in the exercise of its sovereign judgment, constitutes race-based discrimination. And "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury," *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up), and that is true all the more when the statute at issue furthers an interest as fundamental as the elimination of racial discrimination and/or hostility.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated: July 21, 2022

Timothy L. Newhall
*Special Counsel*
Complex Litigation
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399-1050
Telephone: 850.414.3300
timothy.newhall@myfloridalegal.com

Respectfully Submitted,

/s/ Charles J. Cooper
Charles J. Cooper (Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants Ron DeSantis,
in his official capacity, et al.*

## CERTIFICATE OF WORD COUNT

Pursuant to Northern District of Florida Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing Defendant's Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 7,988 words as measured by Microsoft Office for Word 365.

/s/Charles J. Cooper
Charles J. Cooper