# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

HONEYFUND.COM INC

      VS                        USDC NO. 4:22-cv-00227-MW-MAF
                                     USCA NO. _____

RON DESANTIS et al

## TRANSMITTAL OF NOTICE OF APPEAL

      The following documents are hereby transmitted to the Clerk, U. S. Court of Appeals. The Certified copy of the appeal notice, docket entries, judgment/opinion/order appealed from are enclosed.

First Appeal Notice.
The appellate docket fee paid.  Date paid: 9/16/22
Court Reporter(s): Lisa Snyder and Megan Hague
Other:

Please acknowledge receipt on the enclosed copy of this transmittal to: TALLAHASSEE DIVISION

                                 JESSICA J. LYUBLANOVITS,
                                 CLERK OF COURT

                                 By: <u>Samantha Buckhalt</u>
                                 Deputy Clerk
                                 111 North Adams Street
September 19, 2022                    Tallahassee, Florida 32301

APPEAL

# U.S. District Court
## Northern District of Florida (Tallahassee)
## CIVIL DOCKET FOR CASE #: 4:22–cv–00227–MW–MAF
### *Internal Use Only*

HONEYFUND.COM INC et al v. DESANTIS et al
Assigned to: CHIEF JUDGE MARK E WALKER
Referred to: MAGISTRATE JUDGE MARTIN A
FITZPATRICK
Cause: 42:1983 Civil Rights Act

Date Filed: 06/22/2022
Jury Demand: Both
Nature of Suit: 950 Constitutional – State
Statute
Jurisdiction: Federal Question

**Plaintiff**

**HONEYFUND.COM INC**                    represented by    **AMY JANE LONGO**
ROPES & GRAY LLP – SAN
FRANCISCO CA
THREE EMBARCADERO CENTER
SAN FRANCISCO, CA 94111–4006
415–315–2301
Email: amy.longo@ropesgray.com
*ATTORNEY TO BE NOTICED*

**DOUGLAS H
HALLWARD–DRIEMEIER**
ROPES & GRAY LLP – WASHINGTON
DC
2099 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20006
202–508–4776
Email: douglas.hallward–driemeier@ropesgray.com
*ATTORNEY TO BE NOTICED*

**JOHN THOMAS LANGFORD**
PROTECT DEMOCRACY – NEW YORK
NY
82 NASSAU STREET
SUITE 601
NEW YORK, NY 10038
202–579–4582
Fax: 929–777–8428
Email: john.langford@protectdemocracy.org
*ATTORNEY TO BE NOTICED*

**RACHEL ELIZBABETH GOODMAN**
PROTECT DEMOCRACY – NEW YORK
NY
82 NASSAU STREET
SUITE 601
NEW YORK, NY 10038
202–997–0599
Email: rachel.goodman@protectdemocracy.org
*ATTORNEY TO BE NOTICED*

**SARA CHIMENE–WEISS**
PROTECT DEMOCRACY –
WASHINGTON DC
2020 PENNSYLVANIA AVENUE NW
SUITE 163
WASHINGTON, DC 20006
202–934–4237
Email: sara.chimene–weiss@protectdemocracy.org
*ATTORNEY TO BE NOTICED*

**SHALINI GOEL AGARWAL**
PROTECT DEMOCRACY –
WASHINGTON DC
2020 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20006–1811
850–860–9344
Email: shalini.agarwal@protectdemocracy.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHEVARA ORRIN**                    represented by    **AMY JANE LONGO**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **DOUGLAS H
                                                       HALLWARD–DRIEMEIER**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **JOHN THOMAS LANGFORD**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **RACHEL ELIZBABETH GOODMAN**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **SARA CHIMENE–WEISS**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **SHALINI GOEL AGARWAL**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**WHITESPACE CONSULTING LLC**        represented by    **AMY JANE LONGO**
*doing business as*                                    (See above for address)
COLLECTIVE CONCEPTS LLC                                *ATTORNEY TO BE NOTICED*

                                                       **DOUGLAS H
                                                       HALLWARD–DRIEMEIER**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **JOHN THOMAS LANGFORD**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **RACHEL ELIZBABETH GOODMAN**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **SARA CHIMENE–WEISS**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **SHALINI GOEL AGARWAL**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**PRIMO TAMPA LLC**                  represented by

**RACHEL ELIZBABETH GOODMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARA CHIMENE–WEISS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SHALINI GOEL AGARWAL**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**RON DESANTIS**                    represented by   **CHARLES JUSTIN COOPER**
COOPER & KIRK PLLC –
WASHINGTON DC
1523 NEW HAMPSHIRE AVE NW
WASHINGTON, DC 20036
202–220–9600
Email: ccooper@cooperkirk.com
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
COOPER & KIRK PLLC –
WASHINGTON DC
1523 NEW HAMPSHIRE AVE NW
WASHINGTON, DC 20036
202–220–9600
Email: johlendorf@cooperkirk.com
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
COOPER & KIRK PLLC –
WASHINGTON DC
1523 NEW HAMPSHIRE AVE NW
WASHINGTON, DC 20036
202–220–9621
Email: jramer@cooperkirk.com
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
COOPER & KIRK PLLC –
WASHINGTON DC
1523 NEW HAMPSHIRE AVE NW
WASHINGTON, DC 20036
202–220–9650
Email: mwold@cooperkirk.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**ASHLEY MOODY**                    represented by   **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**TIMOTHY LEEDS NEWHALL**
FLORIDA ATTORNEY GENERAL –
TALLAHASSEE FL
PL–01 THE CAPITOL
SUITE 310
32399–1050
TALLAHASSEE, FL 32399–1050
850–414–3300
Fax: 850–488–4872
Email: timothy.newhall@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**DARRICK MCGHEE**                    represented by   **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANGELA PRIMIANO**                   represented by   **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARIO GARZA**                       represented by   **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**LIBBY FARMER**                    represented by   **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAY PICHARD**                     represented by   **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**LARRY HART**                      represented by   **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MONICA CEPERO**                   represented by   **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**

(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

VIVIAN MYRTETUS                 represented by  **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

DAWN HANSON                     represented by  **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

KENYATTA MOYE                   represented by  **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PAMELA PAYNE**    represented by **CHARLES JUSTIN COOPER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D OHLENDORF**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOHN D RAMER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MEGAN MARIE WOLD**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/22/2022 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number AFLNDC–7213387.), filed by Whitespace Consulting, LLC, Chevara Orrin, Honeyfund.com, Inc.. (AGARWAL, SHALINI) (Entered: 06/22/2022) |
| 06/22/2022 | 2 | DOCKET ANNOTATION BY COURT: Re 1 Complaint filed by Whitespace Consulting, LLC, Chevara Orrin, Honeyfund.com, Inc. Party names (including aliases) are to be added using all caps and no punctuation. (See "Style Guide for Electronic Case Filing," available on Clerk's website.) The party names will be corrected by the clerk. Further, counsel is advised by this entry, that a Civil Cover Sheet must be filed as a separate entry using the event selection "Civil Cover Sheet" which is found under "Other Filings" under "Other Documents". (rcb) (Entered: 06/22/2022) |
| 06/22/2022 | 3 | NOTICE *of Filing Summons* by Honeyfund.com, Inc., Chevara Orrin, Whitespace Consulting, LLC (Attachments: # 1 Exhibit Summons – DeSantis, # 2 Exhibit Summons – Moody, # 3 Exhibit Summons – McGhee, # 4 Exhibit Summons – Primiano, # 5 Exhibit Summons – Garza, # 6 Exhibit Summons – Farmer, # 7 Exhibit Summons – Pichard, # 8 Exhibit Summons – Hart, # 9 Exhibit Summons – Cepero, # 10 Exhibit Summons – Myrtetus, # 11 Exhibit Summons – Hanson, # 12 Exhibit Summons – Moye, # 13 Exhibit Summons – Payne) (AGARWAL, SHALINI) (Entered: 06/22/2022) |
| 06/22/2022 | 4 | CIVIL COVER SHEET. (AGARWAL, SHALINI) (Entered: 06/22/2022) |
| 06/22/2022 | 5 | NOTICE *of a Prior or Similar Case* by Honeyfund.com, Inc., Chevara Orrin, Whitespace Consulting, LLC (AGARWAL, SHALINI) (Entered: 06/22/2022) |
| 06/23/2022 | 6 | Summons Issued as to All Defendants. (Attachments: # 1 Picard, # 2 Payne, # 3 myrtetus, # 4 Moye, # 5 mcghee, # 6 Hart, # 7 Hanson, # 8 garza, # 9 farmer, # 10 Desantos, # 11 Cepero, # 12 moody) (bkp) (Entered: 06/23/2022) |
| 06/23/2022 | | (Court only) ***Set Deadline – 60 Day No Activity Deadline set for **8/22/2022**. (bkp) (Entered: 06/23/2022) |
| 06/28/2022 | 7 | MOTION to Appear Pro Hac Vice by Douglas Hallward–Driemeier.( Filing fee $ 208 receipt number AFLNDC–7232597.) by HONEYFUND.COM INC, CHEVARA ORRIN, WHITESPACE CONSULTING LLC. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 06/28/2022) |
| 06/28/2022 | 8 | MOTION for Rachel Goodman to Appear Pro Hac Vice( Filing fee $ 208 receipt number AFLNDC–7232666.) by HONEYFUND.COM INC, CHEVARA ORRIN, WHITESPACE CONSULTING LLC. (GOODMAN, RACHEL) Modified on 6/28/2022 (tss). (Entered: 06/28/2022) |
| 06/28/2022 | 9 | MOTION to Appear Pro Hac Vice by Amy Jane Longo.( Filing fee $ 208 receipt number AFLNDC–7232910.) by HONEYFUND.COM INC, CHEVARA ORRIN, WHITESPACE CONSULTING LLC. (LONGO, AMY) (Entered: 06/28/2022) |

| 06/28/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 8 MOTION to Appear Pro Hac Vice and 9 MOTION to Appear Pro Hac Vice – Referred to MARTIN A FITZPATRICK. (tss) (Entered: 06/28/2022) |
|---|---|---|
| 06/29/2022 | 10 | ORDER– Accordingly, it is ORDERED that the motion for leave to appear prohac vice, ECF No. 7 , is GRANTED. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 6/29/22. (sjb) Modified on 6/29/2022 edit to judge(sjb). (Entered: 06/29/2022) |
| 06/29/2022 | 11 | ORDER – Accordingly, it is ORDERED that the motion for leave to appear prohac vice, ECF No. 8 , is GRANTED. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 6/29/22. (sjb) Modified on 6/29/2022 edit to judge (sjb). (Entered: 06/29/2022) |
| 06/29/2022 | 12 | ORDER – Accordingly, it is ORDERED that the motion for leave to appear prohac vice, ECF No. 9 , is GRANTED. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 6/29/22. (sjb) Modified on 6/29/2022 edit to judge (sjb). (Entered: 06/29/2022) |
| 06/29/2022 | 13 | MOTION to Appear Pro Hac Vice by John Langford.( Filing fee $ 208 receipt number AFLNDC–7236336.) by HONEYFUND.COM INC, CHEVARA ORRIN, WHITESPACE CONSULTING LLC. (LANGFORD, JOHN) (Entered: 06/29/2022) |
| 06/29/2022 | 14 | MOTION to Appear Pro Hac Vice by Sara Chimene–Weiss.( Filing fee $ 208 receipt number AFLNDC–7236190.) by HONEYFUND.COM INC, CHEVARA ORRIN, WHITESPACE CONSULTING LLC. (CHIMENE–WEISS, SARA) (Entered: 06/29/2022) |
| 06/29/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 14 MOTION to Appear Pro Hac Vice by Sara Chimene–Weiss.( Filing fee $ 208 receipt number AFLNDC–7236190.), 13 MOTION to Appear Pro Hac Vice by John Langford.( Filing fee $ 208 receipt number AFLNDC–7236336.). Referred to MARTIN A FITZPATRICK. (bkp) (Entered: 06/29/2022) |
| 06/29/2022 | 15 | ORDER – Accordingly, it is ORDERED that the motion for leave to appear prohac vice, ECF No. 13 , is GRANTED. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 6/29/22. (sjb) (Entered: 06/29/2022) |
| 06/29/2022 | 16 | ORDER – Accordingly, it is ORDERED that the motion for leave to appear prohac vice, ECF No. 14 , is GRANTED. Signed by MAGISTRATE JUDGE MARTIN A FITZPATRICK on 6/29/22. (sjb) (Entered: 06/29/2022) |
| 06/30/2022 | 17 | FIRST AMENDED COMPLAINT against All Defendants All Defendants., filed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. (AGARWAL, SHALINI) (Entered: 06/30/2022) |
| 06/30/2022 | 18 | MOTION for Preliminary Injunction *and MEMORANDUM in Support of Motion for Preliminary Injunction* by HONEYFUND.COM INC, CHEVARA ORRIN, PRIMO TAMPA LLC, WHITESPACE CONSULTING LLC. (Attachments: # 1 Exhibit Declaration – Sara Margulis (Honeyfund.com, Inc.), # 2 Exhibit Declaration – Antonio McBroom (Primo Tampa, LLC), # 3 Exhibit Declaration and Attached Exhibits – Chevara Orrin (Whitespace Consulting, LLC)) (AGARWAL, SHALINI) (Entered: 06/30/2022) |
| 06/30/2022 | 19 | NOTICE of Appearance by SARA CHIMENE–WEISS on behalf of All Plaintiffs (CHIMENE–WEISS, SARA) (Entered: 06/30/2022) |
| 06/30/2022 | 20 | NOTICE of Appearance by RACHEL ELIZABETH GOODMAN on behalf of HONEYFUND.COM INC, CHEVARA ORRIN, PRIMO TAMPA LLC, WHITESPACE CONSULTING LLC (GOODMAN, RACHEL) (Entered: 06/30/2022) |
| 07/01/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is needed Re: 18 MOTION for Preliminary Injunction *and MEMORANDUM in Support of Motion for Preliminary Injunction*, 17 Amended Complaint. Referred to MARTIN A FITZPATRICK. (sjb) (Entered: 07/01/2022) |

| 07/01/2022 | | ACTION NO LONGER REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE MARTIN A FITZPATRICK notified that action is no longer needed Re: 17 Amended Complaint and 18 MOTION for Preliminary Injunction (tss) (Entered: 07/01/2022) |
|---|---|---|
| 07/01/2022 | | Motions No Longer Referred: 18 MOTION for Preliminary Injunction *and MEMORANDUM in Support of Motion for Preliminary Injunction* (sjb) (Entered: 07/01/2022) |
| 07/01/2022 | 21 | ORDER FOR REASSIGNMENT. Case reassigned to CHIEF JUDGE MARK E WALKER for all further proceedings. JUDGE ALLEN C WINSOR no longer assigned to case signed by JUDGE ALLEN C WINSOR on 7/1/22. (bkp) (Entered: 07/01/2022) |
| 07/01/2022 | 22 | ORDER SETTING CONFERENCE SCHEDULE – Plaintiffs shall serve Defendants with a copy of this Order, their First Amended Complaint, and their Motion for Preliminary Injunction before the close of business, 5:00 p.m. (ET) on Wednesday, July 6, 2022, so the parties can confer prior to the scheduling conference. The Clerk shall set this matter for a telephonic scheduling conference on Friday, **7/8/2022 04:00 PM** (ET). Signed by CHIEF JUDGE MARK E WALKER on 7/1/22. (sjb) (Entered: 07/01/2022) |
| 07/07/2022 | 23 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. RON DESANTIS served on 7/5/2022, answer due 7/26/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |
| 07/07/2022 | 24 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. ASHLEY MOODY served on 7/5/2022, answer due 7/26/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |
| 07/07/2022 | 25 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. DARRICK MCGHEE served on 7/6/2022, answer due 7/27/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |
| 07/07/2022 | 26 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. ANGELA PRIMIANO served on 7/6/2022, answer due 7/27/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |
| 07/07/2022 | 27 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. MARIO GARZA served on 7/6/2022, answer due 7/27/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |
| 07/07/2022 | 28 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. LIBBY FARMER served on 7/6/2022, answer due 7/27/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |
| 07/07/2022 | 29 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. JAY PICHARD served on 7/6/2022, answer due 7/27/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |
| 07/07/2022 | 30 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. LARRY HART served on 7/6/2022, answer due 7/27/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |
| 07/07/2022 | 31 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. MONICA CEPERO served on 7/6/2022, answer due 7/27/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |

| 07/07/2022 | 32 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. VIVIAN MYRTETUS served on 7/6/2022, answer due 7/27/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |
|---|---|---|
| 07/07/2022 | 33 | NOTICE OF HEARING: Telephonic Preliminary Injunction Scheduling Hearing set for **7/8/2022 04:00 PM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER.<br><br>You may dial into the conference call as early as 3:50 PM EDT. Call in number: 888–684–8852. When prompted for an access code, enter: 3853136#. If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: 4565#. Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking.<br><br>*s/ Kimberly Westphal*<br>Deputy Clerk<br><br>The quality of the audio connection is compromised by the use of cell phones or speakerphones and counsel are requested not to use those devices during the call.<br><br>(kjw) (Entered: 07/07/2022) |
| 07/07/2022 | 34 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. DAWN HANSON served on 7/6/2022, answer due 7/27/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |
| 07/07/2022 | 35 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. KENYATTA MOYE served on 7/6/2022, answer due 7/27/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |
| 07/07/2022 | 36 | SUMMONS Returned Executed by WHITESPACE CONSULTING LLC, CHEVARA ORRIN, HONEYFUND.COM INC, PRIMO TAMPA LLC. PAMELA PAYNE served on 7/6/2022, answer due 7/27/2022. (HALLWARD–DRIEMEIER, DOUGLAS) (Entered: 07/07/2022) |
| 07/07/2022 | 37 | NOTICE of Appearance by TIMOTHY LEEDS NEWHALL on behalf of ASHLEY MOODY (NEWHALL, TIMOTHY) (Entered: 07/07/2022) |
| 07/08/2022 | 38 | ORDER SETTING HEARING ON MOTION FOR PRELIMINARY INJUNCTION AND OTHER DEADLINES – The hearing on Plaintiffs' motion for preliminary injunction is set for Monday, **8/8/2022**, at 9:00 a.m. (ET). Defendants' motion to dismiss, response to Plaintiffs' motion for preliminary injunction, and any declarations in support of their response, are due on or before **7/21/2022**. Plaintiffs' response to Defendants' motion to dismiss, their reply to Defendants' response to the motion for preliminary injunction, along with any rebuttal declarations, are due on or before **7/29/2022**. Finally, Defendants' reply in support of their motion to dismiss and any counter declarations are due on or before **8/4/2022**. Signed by CHIEF JUDGE MARK E WALKER on 7/8/22. (sjb) Modified on 7/11/2022 (sjb). (Entered: 07/08/2022) |
| 07/08/2022 | 39 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Scheduling Conference held on 7/8/2022. Parties discuss case status and schedule for 18 Motion for Preliminary Injunction hearing. Defendants witness declarations and response to 18 Motion and motion to dismiss due **7/21/2022**. Plaintiff's reply to 18 Motion and response to motion to dismiss due **7/29/2022**. Defendant's reply to motion to dismiss and plaintiff's counter declarations due **8/4/2022**. Preliminary injunction hearing set for 9:00 am on 8/8/22. Order to follow (Court Reporter Lisa Snyder (USDC–Tallahassee)). (vkm) (Entered: 07/08/2022) |
| 07/08/2022 | 40 | NOTICE OF HEARING RE: 18 MOTION for Preliminary Injunction: Preliminary Injunction Hearing set for **8/8/2022 09:00 AM** before CHIEF JUDGE MARK E WALKER. United States Courthouse, **Courtroom 5 West,** 111 North Adams St., Tallahassee, Florida 32301. |

|  |  | NOTE: If you or any party, witness or attorney in this matter has a disability that requires special accommodation, such as, a hearing impairment that requires a sign language interpreter or a wheelchair restriction that requires ramp access, please contact Victoria Milton McGee at 850−521−3510 in the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 07/08/2022) |
|---|---|---|
| 07/20/2022 | 41 | NOTICE of Appearance by CHARLES JUSTIN COOPER on behalf of MONICA CEPERO, RON DESANTIS, LIBBY FARMER, MARIO GARZA, DAWN HANSON, LARRY HART, DARRICK MCGHEE, KENYATTA MOYE, VIVIAN MYRTETUS, PAMELA PAYNE, JAY PICHARD, ANGELA PRIMIANO (COOPER, CHARLES) (Entered: 07/20/2022) |
| 07/21/2022 | 42 | NOTICE of Appearance by CHARLES JUSTIN COOPER on behalf of ASHLEY MOODY (COOPER, CHARLES) (Entered: 07/21/2022) |
| 07/21/2022 | 43 | MOTION to Appear Pro Hac Vice( Filing fee $ 208 receipt number AFLNDC−7323483.) by MONICA CEPERO, RON DESANTIS, LIBBY FARMER, MARIO GARZA, DAWN HANSON, LARRY HART, DARRICK MCGHEE, ASHLEY MOODY, KENYATTA MOYE, VIVIAN MYRTETUS, PAMELA PAYNE, JAY PICHARD, ANGELA PRIMIANO. (Attachments: # 1 Exhibit A − Certificate of Good Standing) (OHLENDORF, JOHN) (Entered: 07/21/2022) |
| 07/21/2022 | 44 | MOTION to Appear Pro Hac Vice( Filing fee $ 208 receipt number AFLNDC−7323580.) by MONICA CEPERO, RON DESANTIS, LIBBY FARMER, MARIO GARZA, DAWN HANSON, LARRY HART, DARRICK MCGHEE, ASHLEY MOODY, KENYATTA MOYE, VIVIAN MYRTETUS, PAMELA PAYNE, JAY PICHARD, ANGELA PRIMIANO. (Attachments: # 1 Exhibit A − Certificate of Good Standing) (RAMER, JOHN) (Entered: 07/21/2022) |
| 07/21/2022 | 45 | MOTION to Appear Pro Hac Vice( Filing fee $ 208 receipt number AFLNDC−7323752.) by MONICA CEPERO, RON DESANTIS, LIBBY FARMER, MARIO GARZA, DAWN HANSON, LARRY HART, DARRICK MCGHEE, ASHLEY MOODY, KENYATTA MOYE, VIVIAN MYRTETUS, PAMELA PAYNE, JAY PICHARD, ANGELA PRIMIANO. (Attachments: # 1 Exhibit A − Certificate of Good Standing) (WOLD, MEGAN) (Entered: 07/21/2022) |
| 07/21/2022 | 46 | ORDER ADMITTING JOHN RAMER PRO HAC VICE − The 44 motion is GRANTED. Mr. Ramer has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Defendants. Signed by CHIEF JUDGE MARK E WALKER on 7/21/22. (sjb) (Entered: 07/21/2022) |
| 07/21/2022 | 47 | ORDER ADMITTING JOHN OHLENDORF PRO HAC VICE − The 43 motion is GRANTED. Mr. Ohlendorf has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Defendants. Signed by CHIEF JUDGE MARK E WALKER on 7/21/22. (sjb) (Entered: 07/21/2022) |
| 07/21/2022 | 48 | ORDER ADMITTING MEGAN WOLD PRO HAC VICE − The 45 motion is GRANTED. Ms. Wold has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Defendants. Signed by CHIEF JUDGE MARK E WALKER on 7/21/22. (sjb) (Entered: 07/21/2022) |
| 07/21/2022 | 49 | MEMORANDUM in Opposition re 18 MOTION for Preliminary Injunction *and MEMORANDUM in Support of Motion for Preliminary Injunction* filed by MONICA CEPERO, RON DESANTIS, LIBBY FARMER, MARIO GARZA, DAWN HANSON, LARRY HART, DARRICK MCGHEE, ASHLEY MOODY, KENYATTA MOYE, VIVIAN MYRTETUS, PAMELA PAYNE, JAY PICHARD, ANGELA PRIMIANO. (COOPER, CHARLES) (Entered: 07/21/2022) |
| 07/21/2022 | 50 | MOTION to Dismiss for Lack of Jurisdiction ( (Internal deadline for referral to judge if response not filed earlier: **8/4/2022**).), MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by MONICA CEPERO, RON DESANTIS, LIBBY FARMER, MARIO GARZA, DAWN HANSON, LARRY HART, DARRICK MCGHEE, ASHLEY MOODY, KENYATTA MOYE, VIVIAN MYRTETUS, PAMELA PAYNE, JAY PICHARD, ANGELA PRIMIANO. (Attachments: # 1 Memorandum in |

| | | |
|---|---|---|
| | | Support) (COOPER, CHARLES) (Entered: 07/21/2022) |
| 07/26/2022 | | (Court only) ***Terminate Deadlines: Response Deadline (sjb) (Entered: 07/26/2022) |
| 07/29/2022 | 51 | REPLY to Response to Motion re 18 MOTION for Preliminary Injunction *and MEMORANDUM in Support of Motion for Preliminary Injunction* filed by HONEYFUND.COM INC, CHEVARA ORRIN, PRIMO TAMPA LLC, WHITESPACE CONSULTING LLC. (AGARWAL, SHALINI) (Entered: 07/29/2022) |
| 07/29/2022 | 52 | RESPONSE in Opposition re 50 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by HONEYFUND.COM INC, CHEVARA ORRIN, PRIMO TAMPA LLC, WHITESPACE CONSULTING LLC. (Attachments: # 1 Affidavit of Chevara Orrin (supplemental)) (AGARWAL, SHALINI) (Entered: 07/29/2022) |
| 08/01/2022 | | (Court only) ***Terminate Deadlines: Reply Deadline (sjb) (Entered: 08/01/2022) |
| 08/04/2022 | | (Court only) ***Terminate Deadlines: Miscellaneous Deadline and Response Deadline (sjb) (Entered: 08/04/2022) |
| 08/04/2022 | 53 | RESPONSE in Support re 50 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by MONICA CEPERO, LIBBY FARMER, MARIO GARZA, DAWN HANSON, LARRY HART, DARRICK MCGHEE, ASHLEY MOODY, KENYATTA MOYE, VIVIAN MYRTETUS, PAMELA PAYNE, JAY PICHARD, ANGELA PRIMIANO. (COOPER, CHARLES) (Entered: 08/04/2022) |
| 08/08/2022 | 54 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Evidentiary Hearing held on 8/8/2022. Court hears argument regarding Plaintiff's 18 Motion for Preliminary Injunction & Defendants' 50 Motion to Dismiss. Ruling by Court: Order to follow (Court Reporter Megan Hague (USDC–Tallahassee)). (vkm) (Entered: 08/08/2022) |
| 08/17/2022 | | (Court only) ***Terminate Deadlines: Answer deadline (sjb) (Entered: 08/17/2022) |
| 08/17/2022 | | (Court only) ***Terminate Deadlines: Motion Hearing (sjb) (Entered: 08/17/2022) |
| 08/18/2022 | 55 | PRELIMINARY INJUNCTION. Plaintiffs' motion for a preliminary injunction, ECF No. 18 , is GRANTED in part. Defendants Moody, McGhee, Primiano, Garza, Farmer, Pichard, Hart, Cepero, Myrtetus, Hanson, Moye, and Payne must take no steps to enforce § 760.10(8), Fla. Stat. until otherwise ordered. The motion, ECF No. 18 , is otherwise DENIED in part as to Defendant DeSantis. Signed by CHIEF JUDGE MARK E WALKER on 8/18/2022. (kjw) (Entered: 08/18/2022) |
| 08/18/2022 | 56 | ORDER DENYING MOTION TO DISMISS. Defendants' motion to dismiss, ECF No. 50 , is DENIED. Signed by CHIEF JUDGE MARK E WALKER on 8/18/2022. (kjw) (Entered: 08/18/2022) |
| 08/29/2022 | | (Court only) ***Set/Reset Deadline –( 90 Day No Activity Deadline set for **11/28/2022**.), ***Terminate Deadlines: 60 Day Deadline (sjb) (Entered: 08/29/2022) |
| 09/01/2022 | 57 | ANSWER to 17 Amended Complaint by MONICA CEPERO, RON DESANTIS, LIBBY FARMER, MARIO GARZA, DAWN HANSON, LARRY HART, DARRICK MCGHEE, ASHLEY MOODY, KENYATTA MOYE, VIVIAN MYRTETUS, PAMELA PAYNE, JAY PICHARD, ANGELA PRIMIANO. (COOPER, CHARLES) (Entered: 09/01/2022) |
| 09/14/2022 | 58 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Preliminary Injunction Proceedings held on 8/8/2022, before Judge Mark E. Walker. Court Reporter/Transcriber Megan A. Hague, Telephone number 850–443–9797.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. |

| | | |
|---|---|---|
| | | Redaction Request due **9/21/2022**. Release of Transcript Restriction set for **12/20/2022**. (mah) (Entered: 09/14/2022) |
| 09/16/2022 | 59 | NOTICE OF APPEAL as to 55 Preliminary Injunction, by MONICA CEPERO, RON DESANTIS, LIBBY FARMER, MARIO GARZA, DAWN HANSON, LARRY HART, DARRICK MCGHEE, ASHLEY MOODY, KENYATTA MOYE, VIVIAN MYRTETUS, PAMELA PAYNE, JAY PICHARD, ANGELA PRIMIANO. ( Filing fee $505 Receipt Number AFLNDC−7445320.) (COOPER, CHARLES) (Entered: 09/16/2022) |
| 09/19/2022 | 60 | Appeal Instructions re: 59 Notice of Appeal, : The Transcript Request Form is available on the Internet at http://www.flnd.uscourts.gov/forms/Attorney/ECCA_transcript_form_fillable.pdf **PLEASE NOTE** Separate forms must be filed for each court reporter in both the district court and the appeals court. Transcript Order Form due by **10/3/2022**. (sjb) (Entered: 09/19/2022) |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

HONEYFUND.COM, INC., et al.,

                    *Plaintiffs*,

      v.

RON DESANTIS, in his official
capacity as Governor of Florida, et al.,

                  *Defendants*.

Case No. 4:22-cv-227-MW/MAF

## NOTICE OF APPEAL

Notice is hereby given that Defendants RON DESANTIS, in his official capacity as Governor of the State of Florida; ASHLEY MOODY, in her official capacity as Attorney General of the State of Florida; DARRICK D. MCGHEE, in his official capacity as Senior Chair of the Florida Commission on Human Relations ("the Commission"); ANGELA PRIMIANO, in her official capacity as Vice Chair and Commissioner of the Commission; and MARIO GARZA, LIBBY FARMER, JAY PICHARD, LARRY D. HART, MONICA CEPERO, VIVIAN MYRTETUS, DAWN HANSON, KENYATTA MOYE, and PAMELA PAYNE, in their official capacities as Commissioners of the Commission, hereby appeal to the United States Court of Appeals for the Eleventh Circuit from the Order and Opinion granting a

Preliminary Injunction, Doc. 55, entered in this action on the 18th day of August,

2022.

September 16, 2022                          Respectfully Submitted,

Timothy L. Newhall                          s/ Charles J. Cooper
*Special Counsel*                           Charles J. Cooper (Bar No. 248070DC)
Complex Litigation                          John D. Ohlendorf (*Pro Hac Vice*)
Office of the Attorney General              Megan M. Wold (*Pro Hac Vice*)
The Capitol, PL-01                          John D. Ramer (*Pro Hac Vice*)
Tallahassee, FL 32399-1050                  COOPER & KIRK, PLLC
Telephone: (850) 414-3300                   1523 New Hampshire Avenue, N.W.
timothy.newhall@myfloridalegal.com          Washington, D.C. 20036
                                            Tel: (202) 220-9600
                                            Fax: (202) 220-9601
                                            ccooper@cooperkirk.com
                                            johlendorf@cooperkirk.com
                                            mwold@cooperkirk.com
                                            jramer@cooperkirk.com

                                            *Counsel for Defendants Ron DeSantis,*
                                            *in his official capacity, et al.*

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

HONEYFUND.COM, INC.,
et al.,

         *Plaintiffs*,

 v.                      Case No.:  4:22cv227-MW/MAF

RON DESANTIS, in his official
Capacity as Governor of Florida,
et al.,

         *Defendants*.

_____/

## PRELIMINARY INJUNCTION

In the popular television series *Stranger Things*, the "upside down" describes a parallel dimension containing a distorted version of our world. *See Stranger Things* (Netflix 2022). Recently, Florida has seemed like a First Amendment upside down. Normally, the First Amendment bars the state from burdening speech, while private actors may burden speech freely. But in Florida, the First Amendment apparently bars private actors from burdening speech, while the state may burden speech freely. *Compare NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082, 1084 (N.D. Fla. 2021), *with* § 760.10(8)(a)–(b), Fla. Stat.

Now, like the heroine in *Stranger Things*, this Court is once again asked to pull Florida back from the upside down. Before this Court is a motion for a preliminary injunction, asking this Court to enjoin a host of Government officials

from enforcing portions of the Individual Freedom Act—a law that prohibits employers from endorsing any of eight concepts during any mandatory employment activity. Because the challenged provision of the Act is a naked viewpoint-based regulation on speech that does not pass strict scrutiny, Plaintiffs' motion for a preliminary injunction, ECF No. 18, is **GRANTED in part**.

## I

Patterned after Title VII of the Civil Rights Act of 1964, the Florida Civil Rights Act of 1992—or FCRA—bans discrimination in employment based on race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status. § 760.10(2), Fla. Stat. Since its passage, the FCRA has been a centerpiece of Florida antidiscrimination law.

In 2022, the Florida Legislature passed the "Individual Freedom Act," or IFA. Besides overhauling Florida's education laws, the IFA amends the FCRA by expanding the definition of unlawful employment practice to include requiring employees to attend a training—or any other "required activity"—that promotes any of eight forbidden concepts. It provides:

> (a) Subjecting any individual, as a condition of employment, membership, certification, licensing, credentialing, or passing an examination, to training, instruction, or any other required activity that espouses, promotes, advances, inculcates, or compels such individual to believe any of the following concepts constitutes discrimination based on race, color, sex, or national origin under this section:
> 1. Members of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin.

2.   An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3.   An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex, or national origin.

4.   Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin.

5.   An individual, by virtue of his or her race, color, sex, or national origin, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, sex, or national origin.

6.   An individual, by virtue of his or her race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7.   An individual, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the individual played no part, committed in the past by other members of the same race, color, sex, or national origin.

8.   Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin.

(b)   Paragraph (a) may not be construed to prohibit discussion of the concepts listed therein as part of a course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts.

§ 760.10(8), Fla. Stat.

Plaintiffs challenge this provision. They include both employers who wish to mandate trainings now barred by the IFA (Plaintiffs Honeyfund and Primo) and a diversity and inclusion consultant who gives such trainings (Plaintiffs Orrin and Whitespace Consulting). ECF No. 17 ¶¶ 19–22. In their complaint, Plaintiffs argue

3

that the IFA is a viewpoint-based restriction on speech that presumptively violates the First Amendment. *Id.* ¶¶ 104–14. They also claim that the IFA is both vague and overbroad. *Id.* ¶¶ 115–24. Defendants are Governor DeSantis, Attorney General Moody, and the Commissioners of the Florida Commission on Human Relations (FCHR)—all sued in their official capacities. *Id.* ¶¶ 23–35.

Along with their complaint, Plaintiffs filed a motion for a preliminary injunction, asking this Court to enjoin Defendants from enforcing the IFA. ECF No. 18. After extensive briefing, *see* ECF Nos. 49, 50, 51, 52 & 53, this Court held a hearing on the motion, and the issue is now ripe for resolution.[1]

## II

A district court may grant a preliminary injunction if the movant shows: "(1) it has a substantial likelihood of success on the merits;" (2) it will suffer irreparable injury "unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Although a "preliminary

---

[1] This Court recognizes that "urgency . . . is characteristic of the preliminary-injunction context." Charles Alan Wright et al., *Federal Practice and Procedure* § 2949 (3d ed. 2013). And, as it always has whether granting or denying such motions, this Court has done its best to treat Plaintiffs' motion accordingly. *See, e.g.*, *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1134 (N.D. Fla. 2020) (noting that this Court "issued its original order at 2:07 a.m." just days after the plaintiffs filed their motion). This Court held a hearing on Plaintiffs' motion roughly a month after Plaintiffs filed it. This Court has also striven to get this written order out as quickly as possible, while also accounting for other important matters—such as a four-day murder-for-hire criminal trial.

injunction is an extraordinary and drastic remedy," it should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). No one factor, however, is controlling; this Court must consider the factors jointly, and a strong showing on one factor may compensate for a weaker showing on another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Finally, "[a]lthough the initial burden of persuasion is on the moving party, the ultimate burden is on the party who would have the burden at trial." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (citing *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)). Applying this standard, this Court first considers whether Plaintiffs have established a likelihood of success on the merits.

## III

This Court begins with whether Plaintiffs have shown a substantial likelihood of success on the merits. This Court addresses this factor first because, typically, if a plaintiff cannot "establish a likelihood of success on the merits," this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). And because standing is always "an indispensable part of the plaintiff's case,"

this Court begins its merits analysis with standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

A

The "affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that [a] plaintiff has standing." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring and dissenting). Any evaluation of Plaintiffs' claims thus necessitates an inquiry into Plaintiffs' ability to bring such claims.

Over time, the Supreme Court has developed a three-part test for determining when standing exists. Under that test, a plaintiff must show (1) that they have suffered an injury-in-fact that is (2) traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *See Lujan*, 504 U.S. at 560–61. And "where a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.' " *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). Thus, "a plaintiff cannot 'rest on such mere allegations, [as would be appropriate at the pleading stage] but must set forth by affidavit or other evidence

6

specific facts, which for purposes of the summary judgment motion will be taken to be true.' " *Cacchillo*, 638 F.3d at 404 (some alteration in original) (quoting *Lujan*, 504 U.S. at 561).

Plaintiffs fall into two categories: employers and consultants. This Court will address each category's standing in turn. Then, this Court explains why Plaintiffs have not established standing to obtain an injunction against Governor DeSantis.

1

This Court first addresses the standing of Plaintiff Honeyfund and Plaintiff Primo (Plaintiff employers). Plaintiff employers are both Florida employers subject to the FCRA, including the provisions added by the IFA. The FCRA defines employers as "any person employing 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person." § 760.02(7), Fla. Stat. Plaintiff Honeyfund is a technology company based in Clearwater, Florida, with sixteen employees. ECF No. 18-1 at 1. Plaintiff Primo is a Ben & Jerry's franchise operator with shops in Clearwater Beach and Midtown Tampa. ECF No. 18-2 at 2. It has forty employees working in those Florida locations. *Id.*

Both Plaintiff employers planned to conduct mandatory trainings, which they now fear the IFA prohibits. Plaintiff Honeyfund had plans to formalize DEI (diversity, equity, inclusion) training this year at its November 2022 mandatory team

7

retreat. ECF No. 18-1 at 6. "Planned topics include advancing women in business, understanding gender expansiveness . . . understanding institutional racism" and anti-harassment training. *Id.* Each of these topics might run afoul of the IFA, which prohibits requiring employees to attend trainings as a condition of employment which "espouse[], promote[], advance[], inculcate[]" or endorse prohibited concepts. § 760.10(8), Fla. Stat. In response, Honeyfund will have to hire lawyers to review any training plans, and will likely need to change or limit the scope of training sessions, or make them voluntary rather than mandatory. ECF No. 18-1 at 6.

Similarly, Plaintiff Primo regularly holds DEI trainings for its employees which expressly use terms such as "dominant group," "racial bias," "white man's privilege," and "white man's guilt," and address topics such as systemic racism, oppression, and intersectionality. ECF No. 18-2 at 4. The IFA prohibits employers from endorsing the concept that "a person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex" at mandatory trainings. § 760.10(8)(a)(3), Fla. Stat. As such, Plaintiff Primo plans to alter language used at mandatory trainings to avoid violating the law. ECF No. 18-2 at 5. With these facts in mind, this Court considers each of the three standing prongs, starting with injury.

When First Amendment rights are involved, courts apply the injury-in-fact requirement most loosely, "lest free speech be chilled even before the law or

regulation is enforced." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). As such, an actual injury can exist when a plaintiff avoids expression to avoid potential legal consequences of the expression. *Id.* Both Plaintiff employers have submitted affidavits expressing that (1) they are employers subject to the Florida Civil Rights Act; (2) before the IFA's passage they held or planned to imminently hold mandatory DEI trainings; and (3) to avoid violating the IFA, they plan to alter their trainings in ways that either change the language used, message conveyed, or transition from mandatory to voluntary trainings. For these reasons, this Court concludes that the Plaintiff employers have submitted sufficient evidence to establish injury in fact.

This Court also concludes that the Plaintiff employers' injury is traceable to Defendants Moody—in her official capacity as Florida Attorney General—and the FCHR. Section 760.021, Florida Statutes, grants the Attorney General authority to commence civil actions if she has reasonable cause to believe that an employer has engaged in a pattern or practice of discrimination, which includes requiring employees to attend trainings as a condition of employment which endorse the eight prohibited concepts listed in section 760.10(8), Florida Statutes. Additionally, the FCHR is empowered to "receive, initiate, investigate, seek to conciliate, hold hearings on, and act upon complaints alleging any discriminatory practice," including mandatory trainings which endorse the concepts prohibited by the IFA.

§ 760.06(5), Fla. Stat. Should Plaintiff employers host mandatory trainings endorsing the eight prohibited concepts, they could be subject to enforcement actions under the authority the FCRA grants to either of these two Defendants.

As such, Plaintiffs have also established redressability, because an injunction prohibiting the Attorney General and the FCHR from enforcing section 760.10(8) would give Plaintiffs the freedom to endorse those eight concepts without fear of government enforcement. *See Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) ("The latter two [standing] requirements—traceability and redressability—often travel together . . . ."). While unclear, an injunction may not prevent employees from bringing suit. But redress need not be total to satisfy Article III. *Reeves v. Comm'r*, 23 F.4th 1308, 1318 (11th Cir. 2022). And enjoining Defendants here will provide at least partial redress.

Based on the above, Plaintiff employers have standing. While the standing requirement is satisfied as long as a single plaintiff has standing, *see Rumsfeld v. FAIR*, 547 U.S. 47, 53 (2006), this Court will also address Plaintiff consultants' standing.

2

This Court next addresses the standing of Plaintiff Orrin and Plaintiff Collective Concepts (Plaintiff consultants). Plaintiff Orrin is an expert in DEI, who works with private employers in Florida to provide seminars and trainings on topics

10

including historical and structural racism, unconscious bias, and diversity and inclusion in the workplace. ECF No. 18-3 at 2. Collective Concepts is a consulting company Plaintiff Orrin founded to provide corporations and nonprofits with DEI trainings. *Id.* at 1. Plaintiff Orrin's clients at Collective Concepts include, among others, St. Jude Children's Research Hospital, Truist Banks, the American Bar Association, Comoto, and Florida Blue. *Id.* at 2. Plaintiff Orrin is also a strategist at the Winters Group, a diversity and inclusion consulting firm. *Id.*

Plaintiff consultants argue that the IFA injures them because it has had a chilling effect on Florida employers, which has tangibly harmed their business. *Id.* at 7. In one instance, Plaintiff Orrin was asked by clients to change language in her training to avoid triggering discrimination complaints from employees. *Id.* at 4. Some clients have decided to wait and see if the IFA is enjoined before moving forward with training contracts. *Id.* at 7. Additionally, clients who had previously expressed interest in hiring Plaintiff Orrin have since said they likely could not pursue DEI work with her because of the IFA. *Id.*

In *Falls*—a parallel challenge to the IFA also pending in this Court—this Court held that a DEI consultant did not have standing. This Court so held because, when a consultant's injury depends on "the decision of an independent third party" not to hire her, "standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (cleaned

up). However, unlike the consultant in *Falls*, Plaintiff Orrin has submitted an affidavit expressing that "she has lost clients, that clients have told her they will no longer hire her, [and] that clients have even expressed trepidation about hiring her." ECF No. 62 at 21, *in Falls v. DeSantis*, 4:22cv166 (N.D. Fla.). As this Court need not rely on inferences that clients will act in a way which will damage Plaintiff consultants' business, and can instead rely directly on Plaintiff Orrin's affidavit, Plaintiff consultants have established that the IFA has caused—and will cause— them tangible injuries.

This Court likewise concludes that Plaintiff consultants' injury is fairly traceable to Defendants Moody and the FCHR. Plaintiffs' clients have expressed that they will change or cancel DEI trainings to avoid the legal consequences of the IFA that, as explained above, both Defendants have the authority to impose. In turn, Plaintiff consultants are harmed because they lose business. But if this Court enjoins Defendants Moody and the FCHR from enforcing the IFA, Plaintiffs' clients will be free to hire Plaintiffs. *See* ECF No. 18-3 at 7 (explaining that "a number of potential clients have adopted a wait and see position of mostly not moving forward with contracts until [the IFA] is enjoined"). Therefore, the injury Plaintiff consultants suffer can be traced to the Attorney General and the FCHR's authority to enforce the IFA. Plus, an injunction prohibiting the Attorney General and the FCHR from enforcing the law would allow Plaintiffs' clients to proceed with previously planned

contracts without fear of legal consequences. Thus, the Plaintiff consultants have established redressability. In sum, Plaintiffs have shown that the "third parties" on which their standing relies "will likely react in predictable ways." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). Thus, Plaintiff consultants have standing.

3

While all Plaintiffs have standing to seek an injunction against the Attorney General and the FCHR, none have set forth by affidavit or other evidence specific facts that, taken to be true, establish that Plaintiffs' injuries are traceable to Governor DeSantis or redressable by an injunction against him. Plaintiffs argue that they have standing to sue Governor DeSantis because (1) the Governor has constitutional authority to enforce the laws of Florida, (2) the Governor has unilateral constitutional authority to initiate judicial proceedings against members of the FCHR for failure to enforce the law, (3) the Governor has unilateral statutory authority to appoint all FCHR commissioners and suspend them for cause, and (4) the FCHR may refer employment complaints to the Governor's office. ECF No. 52 at 21.

As for Plaintiffs' argument that the Governor has constitutional authority to enforce the laws of Florida, that alone is not enough to establish traceability or redressability. *See Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052, 1078 (N.D. Fla. 2021). However, this Court has found that injuries are fairly traceable to the

Governor where the Governor has the authority to suspend officers, initiate proceedings against those who fail to follow directives to enforce the law, *plus* some other additional enforcement authority. *See Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1261 (N.D. Fla. 2021) (holding Governor was a proper party because he had the power to order sheriffs to suppress riots and unlawful assemblies, to suspend sheriffs who decline to obey his directives to suppress riots, and to order the Florida Department of Law Enforcement to investigate sheriffs). If the FCHR does indeed refer complaints to the Governor's office, Plaintiffs' injuries could be traceable to Governor DeSantis and redressable by an order against him.

But while, under this theory, Plaintiffs may have standing to sue the Governor, Plaintiffs have not met their burden at the preliminary injunction stage to provide evidence establishing that Governor DeSantis has additional enforcement authority related directly to section 760.10, Florida Statutes. Plaintiffs point to the FCHR's website, which notes that it may refer employment complaints to another agency, including the Governor's office, but they have provided no evidence to show what happens after a referral. *Employment*, Florida Commission on Human Relations, https://fchr.myflorida.com/employment. In fact, Plaintiffs conceded during the hearing on their motion that they would need discovery to investigate what happens after a complaint is referred by the FCHR to the Governor, and admitted that they

14

lack the evidence to support standing as to the Governor at the preliminary injunction stage.

Furthermore, even if Plaintiffs had standing to sue the Governor, an order directed to the FCHR, prohibiting them from referring employment complaints under section 760.10(8), Florida Statutes, to the Governor's office would be sufficient to provide complete relief. "The Eleventh Circuit has held that a district court may dismiss claims against redundant official-capacity defendants." *See Brenner v. Scott*, 999 F. Supp. 2d 1278, 1286 (N.D. Fla. 2014) (citing *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991)). For these reasons, this Court finds that Plaintiffs are not substantially likely to succeed on the merits as to their claims against Governor DeSantis, and the motion for preliminary injunction is **DENIED** as to him.[2]

In sum, all Plaintiffs have standing to seek an injunction against Defendants Moody and the FCHR. Having so concluded, this Court turns to the substance of Plaintiffs' claims.

---

[2] Because this Court determines that Plaintiffs have not shown that they are substantially likely to establish standing to sue Governor DeSantis, this Court need not address the issue—which the parties also briefed—of whether the Governor is a proper party under *Ex parte Young*. *See Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) (declining to address *Ex parte Young* after finding the plaintiffs lacked standing).

B

"The State may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578–79 (2011). Plaintiffs argue that the IFA does just that, placing a presumptively unconstitutional viewpoint-based restriction on speech—in other words, they say the IFA targets their "speech because of its message." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

Defendants offer three responses. *First*, Defendants say that the IFA restricts only conduct, not speech. *Second*, Defendants argue that, even if the IFA restricts speech, it does so only incidentally in regulating conduct. *Third*, assuming that the IFA directly regulates speech, Defendants argue it passes constitutional scrutiny. This Court tackles each argument in turn.

1

Defendants first argue that Plaintiffs' First Amendment challenge fails because the IFA does not regulate speech at all. Rather, they say, it only regulates the conduct of making "attendance at training events or sessions [covered by the IFA] mandatory" for employees. ECF No. 49 at 13.[3] Defendants are mistaken.

---

[3] In so arguing, Defendants concede that Plaintiffs have First Amendment rights, and that the First Amendment protects speech delivered at private workplace trainings.

To start—though trainings are admittedly at the center of this case—the IFA does far more than ban mandatory trainings. It bars "*any* . . . required activity" at which the eight forbidden "concepts" are discussed and endorsed. § 760.10(8)(a), Fla. Stat. (emphasis added). Conceivably, that includes trainings, phone calls, assignments, discussions—anything that is required and endorses the concepts.

More to the point, the IFA does not ban *all* mandatory employee trainings. Nor does it ban mandatory trainings addressing certain concepts. No, the IFA only prohibits trainings that *endorse* the covered concepts. Indeed, the IFA grants employers free rein to hold mandatory trainings addressing any of the eight concepts so long as those trainings condemn or take no position on those concepts.

Take that idea further. Because the IFA covers any required activity, an employer could require every employee to read *Woke, Inc., Inside Corporate America's Social Justice Scam* but could not require employees to read *The Color of Law*. Worse still, a nonprofit corporation devoted to promoting the idea that white privilege exists could not hold a required meeting at which it endorses the concept of white privilege. But a nonprofit holding the opposite view could freely hold meetings criticizing the concept of white privilege.

The bottom line is that the *only* way to determine whether the IFA bars a mandatory activity is to look to the viewpoint expressed at that activity—to look at speech. Plainly, the IFA regulates speech. *See Sorrell*, 564 U.S. at 567 (noting, in

rejecting the state's argument that the challenged law restricted only conduct, that the "law does not simply have an effect on speech, but is directed at certain content and is aimed at particular speakers"); *Dana's R.R. Supply v. Attorney Gen., Fla.*, 807 F.3d 1235, 1245 (11th Cir. 2015) (explaining that, when liability for violating a statute "turns solely on the [speaker's] choice of words," the statute restricts "speech, not conduct").[4]

2

Fine, Defendants say, let's assume the IFA burdens speech. Even still, that burden is only incidental to the IFA's permissible regulation of conduct. Thus, the IFA does not implicate the First Amendment. True, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell*, 564 U.S. at 567.[5] But that principle does not apply here.

---

[4] For the same reason the IFA regulates speech, Defendants' reliance on *Hill v. Colorado*, 530 U.S. 703 (2000) is inapt. While *Hill* said that "[i]t is common in the law to examine the content of a communication to determine the speaker's purpose," it also made clear that the restriction at issue was permissible only because it did not restrict "either a particular viewpoint or any subject matter that may be discussed by a speaker." *Id.* at 721, 723. By comparison, the IFA does just that.

[5] At times, Defendants seem to suggest that Plaintiffs' speech is commercial. *See* ECF No. 49 at 14 (describing the IFA as regulating "commercial action"). But Plaintiffs' speech is not commercial just because Plaintiffs are companies or consultants paid to speak. Rather, commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980); *see also Commercial*, *Black's Law Dictionary* (6th ed. 1990) ("Relates to or is connected with trade and traffic or commerce in general; is occupied with business and commerce."). Plaintiffs' speech to their employees is not concerned with trade and does not propose a transaction. It is not commercial speech.

As the Eleventh Circuit has explained, where "the only conduct which the State [seeks] to punish [is] the fact of communication," the statute regulates speech, not conduct. *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020) (cleaned up) (quoting *Cohen v. California*, 403 U.S. 15, 18 (1971)). And the telltale sign of the state's intention to punish communication is that statutory violations are not based on conduct that is "separately identifiable" from speech. *Cohen*, 403 U.S. at 18. Thus, in *Cohen*, the problem was not that the defendant wore a jacket to court (conduct), but that the jacket said "Fuck the Draft" on it (speech). So too here, the problem is not that Plaintiffs wish to hold mandatory trainings (conduct), but that they want to endorse some of the eight concepts at those trainings (speech). Comparing the IFA to some classic examples of laws incidentally burdening speech makes this point clear.

Take *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 51 (2006), which Defendants cite. In explaining why the Solomon Amendment—which required law schools to give military recruiters the same access as civil-sector recruiters—placed only an incidental burden on speech, the Court analogized to Title VII. The Court explained that, although a law banning employment discrimination "will require an employer to take down a sign reading 'White Applicants Only,' " that does not mean "that the law should be analyzed as one regulating the employer's speech rather than conduct." *Id.* at 62. So too, in *FAIR*, even though the Solomon Amendment required

19

law schools to send notifications to students about military recruiters as part of granting equal access to the military, the Solomon Amendment did not directly restrict—or, more accurately, compel—speech. *Id.* (concluding that "[c]ompelling a law school that sends scheduling e-mails for other recruiters to send one for a military recruiter is simply not the same as forcing a student to pledge allegiance").

But the IFA is different. Both Title VII and the Solomon Amendment can be understood without reference to speech; Title VII orders employers not to discriminate based on race and the Solomon Amendment orders law schools to grant military recruiters the same access as civilian recruiters. In other words, both Title VII and the Solomon Amendment regulate separately identifiable conduct. By contrast, what does the IFA do? As Defendants' counsel candidly conceded, the IFA's rule cannot be understood without reference to the underlying speech's content.[6] In short, the IFA is not "connected to any regulation of separately identifiable conduct." *Otto*, 981 F.3d at 865. Thus, it is fairly characterized as directly regulating speech.[7]

---

[6] To be sure, citing *Hill*, Defendants maintain that this means little. But as explained in footnote four, *Hill* is different because, while one had to look to speech to determine whether the law at issue applied, the law's application itself did not turn on either the viewpoint or content of that speech, as the IFA's application clearly does. *Hill*, 530 U.S. at 723.

[7] The act of holding a mandatory training also appears to be expressive conduct. Conduct implicates the First Amendment when (1) the acting party intended the conduct to convey a message and (2) "the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). The Plaintiff companies intend the trainings to send a message about their values. And people would understand as much. Plaintiff companies incur significant costs to hold these trainings, not just the cost of paying someone to conduct them but also the cost in lost productivity from every employee halting work and attending. Given the high financial cost of holding a mandatory training, it is very likely that

3

Assuming the IFA directly regulates speech, which it does, Defendants argue that it survives constitutional scrutiny. First, they argue that intermediate scrutiny applies under the captive audience doctrine. Second, even assuming strict scrutiny applies, Defendants argue that the IFA must pass such scrutiny because—if it does not—Title VII is unconstitutional too. Neither is true.

a

Start with Defendants' captive audience argument. There are good reasons to suspect that the doctrine does not apply to this situation. As Defendants concede, neither the Supreme Court nor the Eleventh Circuit has held that the captive audience doctrine applies in the employment context, let alone to *private* employers. And "[a]s a general matter," courts have "applied the captive audience doctrine only sparingly to protect unwilling listeners from protected speech." *Snyder v. Phelps*, 562 U.S. 443, 459 (2011); *see also Cohen*, 403 U.S. at 21 (explaining that, broadly interpreted, the captive audience doctrine "would effectively empower a majority to silence dissidents simply as a matter of personal predilections").

---

outsiders would interpret holding such trainings as sending a message about the company's priorities.

In pushing back against this conclusion, Defendants offered examples of trainings that are not expressive, such as a safety training mandated by OSHA, or a mandatory sexual harassment training recommended by outside lawyers. But those examples only strengthen Plaintiffs' case. In those examples, the employer has little choice but to hold the training. Here, Plaintiffs have chosen to require the trainings even though they do not need to. That choice is what renders Plaintiffs' conduct expressive.

Still, this Court need not determine whether the captive audience doctrine applies, even assuming it does, strict scrutiny still governs. The captive audience doctrine "permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech." *Frisby v. Schultz*, 487 U.S. 474, 487 (1988). But, of course, "the power to proscribe particular speech on the basis of a noncontent element"—here, inescapability—"does not entail the power to proscribe the same speech on the basis of the content element"—here, endorsing a regulated concept. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992) (contrasting *Frisby*, which upheld a ban on targeted residential picketing, with *Carey v. Brown*, 447 U.S. 455 (1980), which struck down a ban on targeted residential picketing that exempted labor picketing).

For example, Defendants cite *Lehman v. City of Shaker Heights*, which upheld a rule barring "political advertising" on public transit, in support of their argument that the captive audience doctrine authorizes the IFA's restrictions. 418 U.S. 298, 300–01 (1974). But *Lehman* surely would have come out differently had the city banned only political adverting criticizing incumbents. *See id.* at 304 (upholding the political ad restriction, in part, based on "lurking doubts about favoritism"). That, as explained above, is more like what we have here.

In short, the IFA does not target trainings because they are mandatory; the IFA targets trainings because of the speech delivered at them. Indeed, without violating

the IFA, an employer could fire an employee for refusing to attend a training *condemning* the covered topics. Because the IFA targets only those viewpoints with which the State disagrees, even assuming Florida could ban mandatory employee trainings in toto, the IFA still triggers strict scrutiny as a viewpoint-based restriction on speech. *See R.A.V.*, 505 U.S. at 385.

b

Defendants also argue that "[a]ny holding striking down the [IFA's] employment provisions would . . . directly threaten the validity of Title VII's protections against hostile working environments." ECF No. 49 at 27. That is simply not so.

Title VII does not regulate speech. Rather, it targets conduct—discriminating "with respect to . . . compensation, terms, conditions, or privileges of employment"—and only incidentally burdens speech. 42 U.S.C. § 2000e-2(a)(1); *see Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (calling Title VII "a permissible content-neutral regulation of conduct"); *see also R.A.V.*, 505 U.S. at 389; *FAIR*, 547 U.S. at 62; *Sorrell*, 564 U.S. at 567. That prohibition on conduct includes a bar on "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). In turn, to be sure, it can be mostly speech that creates this environment, but only when such speech is both objectively and subjectively offensive *and* when it is sufficiently severe or pervasive.

23

This "severity or pervasiveness" requirement—"that is, a requirement that the conduct objectively and subjectively creates a hostile environment or substantially interferes with an individual's work"—provides "shelter for core protected speech." *DeJohn v. Temple Univ.*, 537 F.3d 301, 317–18 (3d Cir. 2008).

The IFA is the inverse. It targets speech—endorsing any of eight concepts—and only incidentally burdens conduct. Even the slightest endorsement of any of the eight concepts at any required employment activity violates the statute; the IFA requires no evidence that the statement be even subjectively offensive. Nor does the IFA require that the statement create a severely or pervasively hostile work environment. Thus, the IFA, by design, "provides no shelter for core protected speech." *Id.*

In drawing this distinction, this Court need not identify the line at which an antidiscrimination law crosses from incidentally burdening speech to directly restricting speech; the IFA sits comfortably on the direct-restriction side of that line and Title VII sits comfortably on the incidental-burden side. Thus, whether the IFA passes constitutional scrutiny has no bearing on whether Title VII passes constitutional scrutiny.

c

Having dispatched Defendants' arguments, this Court now addresses whether the IFA—as a viewpoint-based regulation on speech—passes strict scrutiny.[8] Laws that discriminate based on content are antithetical to the First Amendment. Thus, under strict scrutiny, content-based laws like the IFA "are presumptively unconstitutional."[9] *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Such laws "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* "Cases where this standard is met are few and far between." *Otto*, 981 F.3d at 868 n.6. And the IFA is no unicorn.

Beginning with the State's compelling interest, Defendants argue that Florida has an interest in preventing employers from "foisting speech that the State finds repugnant on a 'captive audience' of employees." ECF No. 49 at 25. Not so. The First Amendment does not give the state license to censor speech because it finds it "repugnant," no matter how captive the audience. *See R.A.V.*, 505 U.S. at 392

---

[8] Plaintiffs argue that, as a viewpoint-based regulation, the IFA is per se unconstitutional. Defendants push back on that assertion. The Eleventh Circuit has noted that "there is an argument that such regulations are unconstitutional per se," but that "the Supreme Court has not explicitly adopted a per se rule." *Otto*, 981 F.3d at 864. Thus, rather than simply enjoining the IFA upon finding it viewpoint-based, this Court will apply strict scrutiny.

[9] Much like all toads are frogs but not all frogs are toads, all viewpoint-based laws are content-based, but not all content-based laws are viewpoint-based. *See Rosenberger*, 515 U.S. at 829 ("Viewpoint discrimination is . . . an egregious form of content discrimination.").

("[M]ajority preferences must be expressed in some fashion other than silencing speech on the basis of its content.").

And even assuming the IFA serves a compelling government interest—like prohibiting discrimination—it is not narrowly tailored. In large part, this is because the FCRA *already* prohibited much of what Defendants claim the IFA aims to prohibit. For example, a diversity and inclusion training could be so offensive, and so hostile to White employees, that it could create a hostile work environment. That is already illegal—as both parties acknowledge.

Defendants also place a great deal of weight on the first "concept"—that "[m]embers of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin." § 760.10(8)(a)(1), Fla. Stat. Who could object to banning that? Of course, the IFA bans much more: such as suggesting that white privilege exists (concept 3) or that people should consider another person's race or sex when interacting with them (concept 4).[10] In other words, even assuming some concepts are proscribable—which they are not—the IFA still prohibits the endorsement of many widely-accepted ideas.

In sum, the IFA sweeps up an enormous amount of protected speech to ban a sliver of offensive conduct that exists somewhere between the trainings Plaintiffs wish to hold and what the FCRA already bars. It is, to borrow a phrase from defense

---

[10] Assuming that is what concept 4 means. As explained below, it is not altogether clear.

counsel, self-evident. The IFA is not narrowly tailored. And so, the IFA violates the First Amendment.

*      *      *

Florida's Legislators may well find Plaintiffs' speech "repugnant." But under our constitutional scheme, the "remedy" for repugnant speech "is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927). Indeed, "it is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969). If Florida truly believes we live in a post-racial society, then let it make its case. But it cannot win the argument by muzzling its opponents. Because, without justification, the IFA attacks ideas, not conduct, Plaintiffs are substantially likely to succeed on the merits of this lawsuit.

C

Even if the IFA did not violate the First Amendment for the reasons set out above, Plaintiffs also argue that the IFA is impermissibly vague in violation of the Due Process Clause of the Fourteenth Amendment, and overbroad in violation of First Amendment. ECF No. 18 at 27–32. While this Court agrees that the IFA is impermissibly vague, it is not overbroad.

1

Vagueness, an outgrowth of the Due Process Clause, reflects the "fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). A law can be impermissibly vague for two distinct reasons. *Hill*, 530 U.S. at 732. "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)). And while vagueness descends from the Fifth and Fourteenth Amendments, a vague law nonetheless "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997).

When statutes are vague, " 'the hazard or loss or substantial impairment of those precious [First Amendment] rights may be critical,' since those covered by the statute are bound to limit their behavior to that which is unquestionably safe." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 609 (1967) (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 488 (1965)). Thus, while "[v]ague laws in any area suffer a constitutional infirmity," "[w]hen First Amendment rights are involved," this Court must "look even more closely lest, under the guise of regulating conduct that is

reachable by the police power, freedom of speech or of the press suffer." *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966).

This Court begins by construing the statute at issue, ever mindful of its duty to construe statues as constitutional when possible. *Boos v. Barry*, 485 U.S. 312, 330–31 (1988). The nature of this duty depends on whether a state or federal law is at issue. For federal laws, this Court has a "duty to avoid constitutional difficulties by [adopting a limiting construction] if such a construction is fairly possible." *Id.* at 331. For state laws, however, "federal courts are without power to adopt a narrowing construction . . . unless such a construction is reasonable and readily apparent." *Id.* at 330; *see also Gooding v. Wilson*, 405 U.S. 518, 520 (1972) (noting that "[o]nly [state] courts can supply the requisite construction" to save an otherwise vague and overbroad statute). Thus, this Court can only adopt a narrowing construction of the IFA—a state law—if such a construction is both reasonable and readily apparent.

With these considerations in mind, this Court turns to the text.[11] Plaintiffs first argue that the eight prohibited concepts themselves are riddled with undefined terms so vague that they cannot determine what speech is prohibited. ECF No. 18 at 29. For example, Plaintiffs do not know the meaning of "morally superior" in concept 1, "unconsciously" and "inherently" in concept 2, "necessarily" and "privileged" in concept 3, "without respect to" in concept 4, "responsibility" in concept 5,

---

[11] For reference, relevant portions of the IFA are quoted in Part I of this Order.

"psychological distress" in concept 7, and "created" and "oppress" in concept 8. *Id.* Given the nebulous sweep of these prohibited concepts and their application to any "required activity," Plaintiffs claim they will retain lawyers simply to ascertain what they can and cannot say under the IFA. *See* ECF No. 18-1 ¶¶ 17, 21, 24; ECF No. 18-2 ¶¶ 27–28; ECF No. 18-3 ¶ 35.

Defendants respond that the concepts are not vague because they use "plain, everyday language" with an "ordinary or natural meaning" as evidenced by dictionary definitions. ECF No. 49 at 32 (quoting *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 807 (11th Cir. 2020)). In furtherance of this argument, Defendants provide definitions for all the problematic terms Plaintiffs identified. *Id.* at 32–37.

Defendants are correct, the IFA is not rendered vague merely because it does not define its terms. *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning."). Nonetheless, the fact that the IFA uses real words found in an English dictionary does not magically extinguish vagueness concerns. *See Yates v. United States*, 574 U.S. 528, 537 (2015) ("Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words."). If that were true, the Due Process Clause would tolerate laws containing the most incomprehensible stream-of-consciousness word salads so long as they used actual words. *See generally* James Joyce, *Finnegans Wake* (1939). "Rather, '[t]he plainness

or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.' " *Yates*, 574 U.S. at 537 (alterations in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

Defendants may be right that some of the prohibited concepts are not vague. But some certainly are. For example, concept 1 is mired in obscurity. It is not clear what is prohibited beyond literally espousing that, for example, "White people are superior to Black people." Much of this confusion has to do with the meaning of "morally superior." Citing *Merriam-Webster's Dictionary*, Defendants claim this concept expresses "the idea that members of one race are better than members of a different race at conforming to right standards of behavior." ECF No. 49 at 33–34. This definition only further muddies the waters, however. *See Arave v. Creech*, 507 U.S. 463, 489 (1993) (Blackmun, J., dissenting) (" 'Vague terms do not suddenly become clear when they are defined by reference to other vague terms,' nor do sweeping categories become narrow by mere restatement." (quoting *Walton v. Arizona*, 497 U.S. 639, 693–94 n.16 (1990) (Blackmun, J., dissenting))). What is a "right" standard of behavior? One deemed right by the State? By an employer? By the "morally superior" race? Plaintiffs are left wondering, and these ambiguities thus deny "person[s] of ordinary intelligence a reasonable opportunity to know what is

prohibited, so that [they] may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

Further, imagine an employer, during a mandatory seminar on dispute resolution, cites the civil disobedience exemplified by Martin Luther King Jr. and Mahatma Gandhi as a peaceful, preferred approach. Has that employer "inculcated" employees with the belief that Black and Asian people are morally superior to White people? If an employer, during sexual harassment training, cites statistics that women are the most common victims of workplace sexual harassment and only provides examples of men sexually harassing women, have they "advanced" the belief that women are morally superior to men? Or, by training its employees on Holocaust awareness, does the beloved softshell jacket company Summit Ice "espouse" the view that Jewish people are morally superior to Gentiles? The IFA offers no guidance on these questions and many others, and the lack of explicit standards circumscribing concept 1 invites "arbitrary and discriminatory enforcement." *Id.*

Concept 4 is even worse, bordering on unintelligible. Under that provision, employers *cannot* endorse the view that "[m]embers of one race, color, sex, or national origin *cannot and should not* attempt to treat others *without* respect to race, color, sex, or national origin." § 760.10(8)(a)(4), Fla. Stat. (emphases added). Concept 4 thus features a rarely seen triple negative, resulting in a cacophony of

confusion. *See Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 437 n.2 (3d Cir. 2019) (striking down prohibition on political speech with "a tangle of double negatives that [was] vague enough to ensnare nearly any message" and lacked "a sufficiently definite standard . . . to exercise discretion"); *Albanese v. McGinnis*, 823 F. Supp. 521, 563 (N.D. Ill. 1993) ("Triple negatives are not conducive to comprehension."). It is unclear what is prohibited, and even less clear what is permitted.

Defendants' effort to clear things up is little more than a restatement: "this provision prohibits endorsing the idea that members of one particular race, sex, etc. *cannot or should not* attempt to treat others as individuals and without 'relation or reference to' the other individuals' listed characteristics." ECF No. 49 at 34–35. And canceling out two of the negatives—i.e., employers *cannot* endorse the view that members of one demographic *can and should* attempt to treat others *with* respect to the listed characteristics—does little good. Does this prohibit anything other than colorblindness? Does it ban topics such as affirmative action and diversity? Will sexual harassment trainings on how to treat the opposite sex be permitted? Can employers acknowledge their employees' differing cultural backgrounds? In sum, concept 4 is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926).

Regardless of whether some of the prohibited concepts are vague, however, Plaintiffs claim the entire statute is rendered vague by the qualifier that "discussion" of the prohibited concepts is permissible if "given in an objective manner without endorsement." ECF No. 18 at 30; ECF No. 51 at 11–12. Plaintiffs are at a loss on how to discuss concepts like white privilege, systemic racism, and white supremacy without simultaneously endorsing the notion that such prejudice should be overcome. ECF No. 18-1 ¶ 19; ECF No. 18-2 ¶ 27; ECF No. 18-3 ¶ 35. With no guidance on the line between "objective discussion" and "endorsement" or what those poles mean, Plaintiffs will self-censor their speech. ECF No. 18 at 30. Therefore, Plaintiffs claim that the IFA both fails to provide fair notice of what is prohibited and "is so imprecise that discriminatory enforcement is a real possibility." *Id.* (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991)).

Defendants respond, again, with dictionary definitions. Under their view, "[t]o discuss a concept 'in an objective manner' is, obviously, to discuss it by 'expressing or dealing with facts or conditions as perceived without distortion by personal feelings, prejudice or interpretation.' " ECF No. 49 at 36 (quoting *Objective*, Merriam-Webster.com, https://bit.ly/3zcLbB1 (last visited July 19, 2022)). On the other hand, Defendants claim, "to 'endorse' a concept is 'to give approval to' or 'support' it." *Id.* (quoting *Endorse*, *Webster's New World College Dictionary* 470 (4th ed. 2022)). Thus, Defendants conclude that the IFA quite clearly permits

"discussion of the concepts—as concepts that factually exist in the world—without *giving approval* to the concepts." *Id.* at 37.

Things are not as simple as Defendants portray, however. To start, few terms are as loaded and contested as "objective." And many would suggest that it is impossible to discuss a concept—or anything for that matter—"as perceived without distortion by personal feelings, prejudice, or interpretation."[12] This is especially true when discussing concepts rooted in historical phenomena, like systemic racism, critical race theory, white privilege, and male privilege. As Justice Stevens observed, "[i]t is hardly a novel insight that history is not an objective science . . . . The historian must choose which pieces to credit and which to discount, and then must

---

[12] *Compare* Immanuel Kant, *Critique of Practical Reason* 5:12 (Mary Gregor ed. & trans., Cambridge Univ. Press 1997) (1788) ("It is an outright contradiction to want to extract necessity from an empirical proposition (*ex pumice aquam*) and to give a judgment, along with necessity, true universality (without which there is no rational inference and so not even inference from analogy, which is at least a presumed universality and objective necessity and therefore presupposes it). To substitute subjective necessity, that is, custom, for objective necessity, which is to be found only in a priori judgments, is to deny to reason the ability to judge an object, that is, to cognize it and what belongs to it . . . ."), *with* Friedrich Nietzsche, *On the Genealogy of Morals* 119 (Walter Kaufmann & R.J. Hollingdale trans., Vintage Books 1989) (1887) ("[T]o *want* to see differently, is no small discipline and preparation of the intellect for its future 'objectivity'—the latter understood not as 'contemplation without interest' (which is a nonsensical absurdity), but as the ability *to control* one's Pro and Con and to dispose of them, so that one knows how to employ a *variety* of perspectives and affective interpretations in the service of knowledge. . . . There is *only* a perspective seeing, *only* a perspective 'knowing'; and the *more* affects we allow to speak about one thing, the *more* eyes, different eyes, we can use to observe one thing, the more complete will our 'concept' of this thing, our 'objectivity' be. But to eliminate the will altogether, to suspend each and every affect, supposing we were capable of this—what would that mean but to *castrate* the intellect?"), *and* Maurice Merleau-Ponty, *Phenomenology of Perception* 79–84 (Donald A. Landes trans., Routledge 2012) (1945) (rejecting absolutes in the external world and instead proposing that the body is in constant communication with objects, i.e., "being in and toward the world," through which we develop a personal, subjective milieu that reflects our experience and perception of the external world).

try to assemble them into a coherent whole." *McDonald v. City of Chicago*, 561 U.S. 742, 907 (2010) (Stevens, J., dissenting). And such objective discussion, if attainable, is even more difficult with respect to controversial matters like the eight prohibited concepts here, where many, including Defendants, question their legitimacy.

Not to worry, says the State. So long as you discuss the concepts "as concepts that factually exist in the world" without "*giving approval*" to them, you'll be fine. ECF No. 49 at 37. Is it permissible then to acknowledge, as a "factual" matter, that the theories and phenomena contained in some of these concepts have been widely accepted and substantiated for decades? Setting that aside, is there a difference between (1) acknowledging that concepts, like systemic racism or white privilege, exist as concepts, and (2) acknowledging that systemic racism and white privilege exist? Defendants certainly reject the latter, but apparently permit the former. Yet that presupposes that such a distinction is possible, practically speaking. Perhaps Defendants anticipate a sterile "Critical Race Theory 101" training from which employees understand that the theory exists—i.e., it is an actual, posited system of thought that some believe in—but do not believe that the theory is valid or correct. Time in the workplace is valuable, however, and if an employer takes time and resources to discuss these concepts, employees are prone to view them as legitimate.

Thus, as a practical matter, an employer's discussion of these concepts—no matter how "objective" it may be—will invariably lend credence to them.

Moreover, the context here cannot be overlooked. The State deems these concepts specters haunting Florida, and to simply acknowledge they exist likely constitutes endorsement. As detailed above, the IFA is *designed* to exorcise these viewpoints out of the marketplace of ideas—Governor DeSantis went so far as to call it the STOP WOKE Act at a press conference with children waving anti-critical race theory signs. It thus comes as no surprise that permissible discussion of these concepts turns on "objectivity"—an inherently vague term that fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108. Additionally, lacking explicit standards to circumscribe enforcement of "objectivity," Defendants can weaponize this term to further discredit the prohibited concepts. The IFA thus "impermissibly delegates basic policy matters to [Defendants] for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–09. Accordingly, as this "objectivity" standard commands the entire statute, the IFA is impermissibly vague in violation of the Due Process Clause of the Fourteenth Amendment.[13]

---

[13] This Court need not confront severability because the unconstitutionally vague "objectivity" requirement, which governs the entire challenged provision, renders the statute as a whole unconstitutionally vague. Thus, even if the IFA's amendments to the FCRA were not an

2

Next, this Court considers Plaintiffs' overbreadth claim. While laws that fail to clearly define their prohibitions are void for vagueness, "[a] clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned*, 408 U.S. at 114. Overbroad laws violate the First Amendment because they punish "a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.' " *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

Here, Plaintiffs argue that the IFA improperly chills a substantial amount of protected free speech in relation to its "plainly legitimate sweep." ECF No. 18 at 34–35. Indeed, Plaintiffs contend that the IFA has "zero 'plainly legitimate sweep,' " *id.*, and this Court agrees. As articulated above, the IFA unconstitutionally discriminates on the basis of viewpoint in violation of the First Amendment and is impermissibly vague in violation of the Fourteenth Amendment. Thus, under either ground, the IFA has no legitimate sweep. And the very concept of overbreadth presupposes that there is *some* legitimate sweep. So, because the IFA has no legitimate sweep, the overbreadth doctrine does not apply.

---

unconstitutional viewpoint-based restriction on speech and some of the prohibited concepts were not vague, the entire provision would still be unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.

IV

Recall that the remaining preliminary injunction factors are (1) that Plaintiffs will suffer irreparable injury absent an injunction, (2) that the harm not granting an injunction causes to Plaintiffs outweighs the harm an injunction would cause Defendants, and (3) that the injunction would not be adverse to the public interest. *Siegel*, 234 F.3d at 1176. Here, the remaining preliminary injunction factors are thoroughly intertwined with considerations already discussed regarding the merits of Plaintiffs' claims. On balance, these factors weigh in favor of granting Plaintiffs' motion for preliminary injunction.

First, absent an injunction, Plaintiffs will suffer irreparable injury because an ongoing First Amendment violation—which the IFA inflicts—constitutes irreparable injury. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022). Second, weighing Plaintiffs' First Amendment injury against Defendants' interest, the scale tips decisively in Plaintiffs' favor. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). That is because the state "has no legitimate interest in enforcing an unconstitutional ordinance." *Id.* Third, and finally, this Court is persuaded that an injunction would not be adverse to the public interest. After all, as noted above, "[t]he public has no interest in enforcing an unconstitutional ordinance." *Id.* at 1272–73. And, as the Supreme Court has recognized, "[t]he First Amendment, in particular, serves significant societal

interests." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978). Plus, the portions of the FCRA that the IFA did not amend remain in effect to protect Floridians from workplace discrimination.

In sum, because Plaintiffs have carried their burden as to all four of the preliminary injunction factors, this Court finds that they are entitled to a preliminary injunction.

V

This Court next considers whether Plaintiffs must secure a bond in furtherance of the preliminary injunction. Rule 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). But "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.' " *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, 425 F. 3d 964, 971 (11th Cir. 2005) (alteration in original) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)). Moreover, "[w]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Curling v. Raffensperger*, 491 F. Supp. 3d 1289, 1326 n.25 (N.D. Ga. 2020) (quoting *Complete Angler, LLC*

40

*v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009)). Here, considering that the IFA's unlawful impact on Plaintiffs' First Amendment rights weighs against requiring a bond, this Court waives the bond requirement.

VI

Finally, having determined a preliminary injunction is warranted, this Court addresses whether it will stay that injunction pending appeal. Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venues Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (applying the same test). Considering that this test is so similar to that applied when considering a preliminary injunction, courts rarely stay a preliminary injunction pending appeal. That rings true here. Because no exceptional circumstances justify staying this Order pending appeal, *see Brenner*, 999 F. Supp. 2d at 1292 (issuing a rare stay of a preliminary injunction given the public interest in stable marriage laws across the country), this Court refuses to do so. Defendants have every right to appeal, and this Court sees no reason to delay Defendants in seeking an appeal by requiring them to move to stay under Rule 62.

VII

In the end, Defendants suggest that there is nothing to see here. They say the IFA does nothing more than ban race discrimination in employment. But to compare the diversity trainings Plaintiffs wish to hold to true hostile work environments rings hollow. Worse still, "it trivializes the freedom protected" by Title VII and the FCRA "to suggest that" the two are the same. *FAIR*, 547 U.S. at 62.

Just imagine two scenarios. In the first scenario, a Black employee complains about a mandatory safety training scheduled on Juneteenth. Then, at a mandatory training the day before Juneteenth, "to the surprise of the employees in attendance, a white woman in a black gorilla suit enter[s] the meeting." *Henry v. CorpCar Servs. Hous., Ltd.*, 625 F. App'x 607, 608 (5th Cir. 2015). As one of the managers blocks the only exit, the woman does "Tarzan yells and repeatedly refer[s] in a suggestive manner to 'big black lips,' 'big black butt,' and bananas." *Id.* As the woman dances suggestively on one of the Black employees who had complained, another manager leans in and says: "Here's your Juneteenth." *Id.* In the second scenario, a company directs a White employee to attend a mandatory training in which employees watch "a video about violence committed against Black people in the United States over the centuries." ECF No. 18-3 at 4. After the video, the presenter defines "Black rage"—"resistance towards oppressive people, practices, structures, and systems"— and "White Humility"—"a reflective practice that helps white people develop [the]

capacity to interrupt white supremacy"—and asks Black and White participants to discuss them. *Id.* at 4, 12, 14.

These two scenarios, under Defendants' theory, are indistinguishable. Indeed, Defendants say, to hold that the state may not ban the latter scenario is to hold that it may not ban the former. ECF No. 49 at 27 (arguing that a ruling for Plaintiffs would doom "a vast range of routine employment discrimination claims"). "If the law supposes that, the law is an ass, an idiot." Charles Dickens, *Oliver Twist* 463 (3d ed. The New American Library 1961). But the law is neither an ass nor an idiot. It can tell the difference.

Telling your employees that concepts such as "normal" or "professional" are imbued with historically based racial biases is not—and it pains this Court to have to say this—the same as trapping Black employees in a room while a woman in a gorilla suit puts on a retaliatory, racially inflammatory performance the day before a holiday celebrating the end of slavery. Rather, it is speech protected by the First Amendment. Because the IFA impermissibly burdens such speech,

**IT IS ORDERED**:

1. Plaintiffs' motion for a preliminary injunction, ECF No. 18, is **GRANTED in part**.

2. Defendants Moody, McGhee, Primiano, Garza, Farmer, Pichard, Hart, Cepero, Myrtetus, Hanson, Moye, and Payne must take no steps to enforce

§ 760.10(8), Fla. Stat. until otherwise ordered. The preliminary injunction binds the above-listed Defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

3. The motion, ECF No. 18, is otherwise **DENIED in part** as to Defendant DeSantis.

**SO ORDERED on August 18, 2022.**

<u>**s/Mark E. Walker**</u>
**Chief United States District Judge**
